**FILED**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

J N  NOV X 1 2007
Nov. 1, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

Plaintiff

v.

MOUNT SINAI MEDICAL CENTER

Defendant.

07CV6183
JUDGE ZAGEL
MAG. JUDGE KEYS

Ancillary to an action pending in the United
States District Court for the Southern
District of Florida – No. 02-22715

JH

## MOTION OF SUBPOENA RESPONDENT DAVID C. LEACH, MD TO STAY SUBPOENA FOR DEPOSITION, OR ALTERNATIVELY, TO QUASH SUBPOENA

Subpoena Respondent David C. Leach, MD moves this Court to stay a subpoena commanding his appearance at a deposition on November 13, 2007, pending the resolution of his motion for a protective order filed contemporaneously in the United States District Court for the Southern District of Florida in the matter to which the subpoena is ancillary. In the alternative, Dr. Leach moves this Court to quash the subpoena pursuant to Fed. R. Civ. P. 45(c)(3). In support of this motion, Dr. Leach states as follows:

1.      David Leach, MD is a respondent to a subpoena issued by this Court, but ancillary to an action pending in the United States District Court for the Southern District of Florida ("Florida case"). The subpoena commands Dr. Leach to appear for deposition on November 13, 2007 in Chicago, Illinois. A copy of the subpoena is attached hereto as Exhibit A.

2.      Plaintiff served Dr. Leach with the subpoena on October 19, 2007.

3.      Contemporaneously with the filing of this motion, Dr. Leach is filing a motion for a protective order pursuant to Fed. R. Civ. P. 26(c) with the United States District Court for the Southern District of Florida asking that the court prohibit plaintiff United States from enforcing

the subpoena and ordering that his deposition not be had. A copy of the motion for protective order and its accompanying memorandum are attached hereto as Exhibits B and C.

4.     Dr. Leach moves to stay the subpoena pending resolution of the motion for protective order by the United States District Court for the Southern District of Florida. The United States, which is the plaintiff in the underlying action in Florida, and which issued the subpoena from this Court, does not object to the motion for a stay, although it opposes the motion to quash and the motion for a protective order.

5.     In the alternative, if this Court will not stay the subpoena pending resolution of the motion for a protective order, Dr. Leach moves this Court to quash the subpoena pursuant to Fed. R. Civ. P. 45(c)(3). A memorandum in support of the alternative motion to stay is filed with this motion and incorporated herein.

6.     Fed. R. Civ. P. 45(c)(3)(A) authorizes a subpoena issuing court to quash or modify its subpoena. Fed. R. Civ. P. 26(c) allows either the court in which the underlying action is pending, or the court where a deposition subpoena was issued, to issue a protective order.

7.     In the Seventh Circuit, transfer to another District Court of a Rule 45(c) motion to quash or compel is not appropriate. *See, In re Orthopedic Bone Screw Products Liability Litigation*, 79 F.3d 46, 48 (7th Cir. 1996). However, it is appropriate in the Seventh Circuit for a District Court to stay a subpoena to allow the court in which the litigation is pending to rule on a Rule 26(c) motion for a protective order, and to defer to that ruling. *See, In re Orthopedic Bone Screw Products Liability Litigation*, at p. 48; *Griffith v. United States*, 2007 U.S. Dist. LEXIS 47869 (N.D. Ill. 2007), citing *Kearney v. Jandernoa*, 172 F.R.D. 381, 383 (N.D. Ill. 1997); *see, generally, In re Sealed Case*, 141 F. 3d 337, 340-42 (D.C. Cir. 1998).

8.     Here, the underlying action is brought in Florida by the federal government

2

against a Florida hospital to recover refunds made by the Internal Revenue Service for FICA taxes paid and withheld by the hospital for payments made to resident physicians.

9.     There are at least seven other lawsuits between plaintiff United States and various hospitals currently pending in federal District Courts around the country involving the same overall issue.

10.    On April 20, 2007, Dr. Leach was deposed in one of the other seven FICA/resident physician cases, per subpoena by the hospital that is a party in that action ("Ohio case"). The transcript of the deposition is attached hereto as Exhibit D.

11.    It is expected that a deposition of Dr. Leach by plaintiff United States in the Florida case would cover the same subject matter as the deposition already taken in the Ohio case.

12.    The deposition would be unduly burdensome to Dr. Leach, as it would be duplicative of his earlier deposition taken in a similar action, and during which the plaintiff in this action questioned him extensively.

13.    Dr. Leach should not be subject to being subpoenaed for duplicative depositions, whether or not he testifies at a particular trial.

WHEREFORE, Subpoena Respondent David C. Leach, MD respectfully requests that this Court enter an Order staying the subpoena pending the resolution of his motion for a protective order filed contemporaneously with the trial court in the underlying action, the United States District Court for the Southern District of Florida.  Alternatively, Dr. Leach respectfully requests that this Court enter an order quashing the subpoena pursuant to Fed. R. Civ. P. 45(c)(3).

Dated:  November 1, 2007

Respectfully submitted,

Douglas R. Carlson (0391948)
Nancy F. Afrasiabi (06285608)
WILDMAN, HARROLD, ALLEN & DIXON, LLP
225 W. Wacker Drive
Chicago, Illinois  60606
(312) 201-2000

Attorneys for Subpoena Respondent David C.
Leach, MD

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 1, 2997, a true and correct copy of the foregoing **Motion of Subpoena Respondent David C. Leach, M.D. to Stay Subpoena for Deposition, or Alternatively, to Quash Subpoena and Memorandum in Support of Alternative Motion of Subpoena Respondent David C. Leach, M.D. to Quash Subpoena,** was electronically filed with the Clerk of the court for the Northern District of Illinois. Notice of this filing will be sent to the following parties via electronic mail:

Brian R. Harris
brian.r.harris@usdoj.gov

Deborah M. Morris
deborah.m.morris@usdoj.gov

Grisel Alonso
grisel.alonso@usdoj.gov

John M. Bilheimer
john.m.bilheimer@usdoj.gov

Bruce Judson Berman
bberman@mwe.com

Christopher Kliefoth
ckliefoth@mwe.com

Dianne Olivia Fischer
dfischer@kpkb.com

James E. Smith
jsmith@mwe.com

Karla L. Palmer
kpalmer@mwe.com

Mark H. Churchill
mchurchill@mwe.com

AO88 (Rev. 12/06) Subpoena in a Civil Case

### Issued by the
# UNITED STATES DISTRICT COURT

**NORTHERN**                  DISTRICT OF                  **ILLINOIS**

| UNITED STATES OF AMERICA | **SUBPOENA IN A CIVIL CASE** |
|---|---|
| V. | |
| MOUNT SINAI MEDICAL CENTER | Case Number:[1] **02-22715 (S. D. Florida)** |

TO:  David Leach
c/o Doug Carlson
Chicago, Illinois

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Wildman, Harrold, Allen & Dixon 225 West Wacker Dr., Chicago, Illinois | DATE AND TIME 11/13/2007 9:30 am |
|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

 Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *John M. Bilheimer*  Atty. for Plaintiff | 10/19/2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
John M. Bilheimer, P.O. Box 14198, Ben Franklin Sta. Washington, DC 20044 (202) 514-6070



(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

*Exhibit "A"*



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

UNITED STATES OF AMERICA

        Plaintiff

     v.

MOUNT SINAI MEDICAL CENTER

        Defendant.

CIVIL ACTION

No. 02-22715

## MOTION OF SUBPOENA RESPONDENT DAVID C. LEACH, MD FOR PROTECTIVE ORDER

      Subpoena Respondent David C. Leach, MD moves this Court for a protective order, pursuant to Fed. R. Civ. P. 26(c), prohibiting plaintiff United States from enforcing a subpoena commanding his appearance for deposition on November 13, 2007. In support of this motion, Dr. Leach states as follows:

      1.     David C. Leach, MD is a non-party to this action. He is a respondent to a subpoena issued by the United States District Court for the Northern District of Illinois. The subpoena commands Dr. Leach to appear for deposition on November 13, 2007. A copy of the subpoena is attached hereto as Exhibit A.

      2.     Plaintiff served Dr. Leach with the subpoena on October 19, 2007.

      3.     Contemporaneously with the filing of this motion, Dr. Leach is filing a motion in the United States District Court for the Northern District of Illinois to stay the subpoena pending this Court's resolution of this motion for a protective order, or in the alternative, to quash the subpoena pursuant to Fed. R. Civ. P. 45(c)(3). A copy of the motion to stay or quash (without exhibits) and its accompanying memorandum are attached hereto as Exhibits B and C.

Exhibit "B"

4. The United States, which issued the subpoena from the Northern District of Illinois, does not object to the motion for a stay, although it opposes the motion to quash and the motion for a protective order.

5. Dr. Leach seeks a protective order from this Court pursuant to Fed. R. Civ. R. 26(c) prohibiting the enforcement of the subpoena. A District Court may stay a proceeding and allow filing of a motion for a protective order in the district in which litigation is pending and defer to the ruling of that court. *Clausnitzer v. Federal Express Corp.*, 2007 U.S. Dist. LEXIS 61699 (N.D. Ga. 2007).

6. The underlying action is brought by the federal government against a Florida hospital to recover funds made by the Internal Revenue Service for FICA taxes paid and withheld by the hospital for payments made to resident physicians, and it is currently pending before this Court ("Florida case").

7. There are at least seven other lawsuits between plaintiff United States and various hospitals currently pending in federal District Courts around the country involving the same overall issue.

8. On April 20, 2007, Dr. Leach was deposed in one of the other seven FICA/resident physician cases, per subpoena by the hospital that is a party in that action ("Ohio case"). A transcript of the deposition is attached hereto as Exhibit D.

9. It is expected that a deposition of Dr. Leach by plaintiff United States in the Florida case would cover the same subject matter as the deposition already taken in the Ohio case.

10. The deposition would be unduly burdensome to Dr. Leach, as it would be duplicative of his earlier deposition taken in a similar action, and during which the

plaintiff in this action questioned him extensively.

11.    Dr. Leach should not be subjected to being subpoenaed for duplicative depositions, whether or not he testifies at a particular trial.

12.    A copy of a memorandum in support of this Motion is attached hereto and incorporated herein.

WHEREFORE, Subpoena Respondent, David C. Leach, respectfully requests that this Court enter a protective order prohibiting plaintiff United States from enforcing a subpoena commanding his appearance for deposition on November 13, 2007, ordering that this deposition not occur, and ordering such other relief as this Court deems equitable and just.

Dated: November 1, 2007            Respectfully submitted,

Douglas R. Carlson (0391948 - Illinois)
Nancy F. Afrasiabi (06285608 – Illinois)
WILDMAN, HARROLD, ALLEN & DIXON, LLP
225 W. Wacker Drive
Chicago, Illinois  60606
(312) 201-2000

Attorneys for Subpoena Respondent David C. Leach, MD

**CERTIFICATE OF SERVICE**

The undersigned certifies that on November 2, 2997, a true and correct copy of the **foregoing Motion of Subpoena Respondent David C. Leach, M.D. for Protective Order and Memorandum in Support of Motion of Subpoena Respondent David C. Leach, MD for Protective Order**, was filed with the Clerk of the Court for the Southern District of Florida – Miami Division. Notice of this filing will be sent to the following parties via electronic mail:

Brian R. Harris
brian.r.harris@usdoj.gov

Deborah M. Morris
deborah.m.morris@usdoj.gov

Grisel Alonso
grisel.alonso@usdoj.gov

John M. Bilheimer
john.m.bilheimer@usdoj.gov

Bruce Judson Berman
bberman@mwe.com

Christopher Kliefoth
ckliefoth@mwe.com

Dianne Olivia Fischer
dfischer@kpkb.com

James E. Smith
jsmith@mwe.com

Karla L. Palmer
kpalmer@mwe.com

Mark H. Churchill
mchurchill@mwe.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

UNITED STATES OF AMERICA

Plaintiff

v.

MOUNT SINAI MEDICAL CENTER

Defendant.

CIVIL ACTION

No. 02-22715

### MEMORANDUM IN SUPPORT OF MOTION
### OF SUBPOENA RESPONDENT DAVID C. LEACH, MD FOR PROTECTIVE ORDER

Subpoena Respondent David C. Leach, MD submits this memorandum in support of his

motion for a protective order prohibiting plaintiff United States from taking his deposition per

subpoena on November 13, 2007 in Chicago, Illinois.

### BACKGROUND

Dr. Leach was served with a subpoena from the United States District Court for the

Northern District of Illinois on October 19, 2007,[1] which subpoena is attached to the motion for a

protective order as Exhibit A.  The deposition would be unduly burdensome to Dr. Leach, as it

would be duplicative of his earlier deposition taken in a similar action, and during which the

plaintiff in this action questioned him extensively.  This Court should order that the plaintiff not

take the deposition of Dr. Leach per Fed. R. Civ. P. 26(c).[2]

---

[1] The subpoena was served on counsel for Dr. Leach, per agreement with counsel for plaintiff.
On October 30, 2007, per Fed. R. Civ. P. 26(c), counsel for subpoena respondent and for plaintiff
United States conferred in good faith by telephone in an attempt to resolve this discovery
dispute, and the dispute has not been resolved.

[2] Fed. R. Civ. P. 26(c) states, in part,



Exhibit "C"

Concurrently with the filing of this motion, Dr. Leach is filing a motion in the United States District Court for the Northern District of Illinois to stay the subpoena pending this Court's resolution of this motion for a protective order, or in the alternative, to quash the subpoena pursuant to Federal Rule of Civil Procedure 45(c)(3). A copy of the motion to stay (without exhibits) and memorandum in support are attached to the motion for a protective order as Exhibits B and C. The United States does not object to the motion for a stay in the Northern District of Illinois, although it opposes the motion to quash and this motion for a protective order.

This action is brought by the federal government against a Florida hospital to recover refunds made by the Internal Revenue Service for FICA taxes paid and withheld by the hospital for payments made to resident physicians. There are at least seven other lawsuits[3] between plaintiff United States and various hospitals currently pending in federal District Courts around the country involving the same overall issue.

---

Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(1) that the disclosure or discovery not be had;...

[3] *United States v. University Hospital, Inc.,* No. 1:05-CV-445 (S.D. Ohio)(currently pending); *Center for Family Medicine v. United States,* No. 4:05-4049 (D.S.D) (currently pending); *United States v. Partners Healthcare System, Inc.,* No. 1:05-cv-11576 (D. Mass.) (currently pending); *University of Chicago Hospitals v. United States,* No. 05-C5120 (N.D. Ill.) (government's motion for summary judgment denied; matter on appeal); *Albany Medical Center v. United States,* No. 04-CV-1399 (W.D.N.Y.) (government's motion for summary judgment granted; matter on appeal); *United States v. Memorial Sloan-Kettering Cancer Center,* No. 1:06-cv-00026 (S.D.N.Y.) (government's motion for summary judgment granted; matter on appeal); *United States v. Detroit Medical Center,* No. 2:05-cv-71722 (E.D. Mich.) (government's motion for summary judgment granted; matter on appeal).

The subpoena respondent is the Executive Director of the Accreditation Council for Graduate Medical Education (ACGME), which accredits the 8,000 plus programs in graduate medical education (residency programs) in the United States, and which is located in Chicago, Illinois. Dr. Leach was approached by counsel for the hospital in this action for deposition or trial testimony. He agreed to appear live at trial in Miami, and the hospital notified the government that Dr. Leach has agreed to appear at the trial of the Florida action. In response to the notification, the plaintiff subpoenaed Dr. Leach for his deposition. Dr. Leach has not agreed to be a paid expert witness for the hospital; he expects to be reimbursed by the hospital only for reasonable travel, accommodation and meals relating to his appearance at trial.

On April 20, 2007, Dr. Leach was deposed in one of the other seven FICA/resident physician cases,[4] per subpoena by the hospital that is a party in that action.[5] The deposition consumed a morning and an afternoon. The transcript is 301 pages without exhibits, including hospital questioning (pp. 7-106; 288-295) and federal government questioning (pp. 106-288; 295-301). The vast bulk of the questioning of Dr. Leach was about the status of resident physicians as students.[6] His testimony addressed residency programs generally, as opposed to

---

[4] *United States v. University Hospital, Inc.*, No. 1:05-CV-445, United States District Court for the Southern District of Ohio. For a description of this case, *see*, *United States v. University Hospital, Inc.*, 2006 WL 212981 (S.D. Ohio 2006).

[5] Dr. Leach had previously been subpoenaed for deposition in the *Albany Medical Center* case (see footnote 3), but the deposition did not go forward, as the government was granted summary judgment the day before the deposition was to proceed.

[6] For example,

> Q (by counsel for the United States). Did I hear you correctly to say that, as far as you are concerned, your opinion is that there is no component to the GME other than education? There is nothing else?
> A. Correct.
> Q. Okay.
> A. It includes direct contact with patients. It includes didactic experiences.

3

the residency programs of the hospital in the Ohio lawsuit. He testified that the ACGME had no opinion as to whether residency program payment to resident physicians should or should not be subject to FICA tax.[7]

It is expected that a deposition of Dr. Leach by plaintiff United States in the Florida case would cover the same subject matter as the deposition already taken in the Ohio case.

**ARGUMENT**

### I.   A SECOND AND DUPLICATIVE DEPOSITION WOULD BE UNDULY BURDENSOME TO DR. LEACH

Dr. Leach is a third party witness in this FICA/resident physician case who has already been deposed by the United States in the Ohio FICA/resident physician case. A second and duplicative deposition would constitute an "undue burden" on him.

The deposition of Dr. Leach in the Ohio case was exhaustive. The hospital examined Dr. Leach on direct and redirect (Exhibit D, T. 7-106; 288-295), and the government examined him on cross and recross (Exhibit D, T. 106-188; 295-301). As a non-resident of Ohio, Dr. Leach cannot be subpoenaed by either party to appear at trial in Ohio. As neither party knew at the deposition whether Dr. Leach would appear live at trial,[8] he was questioned to cover both contingencies, i.e., appearance at trial or not. In the Florida action, the plaintiff has been informed that Dr. Leach will appear live at trial. The Ohio deposition should serve at trial in Florida in every way that the Ohio deposition should serve at trial in Ohio.

---

But it is a consuming experience to achieve the skills necessary to practice independently.
Exhibit D, T. 179-180.

[7] *See*, Exhibit D, T. 167-169.

[8] *See*, Exhibit D, T. 111-112.

4

There do not appear to be any substantive areas of questioning Dr. Leach that are different as between the Ohio and Florida actions, and it would be unduly burdensome to Dr. Leach to subject him to questioning twice in the same subject matter areas. If there are any subject matter areas of questioning Dr. Leach that are different as between the Ohio and Florida actions, it would be incumbent on plaintiff United States to narrow the subpoena to make clear that there will be no questioning in the same subject matter areas as the Ohio deposition, and thereby avoid imposing on Dr. Leach the undue burden of a duplicative deposition. This would be consistent with Fed. R. Civ. P. 45(c)(1), which states in part, "A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena."

This would also be consistent with the requirements under the Federal Rules of Civil Procedure for taking the deposition of the same person twice in the same case. To take a deposition of a person who has already been deposed in the same case, Fed. R. Civ. P. 30(a)(2) provides that a party to a lawsuit must obtain leave of court "which shall be granted to the extent consistent with Rule 26(b)(2)." Fed. R. Civ. P. 26(b)(2)(C) provides that a court shall limit discovery if it determines that, among other reasons, "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some source that is more convenient, less burdensome, or less expensive" or "the burden or expense of the proposed discovery outweighs its likely benefit..."[9]

---

[9] In actions in which a second deposition of the same witness was requested, courts that have allowed the second deposition have limited the subject matter to those areas not covered in the first deposition. *See Tramm v. Porter Memorial Hospital*, 1989 U.S. Dist. LEXIS 16794 at **5 (N.D. Ind. 1989) ("There is no logical reason why the defendants' new attorney should duplicate the same material covered in the first deposition. Therefore, the second deposition must be limited to those areas not covered in the first deposition."); *see also Perry v. Kelly-Springfield Tire Co., Inc.*, 117 F.R.D. 425, 426 (N.D. Ind. 1987); *Christy v. Pennsylvania Turnpike*



The discovery sought in the Florida action, the deposition of Dr. Leach, "is obtainable from some source that is more convenient, less burdensome, or less expensive," i.e., it is obtainable in the transcript of the Ohio deposition. In addition, "the burden or expense of the proposed discovery outweighs its likely benefit." A second deposition would be burdensome to Dr. Leach with no benefit to plaintiff United States.

## II.   IT WOULD BE UNDULY BURDENSOME TO OPEN THE DOOR TO DEPOSITIONS OF DR. LEACH IN AS MANY AS SIX OTHER PENDING CASES

As stated above, the Ohio and Florida actions are two of eight lawsuits pending around the country between plaintiff United States and hospitals over the same issue.[10]   One party or another may or may not want Dr. Leach to testify at trial in one or more of the other six lawsuits.[11]   Dr. Leach may or may not wish to agree to testify at trial in one or more of these additional lawsuits.  The parties may or may not want to depose Dr. Leach in one or more of these lawsuits.

---

Commission, 160 F.R.D. 51, 53 (E.D. Pa. 1995); Collins v. International Dairy Queen, 189 F.R.D. 496 (M.D. Ga. 1999).

[10] Each case is unique as to the identity and nature of the defendant institutions and their residency programs, as well as the tax years at issue. In his Ohio deposition, Dr. Leach testified relating to resident physicians and residency programs generally, rather than to particular residency programs (see, for example, Exhibit D, T. 136-137; 204-205; 277), with almost no substantive mention of the plaintiff University Hospital.  See, Exhibit D, T. 42; 136-137 (government question not referring to University Hospital); 141; 152; 181-182 (Dr. Leach has not been to University Hospital); 204-205 (government question general - not referring to University Hospital in particular); 277 (government question general - not referring to University Hospital in particular).  As to time frame, he testified to the history of GME from colonial America through the present (Exhibit D, T. 20-32), to GME generally from 1997 through 2004 (Exhibit D, T. 32; 74; 92), and to many GME related occurrences through 2006 (throughout the deposition).

[11] An alternative to live trial testimony in cases other than the Florida and Ohio cases might be offering the Ohio deposition under Federal Rule of Evidence 804(b)(1).

To allow plaintiff to take Dr. Leach's deposition in the Florida action, when plaintiff has already deposed him at length in another FICA/resident physician lawsuit, would open the door to deposing Dr. Leach as many as six more times, all covering the same ground. To place this kind of undue burden on a non-party witness would be unduly burdensome to the witness, without benefit to plaintiff.

Dr. Leach should not be subject to being subpoenaed for duplicative depositions, whether or not he testifies at a particular trial. In addition, he should not have to weigh in the burden of a duplicative deposition as he decides whether or not to testify at a particular trial.

## CONCLUSION

The status of resident physicians as students appears to be relevant to the construction of FICA. Given his background, Dr. Leach has information relating to this status. He has not agreed to be a paid expert witness. He gave his subpoena deposition testimony without pay in the Ohio action so as not to give the impression of bias for financial reasons.[12] He would like to do the same at trial in the Florida action. He should not have to be subjected to a deposition in the Florida action covering the same subject matter areas as covered by the Florida plaintiff in the Ohio deposition.

The motion for protective order should be granted.

Dated:  November 1, 2007                 Respectfully submitted,

                                         Douglas R. Carlson (0391948 - Illinois)
                                         Nancy F. Afrasiabi (06285608 – Illinois)
                                         WILDMAN, HARROLD, ALLEN & DIXON, LLP
                                         225 W. Wacker Drive
                                         Chicago, Illinois  60606
                                         (312) 201-2000
                                         Attorneys for Subpoena Respondent David C. Leach, MD

---

[12] *See*, Exhibit D, T. 105-106.

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF OHIO
 3              WESTERN DIVISION
 4  UNITED STATES OF AMERICA,    )
 5       Plaintiff,       )
 6    vs.                  )  No. 1:05-CV-445
 7  UNIVERSITY HOSPITAL, INC.    )
 8       Defendant.        )
 9          The deposition of DAVID C. LEACH, M.D.,
10  called for examination, taken pursuant to the
11  Federal Rules of Civil Procedure of the United
12  States District Courts pertaining to the taking of
13  depositions, taken before JENNIFER L. BERNIER, CSR
14  No. 84-4190, a Notary Public within and for the
15  County of Cook, State of Illinois, and a Certified
16  Shorthand Reporter of said state, at Suite 4400,
17  One North Wacker Drive, Chicago, Illinois, on the
18  20th day of April, A.D. 2007, at 10:09 a.m.
19
20
21
22
23
24
```

## Page 2

```
 1  PRESENT:
 2       U.S. DEPARTMENT OF JUSTICE,
 3       (PO Box 55,
 4       Washington, DC 20044,
 5       202-307-6553), by:
 6       MR. STEPHEN T. LYONS,
 7       stephen.t.lyons@usdoj.gov,
 8       MS. ELIZABETH LAN DAVIS,
 9       elizabeth.lan@usdoj.gov,
10       MS. WENDY J. KISCH,
11       wendy.j.kisch@usdoj.gov,
12          appeared on behalf of the Plaintiff;
13       BAKER & HOSTETLER, LLP,
14       (312 Walnut Street, Suite 3200,
15       Cincinnati, Ohio 45202-4074,
16       513-929-3416), by:
17       MR. TED T. MARTIN,
18       tmartin@bakerlaw.com,
19          appeared on behalf of the Defendant.
20
21
22
23
24
```

## Page 3

```
 1  PRESENT (CONT'D):
 2       WILDMAN, HARROLD, ALLEN & DIXON, LLP,
 3       (225 West Wacker Drive, Suite 3000,
 4       Chicago, Illinois 60606,
 5       312-201-2643), by:
 6       MR. DOUG R. CARLSON,
 7       carlson@wildmanharrold.com,
 8          appeared on behalf of the Deponent.
 9
10  ALSO PRESENT:
11       MR. THOMAS C. GENTILE, JR., MSA.
12
13
14
15  REPORTED BY:  JENNIFER L. BERNIER, C.S.R.,
16          CERTIFICATE NO. 84-4190
17
18
19
20
21
22
23
24
```

## Page 4

```
 1          (WHEREUPON, the witness was duly
 2           sworn.)
 3      MR. LYONS:  Mr. Martin, just before we get
 4  started here, I have a suggestion.  And that would
 5  be that we reserve all of our objections, except any
 6  privileges, until the time of the trial.
 7          It will make things go a lot quicker.
 8  That's for sure.
 9      MR. MARTIN:  No.  I think that, if you have
10  objections, then I wish you would state them other
11  than pursuant to the rules.
12      MR. LYONS:  Yeah.  And the reason I bring it
13  up is, because of the nature of the opinion
14  testimony problems that we're going to have in this
15  case, I'm probably going to have to object to every
16  question.
17      MR. MARTIN:  Well, then we can talk about that
18  as they come up.  And maybe we can have a continuing
19  objection.
20      MR. LYONS:  I don't do continuing objections.
21          Okay.  Okay.  We'll do it that way then.
22  That's fine.
23      MR. MARTIN:  Mr. Lyons, isn't the only
24  objection you can make at a deposition an objection
```

Exhibit "D"

Page 5

1 to form?

2     MR. LYONS: No.

3     MR. MARTIN: Well, let's just proceed. Let's

4 see how it works. We certainly don't want to delay

5 the witness, and we'll take it as it comes.

6     MR. LYONS: The reason, Mr. Martin, that I

7 bring this up is, as you know, you have listed

8 Dr. Leach as a person who is going to give opinions

9 without an expert witness report. And there is a

10 real gray area problem there as to what he can and

11 cannot do.

12     And my concern is, if I don't make

13 objections now, I may waive them. So that's my

14 concern.

15     But if we could reserve them until we can

16 make a decision on that, I will be willing to do

17 that.

18     MR. MARTIN: If you want to have an objection

19 on that issue -- that issue alone -- then I'll give

20 you a continuing objection on the issue of whether

21 or not an expert witness report was required of this

22 witness.

23     MR. LYONS: No. I think that it's got to be

24 either we agree to just save them all or we do them

Page 6

1 all now.

2     MR. MARTIN: Well, then make your

3 objections --

4     MR. LYONS: Okay. That's fine.

5     MR. MARTIN: -- because I don't want to be

6 sandbagged down the road, frankly.

7     MR. LYONS: Okay. That's fine. Okay.

8     MR. MARTIN: I'm surprised that you raised

9 this, because we could have done this deposition

10 before the expert report deadline; but it was

11 postponed at your request.

12     I mean this deposition could have been

13 done in March; but it was postponed. And it was

14 selected for a date that was convenient for you

15 previously. And yet you requested that the

16 deposition be postponed until April, which we've

17 done.

18     So let's just proceed. We'll fight that

19 out later. And we don't need to bother this witness

20 with it.

21

22

23

24

Page 7

1     DAVID C. LEACH, M.D.,

2 called as a witness herein, having been first duly

3 sworn, was examined and testified as follows:

4     EXAMINATION

5 BY MR. MARTIN:

6     Q.  Would you please state your name.

7     A.  David C. Leach.

8     Q.  Dr. Leach, are you currently employed?

9     A.  I am.

10     Q.  And who are you employed by?

11     A.  The Accreditation Council for Graduate

12 Medical Education, also known as the ACGME.

13     Q.  If you were talking to your neighbor and

14 your neighbor asked you, "Tell me. What does the

15 ACGME do," what would you tell him?

16     A.  I would tell him, "I could tell you, but

17 then I would have to kill you." And that's what I

18 usually say, because it is hard to explain.

19     Q.  Okay.

20     A.  But the Accreditation Council for

21 Graduate Medical Education is a 501(c)(3)

22 not-for-profit corporation.

23     It is private and independent. And it

24 sets the standards for and accredits the nation's

Page 8

1 8,000 residency programs that in aggregate house

2 100,000 residents.

3     Q.  Did you say that sets the standards for

4 graduate medical education?

5     A.  I said, for residency programs and

6 graduate education, Graduate Medical Education is

7 the period of education between medical school --

8 which is also known as Undergraduate Medical

9 Education -- and independent practice, an area

10 covered by life-long learning or Continuing Medical

11 Education.

12     Q.  I gather that you know something about

13 medical education; is that right?

14     A.  I think so.

15     Q.  Okay. Why don't we do this? I would

16 like to get a sense of what your background is.

17     And maybe the easiest way to do that is

18 by looking at your curriculum vitae?

19     MR. MARTIN: And, if we could, mark that as an

20 exhibit.

21     (WHEREUPON, a certain document was

22     marked Leach Deposition Exhibit

23     No. 1, for identification, as of

24     04-20-2007.)

2 (Pages 5 to 8)

Page 9

BY MR. MARTIN:

1  BY MR. MARTIN:
2     Q.   Dr. Leach, I've handed you a document,
3  which the court reporter has marked as Leach
4  Exhibit 1.
5          And, first of all, can you tell me what
6  this document is?
7     A.   This is my curriculum vitae.
8     Q.   And does it provide an overview of your
9  background -- your experience, your training?
10    A.   It does.
11    Q.   Can you just kind of sum -- and is this
12  document -- is it accurate?
13    A.   Yes.
14    Q.   Okay.  Can you just tell us -- give us an
15  overview -- of kind of what you've done since
16  college in terms of both your education, and your
17  training, and your employment?
18    A.   I've graduated from the University of
19  Toronto, St. Michael's College.  And I graduated in
20  1965.
21          After that I went to medical school at
22  the University of Rochester School of Medicine and
23  Dentistry, in Rochester, New York.  And I graduated
24  in 1969.

Page 10

1          After that I completed an internship and
2  residency at the Henry Ford Health System in
3  internal medicine.  I was the Chief Medical Resident
4  for one year.  And then I did an endocrinology
5  fellowship for two years.
6          I had some supplemental training at the
7  Children's Hospital of Pittsburgh.  In 1975 I had
8  joined the staff of the Henry Ford Hospital as an
9  endocrinologist.
10         One of my responsibilities was to teach
11  the junior medical students from the University of
12  Michigan.  Each year the University of Michigan
13  would send 36 students to Henry Ford.  And I was
14  charged with their -- I was monitoring and direct
15  teaching, but also monitoring the teaching they got
16  on various rotations.  In that capacity, I was an
17  Assistant Dean at the University of Michigan.
18         In 1984 I became a program director of
19  the transitional year residency program and also
20  what we would now call a DIO, or a designated
21  institutional official -- the one charged with the
22  responsibility of all of the residency programs at
23  Henry Ford.
24         At that time we had about 800 residents,

Page 11

1  and we had about 60 residency programs.  And I was
2  administratively responsible for all of that, as
3  well as the identified official for purposes of
4  ACGME.
5          In 1997 I joined the ACGME as its
6  Executive Director.  And I have been here for the
7  past ten years.
8     Q.   Would it be correct to say that the
9  executive director of the ACGME functions very
10  similar to the CEO of an organization?
11    MR. LYONS:  Objection.  Form.  Misleading.
12  BY THE WITNESS:
13    A.   The title has recently been changed to
14  CEO; and so I think the answer to the question is,
15  yes.
16  BY MR. MARTIN:
17    Q.   Okay.  We have previously marked in this
18  case another exhibit.  And I'm going to hand it to
19  you.  It's a big green book.  And it's marked as
20  Gentile Exhibit 2.
21          Do you recognize this book?
22    A.   I do.
23    Q.   And can you tell me what it is?
24    A.   This book is published by the American

Page 12

1  Medical Association.  It's not a direct product of
2  the ACGME; but it does have all of the institutional
3  and program requirements created by the ACGME.
4          In addition, it has a listing of the
5  various residency programs by specialty in the
6  country; and it also has some other general
7  information about Graduate Medical Education.
8     Q.   Is this a book that is sometimes referred
9  to as, "The Green Book"?
10    A.   It is.
11    Q.   Could I ask you to turn to page 31 of,
12  "The Green Book"?
13    MR. LYONS:  What's the Bates Number?
14    MR. MARTIN:  The Bates Number is 6413.
15  BY MR. MARTIN:
16    Q.   And have you read this section before of,
17  "The Green Book"?
18    A.   I have.
19    Q.   And in this section of, "The Green Book,"
20  is this -- it's called, "The Essentials of
21  Accredited Residencies in Graduate Medical
22  Education:  Institutional Program Requirements."
23          Do you see that?
24    A.   Yes.

3 (Pages 9 to 12)

Page 13

1    Q.    And I notice that here the ACGME talks
2  about the education of physicians. Do you see that?
3    A.    I do.
4    Q.    And it talks about the education of
5  physicians as occurring in three stages?
6    A.    Correct.
7    Q.    From the perspective of the ACGME, what
8  are those three phases -- as defined by the ACGME --
9  of the education for physicians?
10   A.    Undergraduate Medical Education, Graduate
11 Medical Education, and Continuing Medical Education.
12   Q.    I would like to talk to you a little bit
13 about each of those. And sometimes, to get a handle
14 on it, it's nice to look at it in terms of what it
15 means to an individual person.
16        Maybe we can use your background and
17 talk, then, about what are the three phases and how
18 that relates to your background and training.
19        Sometimes I might try to give you an
20 overview of where we're going so it may be a little
21 bit clearer. So that's kind of one of my signposts.
22 So the next few questions would relate to that?
23        You mentioned there are three phases
24 according to the ACGME. And the first phase was

Page 14

1  Undergraduate Medical Education?
2    A.    Yes.
3    MR. LYONS: I'm going to object. You keep
4  referring to the ACGME; and, yet, he's testified
5  that this is an American Medical Association
6  document.
7  BY MR. MARTIN:
8    Q.    Are, "The Essentials of Accredited
9  Residencies in Graduate Medical Education:
10 Institutional Program Requirements," prepared,
11 derived, from the ACGME?
12   A.    Yes. I think I've testified that this
13 green book is published by the American Medical
14 Association; and it includes the requirements
15 developed by the ACGME. These are ACGME
16 requirements.
17   Q.    Okay. So the ACGME requirements for
18 the -- is this kind of sometimes referred to as,
19 "The Essentials"?
20   A.    Yes.
21   Q.    Okay. I'm just trying to get the
22 terminology.
23        And in there -- the ACGME's Essentials --
24 there is a discussion of the three phases of medical

Page 15

1  education. The first phase is, "Undergraduate
2  Medical Education."
3        What is meant by, "Undergraduate Medical
4  Education"?
5    A.    This is the education that occurs in
6  medical school. And, typically, it's a four-year
7  educational program. It's a dynamic world, and
8  things are changing.
9        But, in general, the first two years of
10 medical school consist of learning the sciences --
11 anatomy, physiology, biochemistry, histology,
12 pathology, and so on. In the last two years,
13 medical students begin to get exposed to clinical
14 cases.
15        The Undergraduate Medical Education Phase
16 is concluded with the awarding of the M.D. degree.
17   Q.    Go ahead.
18   A.    The Graduate Medical Education Phase
19 begins with an organized structured residency
20 program. I would define Graduate Medical Education
21 as an organized educational program accredited by
22 ACGME; i.e., it meets our standards.
23        The purpose of Graduate Medical Education
24 is to prepare the student for independent practice.

Page 16

1  And it takes the sort of rules and fundamentals
2  learned in medical school and applies those rules in
3  increasingly complex clinical cases so that
4  residents may learn judgment and the practical
5  skills of becoming a doctor.
6        I would say that Graduate Medical
7  Education varies in duration. There is one minor
8  aberration. And that is the transitional year is a
9  one-year program that serves, fundamentally, two
10 purposes:
11        One, to enable students to discern what
12 they want to become so they will experience
13 different rotations, if they haven't already decided
14 that in medical school. The other purpose is, it is
15 sometimes used as a prerequisite year for further
16 training in the various specialties.
17        But other than that aberration, the
18 duration of Graduate Medical Education is from three
19 to ten years. It is concluded by graduation from
20 the program with a statement from the program
21 director that the individual is competent and now
22 eligible to take their certification exam, at which
23 point the American Board of Medical Specialties, and
24 its particular member boards, will receive the

4 (Pages 13 to 16)

DAVID C. LEACH, M.D., APRIL 20, 2007

Page 17

1  graduate and offer an examination after reviewing
2  all of their credentials. And then it is possible
3  to become a board certified internist, surgeon,
4  pediatrician, family physician, whatever.
5       And then that begins the third phase of
6  Continuing Medical Education, which is really a
7  period of life-long learning. That is in a very
8  dynamic change right now, including things like
9  maintenance of certification. The individual
10  certifying boards will track the experiences of
11  practicing physicians for the rest of their life in
12  four areas:
13       One, their maintenance of licensure and
14  good ethical standing by their respective state
15  medical board.
16       Two, their Continuing Medical Education
17  experiences -- formal didactic experiences. And,
18  recently, it's required that that be relevant to the
19  particular specialty that they're practicing.
20  Third, some analysis of ones practice. So, for
21  example, the American Board of Internal Medicine
22  actually surveys patients of the particular doctor
23  and samples that. They also look at the outcomes
24  of, for example, diabetic patients in the practice

Page 18

1  and so on. So an analysis of the practice and a
2  demonstration of the ability to improve ones
3  practice is the third element of maintenance of
4  certification.
5       And the fourth element is an examination
6  that must be taken every ten years.
7       And that continues through to maintain
8  ones certification. You do that through retirement
9  or death. It goes on forever.
10       Q.  Well, on the first phase, Undergraduate
11  Medical Education -- sometimes we use the phrase,
12  "undergraduate school," to mean the years right
13  after college.
14       Is that how that term is meant here?
15       A.  It is confusing. Usually,
16  "undergraduate," means college and graduate school.
17  You might get a Ph.D. or something.
18       And in medicine it is thought that
19  college is preparatory to entrance into the
20  undergraduate period. Medical education is so
21  unique. It does not use the usual language of the
22  rest of the educational world.
23       Q.  So if the first phase is Undergraduate
24  Medical Education, for you that would have been your

Page 19

1  training at the University of Rochester School of
2  Medicine and Dentistry?
3       A.  Correct.
4       Q.  And then, when you graduated from that
5  program, you received your M.D. degree?
6       A.  Correct.
7       Q.  And then, after you received your M.D.
8  degree, you began entering your second phase of
9  medical education; is that right?
10       A.  Correct. Correct.
11       Q.  And that would be the residency years and
12  fellowship years?
13       A.  Correct.
14       Q.  Now, we're using some terms here that a
15  lot of people -- if you're not in the medical
16  world -- may not know. For example, a resident and
17  what it means to be a fellow.
18       Can you tell us what do you mean by a
19  resident? And what's a fellow? And what's an
20  intern?
21       A.  You're quite right. The language is
22  confusing. And maybe it would be best to give some
23  historical perspective of how this evolved.
24       And the three words that can be confusing

Page 20

1  are house pupil, intern, and resident. And to
2  explain that story, I may go back even farther to
3  Colonial America where the spirit of democracy was
4  so strong there was -- any attempt to regulate a
5  special class of citizen was issued by society.
6       So there were no licensing. Physicians
7  weren't licensed. There was no board certification
8  process. Medical schools were extremely
9  rudimentary, usually proprietary. And this could
10  only be tolerated because not much was known in
11  medicine. And the scientific advances had not
12  occurred.
13       In the early 1800s -- I think around
14  1830 -- the idea of a house pupil emerged. And I
15  may be wrong; but I think that Cincinnati Hospital
16  was the first place, in the United States, to have
17  house pupils. House pupils -- before the Civil War
18  and after the Civil War -- had a different meaning.
19       Before the Civil War, a house pupil was
20  someone who spent one year of practical training,
21  before they entered medical school, just to see if
22  they really wanted to take care of sick people. And
23  they did a lot of the tasks of nurses and of others
24  just caring for the sick. If they performed well

5 (Pages 17 to 20)

## Page 21

1  and if they liked it, then they entered medical
2  school.
3          And medical school in those days was very
4  different. It consisted, typically, of -- first of
5  all, there was a lot of variability. And one of the
6  things that has emerged is a national standard.
7  ACGME has a national standard to dampen the
8  variability in residency. But in those early days,
9  there was a lot of variability in medical school.
10         But, in general, it consisted of two
11  six-month periods of training -- usually conducted
12  in Latin and usually during the winter months so
13  that farmers could come. And many of the medical
14  students did not have a high school education.
15         And then they would apprentice themselves
16  to a physician and do menial tasks, quite often --
17  like grooming the horses and sort of taking care of
18  the daily chores -- that really weren't very
19  relevant to medicine. So that existed in the early
20  1800s. So you would have this one-year house pupil
21  experience, go to one of these medical schools, and
22  then have an apprenticeship afterwards.
23         The Civil War exposed that, number one,
24  medicine didn't know anything; and, number two, that

## Page 22

1  medical education was in dire need of reform. More
2  people died of illness and medical malfeasance in
3  the Civil War than died of bullets.
4          MR. LYONS: Died of what?
5  BY THE WITNESS:
6      A.  Died of bullets.
7          And it was all sort of opinion. For
8  example, one opinion at the time, during the Civil
9  War, was that pus was good. And so, if you were a
10  doctor taking care of a patient with an abdominal
11  wound and in the next room was another patient with
12  an abdominal wound, you would pick the pus up and
13  put it in the second patient hoping that the white
14  cells would help that patient heal. Of course, that
15  was exactly the wrong thing to do. It just infected
16  the second patient.
17         So while this was going on -- in Germany
18  and in France -- scientific studies were conducted
19  that actually compared different interventions and
20  began to build some evidence about what
21  interventions were helpful and what were not. So a
22  body of knowledge emerged with that, now, heavier
23  content to learn to be a doctor.
24         After the Civil War, the house pupil

## Page 23

1  system -- the house pupil took their one-year
2  experience after medical school; and, instead of
3  grooming horses, it sort of replaced the
4  apprenticeship and was a more formal one-year
5  experience almost always based in the hospital.
6          That blurred with internship. So the
7  post-Civil War house pupil and the internship
8  became, eventually, synonymous. It was a one-year
9  experience.
10         At the latter part of the 1800s, the
11  public was so appalled with medical education and
12  the inability of medicine to help people that
13  demands for reform occurred. And the first reforms
14  came out of the University of Michigan, Harvard, the
15  University of Pennsylvania, and later -- in the
16  1890s -- at Johns Hopkins.
17         And Johns Hopkins was the first place in
18  the country, in the late '90s, to have what we would
19  call a residency program. And at that time it was
20  structured so that you would do a one-year
21  internship followed by further practical training
22  called a residency. And that was really the end of
23  the house pupil system and the beginning of the
24  internship/residency system.

## Page 24

1          In 1910, again, on the swell of this
2  public demand for reform of medical education, the
3  Carnegie Foundation hired Abraham Flexner. And he
4  surveyed all medical schools in the United States.
5  I think at that time there was something like 162
6  medical schools.
7          These were terrible places for the most
8  part. I mean, they were proprietary schools. The
9  faculty would not get paid unless the students
10  graduated. So all students graduated.
11         They consisted of, in Carnegie's
12  review -- as he went to these so-called medical
13  schools, he would say, "Let me see your
14  laboratories." He writes very vividly in one school
15  they opened a cigar box and showed him three test
16  tubes and said, "This is our laboratory."
17         So he came out with recommendations --
18  the Flexner Report, which was published in 1910 --
19  that described the following recommendations:
20         That, one, a medical school -- you enter
21  medical school after graduating from college.
22  Medical school must be linked with a university. It
23  should not be a free-standing proprietary. It must
24  have some fundamental capacity in science and

6 (Pages 21 to 24)

Page 25

1  research and more than three test tubes in a cigar
2  box. The faculty should not be paid by the students
3  directly, but should be paid by the medical school
4  whether the student passed it or not.
5        So these reforms were recommended and
6  instituted. And Carnegie categorized medical
7  schools into different sort of grades in the top
8  tier systems. And I think that Hopkins was at the
9  very top, and then others like the University of
10 Michigan and so on.
11       And then there were a bunch that didn't
12 make the grade so, in that one process, the number
13 of medical schools, in the United States, went from
14 162, or something, down to 82. It got rid of half
15 of the medical schools.
16       And that was followed in, I think,
17 1919 -- maybe, 1918, 19 -- by the AMA's Council on
18 Medical Education publishing Standards for
19 Essentials for Internships. And so it's not an
20 accident that ACGME standards exist in an AMA
21 publication because, historically, the AMA was a big
22 advocate for reform of medical education beginning
23 in the 1870s and -- in 1918 or 19 -- published the
24 first Essentials just for internships.

Page 26

1        All right. And they specified that this
2  sort of practical experience was needed to practice
3  safe medicine. And there were certain standards
4  that you had to meet. Later on they published the
5  Essentials for residencies. And they would begin in
6  a crude way. But, nonetheless, they would begin to
7  do site visits and have comments about the various
8  residency programs.
9        In 1949 -- I should say the first
10 certification process occurred around this time in
11 the -- I'm blurring on it. It was around 1917, or
12 something, the American Board of Ophthalmology
13 offered a certificate and said, "You shouldn't be
14 able to take a knife and put it into a person's eye
15 unless you've had a certain amount of practical
16 experience under supervision."
17       It wasn't enough to pop out of medical
18 school, and pick up a knife, and go operate on
19 someone's eye. So they required that you become
20 board certified in ophthalmology in order to be a
21 recognized ophthalmologist.
22       Initially, that process consisted of an
23 examination -- review of your training. You had to
24 graduate from medical school. You had to have some

Page 27

1  just practical experience in a residency/internship.
2  And you had to pass this exam.
3        By 1936 most of the now well-known
4  specialties had established a board certification
5  exam. It was also noticed that many could not pass
6  those exams and did not meet the standards to be an
7  ophthalmologist, or an internist, or a surgeon, or a
8  pediatrician.
9        So in 1949 the first residency review
10 committees were created -- initially, surgery and
11 three months later medicine. And they, for the
12 first time, spread beyond the AMA. So the AMA had
13 identified one-third of the appointees, for example,
14 in the case of surgery, and the American Board of
15 surgery another third, and the American College of
16 Surgeons a third-third.
17       And that constituted the Residency Review
18 Committee For Surgery; likewise, medicine -- AMA,
19 American College of Medicine, American College -- or
20 American Board of Internal Medicine, American
21 College of Physicians.
22       Those groups of experts developed
23 standards for their specialty and began to do site
24 visits, in greater depth and understanding, and

Page 28

1  would publish whether a particular surgical
2  residency met their standards or not. And if you
3  didn't meet them, you had to graduate from an
4  accredited surgery program to sit for the
5  certification exam by the American Board of Surgery.
6        By 1956 most of the now well-established
7  specialties had residency review committees. The
8  residency review committees functioned
9  independently. They each had their own sort of
10 process.
11       The mechanics were different. So how you
12 did a site visit, how you gathered information, all
13 of that was different. There was also a lack of
14 adequate appeal mechanism. If a program wanted to
15 have a reconsideration of its adverse action, there
16 was nowhere to go except back to the residency
17 review committee.
18       So in 1972 the Liaison Committee For
19 Graduate Medical Education was established. It was,
20 frankly, very dysfunctional.
21       There were three layers. There was the
22 Residency Review Committee, the Liaison Committee
23 For Graduate Medical Education, and the Coordinating
24 Committee. The Coordinating Committee had three

7 (Pages 25 to 28)

Page 29

1 things -- the LCME, which did medical schools; the
2 LCGME, which did residency; and the LCCME, which did
3 Continuing Medical Education.
4        What happened was predictable and
5 embarrassing; and that was that all programs
6 reviewed by the Residency Review Committee were, in
7 turn, reviewed by the LCGME, who were, in turn,
8 reviewed by the Coordinating Committee. It was
9 total chaos. Everybody got three reviews. They
10 differed in their outcome. It was a mess.
11        So in 1981 the ACGME was established and
12 made a little more independent, and a little less
13 political, and coordinated the efforts of the
14 various residency review committees.
15        So, now, there are 26 residency review
16 committees, basically, constituted for the
17 specialties, as I've described, for medicine and
18 surgery -- although some differences -- the
19 transitional year review committee, for this
20 one-year program, and an institutional review
21 committee -- which came later -- which sets
22 standards and makes judgments about the sponsoring
23 institution's administrative apparatus to conduct
24 any educational programs.

Page 30

1        So ACGME coordinated the efforts of the
2 various review committees in a way that was coherent
3 and predictable to hospitals so that they sort of
4 knew what was going to happen. And the ACGME logo
5 got you into the certification exam, or the medical
6 license, or later on connected you to some Medicare
7 funding in support of Graduate Medical Education.
8        Of course, the world isn't static while
9 all of this is happening. The body of knowledge
10 building up is tremendous. And because our capacity
11 to know is finite and the capacity to generate new
12 knowledge -- while not infinite -- exceeds our
13 capacity to know it, it was natural to subspecialize
14 and specialize.
15        So you went from internal medicine
16 training, to internal medicine followed by
17 cardiology training, to internal medicine training
18 followed by cardiology, followed by
19 electrophysiology as you broke down the new
20 knowledge into chunks that a single person could
21 master. That latter category of subspecialties and
22 advanced training became known as fellows.
23        So that's a long-winded answer to your
24 simple question of the distinction between

Page 31

1 internship, residency, and fellows. And I added
2 house pupils just hoping that the historical
3 approach would give some clarification for these
4 confusing terms.
5 BY MR. MARTIN:
6     Q.   Was there, then, a period of time when
7 the term internship was used as the first year after
8 you graduated from medical school?
9     A.   Yes.
10     Q.   Is that term used today?
11     A.   Casually, but not formally. We now think
12 of a residency as beginning right after medical
13 school.
14     Q.   Has the ACGME formally abandoned the term
15 internship?
16     A.   Yes.
17     Q.   Okay. And that period, in the second
18 phase of medical education -- which you've referred
19 to, I think, as Graduate Medical Education --
20     A.   Yes.
21     Q.   -- is sometimes referred to as GME; is
22 that right?
23     A.   Correct.
24     Q.   Is that, then, broadly defined as the

Page 32

1 residency period?
2     A.   Yes.
3     Q.   And are fellows, like, a subset of
4 residents then; or are they --
5     A.   We actually went through a period of
6 time, in the late '90s and early 2000s, where we
7 eliminated the term fellow and called everybody
8 residents.
9        We've resurrected the term fellow, in the
10 last few years, because the habits were so
11 entrenched and people wanted to let the world know
12 they were in an advanced training program and wanted
13 to be called a fellow. So we use both terms now.
14     Q.   And for the period in this case -- the
15 years at issue are in 1997 through 2004?
16     A.   Yes.
17     Q.   During that period, what do we mean by
18 fellow, and what do we mean by resident? Can you
19 just give me --
20     A.   Yes. A resident is, in one of the core
21 programs, leading to initial certification. A
22 fellow is, in an organized educational program
23 accredited by ACGME, leading to subspecialty
24 certification.

8 (Pages 29 to 32)

Page 33

1    Q.    Now, you did your residency in internal
2  medicine; is that correct?
3    A.    Correct.
4    Q.    You specialized -- is that the correct
5  term -- in that area?
6    A.    Correct.
7    Q.    First of all, tell me what internal
8  medicine is just so we have some idea? What's that
9  the study of?
10    A.    It is the -- it's everything in the
11  world.
12    MR. LYONS: Give us the program requirements.
13  BY THE WITNESS:
14    A.    A practicing internist specializes in,
15  essentially, all human ailments and is particularly
16  interested in diagnosing disease, in managing
17  illness -- as opposed to surgical intervention -- in
18  managing late adolescence and adults -- as opposed
19  to children -- and managing woman, woman who are
20  sick -- but not during pregnancy, or delivery, or
21  for gynecological problems.
22    So it is a doctor for adults.
23  BY MR. MARTIN:
24    Q.    So if my personal physician specializes

Page 34

1  in internal medicine, that's not unusual then?
2    A.    Right. That would be quite common.
3    Q.    And so, then, your initial -- you would
4  have gone through a residency in internal medicine?
5    A.    Correct.
6    Q.    How would a fellow, in the area of
7  internal medicine, differ from someone who has just
8  graduated from a residency program?
9    A.    Well, I was a fellow in endocrinology. I
10  was not a fellow in internal medicine.
11    Q.    So it's a subspecialty then?
12    A.    Correct.
13    Q.    So does everybody who graduates from a
14  residency program in internal medicine go on --
15    A.    No.
16    Q.    -- to a subspecialty program?
17    A.    No. There are many who will complete
18  their training -- their formal organized training at
19  that point -- and become board certified internists.
20  And then they're able to practice independently.
21    Fellows would want advanced training in
22  one of the subspecialties.
23    Q.    So college, as we know, is four years.
24  Medical school is four years -- I think you've

Page 35

1  said -- typically?
2    A.    Right.
3    Q.    A residency program in internal
4  medicine -- how long, typically, is that?
5    A.    Three years.
6    Q.    And then, if you do a subspecialty, is
7  it, then, additional years after that?
8    A.    It is.
9    Q.    And with that the number of years depend
10  on the subspecialty that you're in?
11    A.    It does.
12    Q.    Okay.
13    A.    Just to put things in perspective, we
14  accredit 26 core specialties. And we accredit, in
15  total, 120 specialties and subspecialties.
16    So medicine, pediatrics, family medicine,
17  surgery, pathology, and so on, would be core
18  specialties. And cardiology, gastroenterology,
19  transplant surgery, and so on, would be
20  subspecialties.
21    Q.    When you were describing the history of
22  medical education, or the education of physicians, I
23  think you indicated that there was a period of time
24  when there was really an absence of governmental

Page 36

1  regulation.
2    Am I right on that?
3    A.    Correct. And I think that, to some
4  extent, remains true today. We are -- the ACGME --
5  is the definitive standards that are for Graduate
6  Medical Education. And we are not regulated by the
7  government.
8    Our work is recognized by the government.
9  And it is recognized through a payment system that
10  supports Graduate Medical Education. In order to
11  get money from the government, you must be
12  accredited by ACGME. If we withdraw accreditation,
13  that money doesn't come any more.
14    We also have, on my board, a federal
15  observer who sits without vote -- but is free to
16  observe our activities -- and gives us a report at
17  every meeting about various issues of interest that
18  they would like us to hear about. And this is
19  somewhat unusual and, I think, reflects the nub of
20  your question about government regulation and about
21  our roots in democracy.
22    In most countries, our kind of work is,
23  in fact, done out of the Ministry of Health of the
24  various governments. But here the public and the

9 (Pages 33 to 36)

Page 37

1  government have delegated that work, if you will, to
2  the profession.
3        And so we are the professional standards
4  that are for Graduate Medical Education and are not
5  regulated by the federal government.
6     Q.   So in this second phase of medical
7  education called Graduate Medical Education, there
8  are standards that exist in terms of what those
9  programs --
10    A.   Yes.
11    Q.   -- and institutions must comply with; is
12  that right?
13    A.   Correct.
14    Q.   And what is the role of the ACGME in
15  connection with those standards?
16    A.   The individual residency review
17  committees develop a proposed set of standards. Let
18  me first give you a little skeleton of the structure
19  of the ACGME.
20    Q.   Okay.
21    A.   So there's my board -- 26 members, plus
22  the federal observer. There are the review
23  committees, including the 26 review committees for
24  various specialties and subspecialties, the

Page 38

1  Transitional Year Review Committee, and the
2  Institutional Review Committee.
3        And then there are standing committees of
4  the ACGME. The Program Requirements Committee is
5  one of them. There's also Monitoring. And there's
6  Strategic Initiatives and Financing. So the process
7  works as follows:
8        Program requirements are developed by the
9  relevant Residency Review Committee. They are, at
10  that point, proposed program requirements. Each
11  review committee must do that, at least, every five
12  years. And they're welcome to do it more frequently
13  if the field changes in a way that's substantial
14  enough to require changes in the program
15  requirements.
16        The proposed requirements are, then,
17  vetted through the entire community. So the
18  announcements go out, and people are invited to look
19  at them from all other specialties -- all of the
20  medical school deans, all of the program directors,
21  the DIOs. The government, the public, anybody, is
22  invited to comment on these proposed program
23  requirements.
24        Those comments come back. And the

Page 39

1  Residency Review Committee also must create an
2  impact statement of the requirements -- both
3  financial, and organizational, and any other impacts
4  of the proposed program requirements. So they,
5  then, develop a document of the proposed program
6  requirements in which every concern harvested --
7  from the public, or other specialties, or anybody --
8  is addressed by the Residency Review Committee.
9        And the Impact Statement is clear. And
10  that package -- the Proposed Program Requirements,
11  Comments and Responses, the Impact Statement -- go
12  to ACGME's Program Requirements Committee. The
13  Program Requirements Committee reviews this, hears
14  it in an open session from anybody who wants to
15  comment on it, and then makes a recommendation to my
16  board.
17        And the board acts to either approve or
18  not approve the program requirements. And so the
19  ACGME uses that mechanism to develop and approve its
20  requirements.
21    Q.   So the ACGME develops standards that
22  measure the -- strike that.
23        The ACGME develops standards for Graduate
24  Medical Education?

Page 40

1     A.   Yes. And it does it using this
2  mechanism.
3     Q.   And does it have standards for the
4  institutions, or for the programs, or for both?
5     A.   Both.
6     Q.   So let's just talk in very specific terms
7  for one year.
8        You have a green book in front of you for
9  one year. I think it's 2000 and 2001 -- that
10  12-month period.
11        Can you show me where -- and maybe just
12  by pages -- where are the requirements for the
13  institutions?
14    A.   The Institutional Review Committee -- the
15  institutional requirements established, initially,
16  by the Institutional Review Committee and approved
17  by ACGME is on page 34, 35, 36, and 37.
18    Q.   Okay.
19    A.   And you can see, for this particular
20  year -- at the end of it, on page 37 -- the last
21  words are, "ACGME, September 1998."
22        That is when they were approved by ACGME.
23  And they were made effective the same time,
24  September of 1998.

10 (Pages 37 to 40)

Page 41

1    Q.    Now, there's a term that's been used in
2  this case before, which is the, "sponsoring
3  institution."
4        What does that mean to the ACGME?
5    A.    The sponsoring institution is the
6  organization that has ultimate authority and
7  accountability for all of its residency programs.
8    Q.    So the institutional requirements, then,
9  would apply, then, to the sponsoring organization?
10   A.    Correct.
11   Q.    Okay. And then, beyond the institutional
12 requirements, are there also program requirements?
13   A.    There are.
14   Q.    And are those set forth somewhere in this
15 book?
16   A.    Yes. And I think one way of doing this
17 would be to tell you they are set forth from pages
18 38 to page 374.
19   Q.    And the programs — for example, would
20 internal medicine be its own program, versus family
21 practice, versus anesthesiology?
22   A.    Yes.
23   Q.    Okay. And would each program, then, have
24 its own requirements or standards?

Page 42

1    A.    Each specialty has its standards. Each
2  program that's going to be accredited must meet
3  those standards.
4    Q.    Oh, I see. The program would be the
5  program at University Hospital?
6    A.    Right.
7    Q.    And then the —
8    A.    So it's an important point, because the
9  standards are national standards. These are not
10 corporate standards. The University Hospital may or
11 may not have their standards.
12        But to be ACGME accredited, there is a
13 uniform set of standards that all programs — for
14 example, in internal medicine — must meet if
15 they're going to be accredited.
16   Q.    So whether your program is in California,
17 New York, or Ohio —
18   A.    Right.
19   Q.    — in order to be accredited by the
20 ACGME, it would have to, then —
21   A.    Meet the standards.
22   Q.    — meet these standards?
23   A.    Right.
24   Q.    And how does the ACGME determine whether

Page 43

1  or not an institution meets the institutional
2  requirements and whether its programs meet the
3  program requirements?
4    A.    They use the following mechanisms: The
5  program or the institution about to be reviewed
6  submits information. And ACGME creates an
7  institutional review document that gathers
8  information relevant to the institutional
9  requirements. And the various residency review
10 committees establish a program information form that
11 gathers information relevant to the program
12 requirements.
13        So the programs and the institution
14 complete those documents and send them to the
15 relevant review committee -- Institutional or
16 Residency Review Committee. Additional data comes
17 in.
18        We survey the residents anonymously over
19 the Internet. So there's 100,000 residents in the
20 United States. And we have questions relevant to
21 our standards that we ask individual residents. And
22 their anonymous replies are sent back via the
23 Internet.
24        And so we have a resident survey that's

Page 44

1  an additional piece of data. Depending on the
2  specialty, we will have case logs as well. So each
3  year over 6 million cases managed by residents enter
4  our servers.
5        And so, for example, the surgery review
6  committee requires that residents have between 500
7  and 1,000 major cases in five years. They also
8  further specify how many cases must be done in the
9  senior or chief resident year.
10        And so the review committee will see
11 those cases so they can look at and make sure each
12 resident has done 500 or a 1,000 operations before
13 they're turned loose on the public to function
14 independently.
15        So we have the program information forms,
16 the resident survey, and -- in some, but not all,
17 specialties -- case logs. We also have any
18 correspondence. We have any resident complaints.
19 We have any sort of dynamic data -- like faculty
20 turnover, and so on.
21        With that we send a site visitor in to do
22 a site visit of the program. The site visitor's
23 function is to verify and clarify that what is
24 said -- on the program information form -- to have

11 (Pages 41 to 44)

DAVID C. LEACH, M.D., APRIL 20, 200

Page 45

1 existed, in fact, exists. And they use a
2 triangulation process of interviewing residents,
3 interviewing faculty, interviewing the program
4 director, and sometimes the DIOs, sometimes the
5 CEOs, sometimes the dean -- but in all cases, the
6 residents, faculty, and program director.
7     And they do -- they'll walk around and
8 see that facilities are adequate. And they will
9 clarify and verify the information, from the
10 aforementioned sources, and write a report. So then
11 the Residency Review Committee meets.
12     Now, the Residency Review Committee -- I
13 should say the ACGME has 120 paid employees and
14 about 300 volunteers. So some of the employees
15 serve to support these various residency review
16 committees. Others are site visitors and so on.
17     The Residency Review Committee members --
18 the voting members of the review committee -- are
19 all volunteers. And so they come together as a
20 group of, perhaps, 15 people would be typical -- for
21 example, of surgery -- and will review the program
22 information form, the resident survey, the case log
23 data system -- and by resident and by program. And
24 they have national data so they can see where this

Page 46

1 program is relevant to all other programs in the
2 country -- and the site visit report.
3     And then they make a determination, using
4 that data, whether the program is in substantial
5 compliance with the requirements. And then they
6 notify the program of their decision. "You're
7 accredited. We're proposing probation." And there
8 are various categories.
9     The longest cycle length -- except for a
10 few experiments that we're doing, the longest cycle
11 length is five years. So even if everything is
12 great, we're going to visit you, again, in five
13 years. The average cycle length is about 3.7 years.
14     So, typically, we'll say, "You're
15 accredited. But we're concerned about this, this,
16 and this. And we'll detail that in citations. And
17 we're going to come back and visit you in three
18 years." Or, if we're very concerned about you, in
19 one or two years.
20     Or we might say, "We don't think you're
21 in substantial compliance. And we're proposing to
22 put you on probation." Or, in egregious cases,
23 "We're proposing to withdraw accreditation."
24     The program can, then, ask the review

Page 47

1 committee to reconsider if they have an adverse
2 action, like a proposed probation. The review
3 committee can reconsider and review the same data
4 and some new data that the program may want to
5 submit for clarification.
6     And they may sustain their initial
7 tendency to adverse action. The program at that
8 point can appeal to the ACGME. The ACGME has
9 another panel of volunteers for all of the
10 specialties -- each of them expert in their field,
11 but different and independent of the review
12 committee.
13     The program can physically appear before
14 them and present oral arguments and written
15 materials to the appeals panel. The appeals panel
16 will make a recommendation to the ACGME board. The
17 ACGME board will act. And that is final.
18     So that's a thumbnail of the process we
19 use.
20     Q.   And was that the same process during the
21 period of '97 through 2004?
22     A.   Yes. The only -- yes, we did. In '97 we
23 did not, yet, have the resident survey. In 2004 we
24 did.

Page 48

1     Q.   Okay. If you look at the green book, on
2 pages 12 through, I think, 17 -- or 11 through 17,
3 does that lay out accurately the accreditation
4 process?
5     A.   Of the time, yes.
6     Q.   At the time?
7     A.   Yes.
8     Q.   And, of course -- and then the green
9 book, for the next year, would set out the process
10 for the following year?
11     A.   Right. Right.
12     Q.   From the perspective of the ACGME, what
13 is the purpose of accreditation?
14     A.   The purpose of accreditation is to
15 discern and publically recognize whether a residency
16 program is in substantial compliance with our
17 standards. And we do that. Several entities rely
18 on our decisions.
19     And so we do that independently. But
20 having then published it, the federal government,
21 the certifying boards, the licensing boards, the
22 credentialing committees of various hospitals -- and
23 undoubtedly others -- use that decision to determine
24 their subsequent action.

12 (Pages 45 to 48)

Page 49

1      Q.   In developing the standards that it
2  applies or sets, what does the ACGME view as the
3  purpose of medical education?
4      A.   The purpose of Graduate Medical
5  Education?
6      Q.   Of Graduate Medical Education, yes.
7      A.   The purpose of Graduate Medical Education
8  is to provide an organized educational program that
9  will lead the physician to appoint that they're able
10  to practice independently.
11      Q.   Is there, from the ACGME's perspective,
12  any relationship between Graduate Medical Education
13  and patient care?
14      A.   Yes.
15      Q.   And what's that relationship?
16      A.   I think that you have to have good
17  patient care to have a good residency program.  If
18  the hospital you're working in cannot provide good
19  patient care, you're not really able to teach good
20  habits of patient care.
21           And so that's our relationship.  We do
22  not measure patient care ourselves.  We are
23  concerned with Graduate Medical Education.  But we
24  use others -- including the Joint Commission on

Page 50

1  Accreditation of Hospitals -- to determine whether
2  adequate patient care is being provided.
3      Q.   Is there any relationship, from ACGME's
4  perspective, between Graduate Medical Education and
5  improving patient care?
6      A.   Yes.
7      Q.   And what's that?
8      A.   The ACGME, in February of 1999, endorsed
9  six competencies that all 100,000 residents have to
10  master and all 8,000 programs have to teach and
11  evaluate.
12           Patient care is one of those six
13  competencies.  Practice-based learning and
14  improvement is another.  So we expect every resident
15  to learn how to analyze their practice and to
16  improve it.
17           The other four are medical knowledge,
18  interpersonal communication skills, professionalism,
19  and something called systems-based practice, which
20  is really to sort of diagnose and treat
21  dysfunctional systems in a way analogous to the
22  diagnosis and treatment of disease as medical care
23  has gotten very complex, and the potential for harm
24  is extremely real, and as we have learned, as a

Page 51

1  community, the prevalence of medical error.  And,
2  for example, the Institute of Medicine feels that
3  most medical error is because of faulty systems
4  rather than individuals.
5           And a deep understanding of systems --
6  and their relationships with the quality of patient
7  care, and the ability of the system to improve
8  patient care -- is an important part of the
9  curriculum.  So with those competencies, we've
10  broadened the knowledge base.
11           It's no longer just medical knowledge and
12  patient care.  But you actually have to pay
13  attention to these other four things if you're going
14  to be accredited by ACGME.
15      Q.   And those are referred to as the six
16  competencies.  Is that the term you used?
17      A.   Correct.
18      Q.   I want to come back to those a little bit
19  later.
20           If one of the purposes of medical
21  education is to improve patient care -- let's look
22  at it from another perspective.  How has the ACGME
23  looked at -- how do physicians, how do doctors,
24  learn to be better doctors?

Page 52

1      A.   There's only one way of learning that.
2  You can learn all of medical knowledge you can stuff
3  into your brain.  You can learn a deep understanding
4  of the rules of medicine.
5           But in order to become a competent
6  physician, you have to apply those rules in various
7  contexts; i.e., with particular patients.  And you
8  have to do it frequently enough and in enough of a
9  disciplined way that you learn the relationship
10  between rules and context.
11           In other words, a clinical judgment must
12  take into account the attributes of the patient and
13  not just the attributes of the disease.  And so you
14  have to see patients and you have to take care of
15  them and make decisions under supervision until you
16  get that relationship right.
17           If you were to learn how to drive a car
18  and had a rule book of how the car works and the law
19  of the land -- in terms of traffic violations -- but
20  had no experience actually driving a car, and then
21  were exiting in a freeway ramp and didn't know
22  exactly how to downshift or not, or take your foot
23  off the accelerator or not -- you didn't have that
24  sort of feel of how a car actually works under road

13 (Pages 49 to 52)

Page 53

1  conditions -- your training wouldn't be adequate in
2  driving a car.
3          And recognizing and treating the myriad
4  of illnesses that happen to patients is a lot more
5  complex than driving a car. And so, for example,
6  let's say that I have an Aunt Evelyn who I've known
7  and loved all of my life.
8          And let's say you have a photograph of my
9  Aunt Evelyn. And we're out walking on the streets
10 of Chicago. And two blocks away I say, "That's my
11 Aunt Evelyn." And I know it because of the jaunt of
12 her walk. And that's her favorite hat. And I know
13 that's my Aunt Evelyn.
14         You have a photograph analogous to a
15 textbook description of a disease. But you've never
16 seen my Aunt Evelyn. So you're looking at the
17 photograph. And we have to be this close,
18 (indicating). And then you say, "That's Aunt
19 Evelyn."
20         Well, recognizing disease is like that,
21 you get to a point where your intuition tells you
22 what's going on because you've seen the disease so
23 many times. And you need to get -- you don't need to
24 to be a master physician. But you need to get to

Page 54

1  the point that you're beyond just textbook
2  descriptions of disease.
3          Or, in a surgical case, it's not
4  accidental that the surgeons require that you do 500
5  to 1,000 operations before you graduate. You would
6  not want a medical school graduate -- who, in some
7  cases, may have never even been in an operating room
8  certainly in the -- I mean, essentially, in all
9  cases, has not done any sort of surgery -- to pop
10 out, and graduate, and say, "Okay. Now, you can
11 take my gallbladder out."
12         I mean, that would be very dangerous for
13 the public. Really bad things happen to patients
14 unless you are adequately trained to practice
15 independently. So society has put these constraints
16 on licensure, on certification, on credentialing,
17 and has used the ACGME to make sure you get adequate
18 practical experiences in patient care before you
19 practice independently.
20         And, I mean, our standards are before
21 you. But supervision is a very important part of
22 this ongoing evaluation. And learning is a very
23 important part of this.
24     Q.  You used the term, "master," I think, as

Page 55

1  one description of mastering of certain skills. Are
2  there other categories?
3          I'd like to get kind of the continuum of
4  the categories and talk about where they are when
5  people graduate from medical school and then what
6  the goal of the ACGME standards are in terms of
7  measuring where they are when they graduate from
8  residency programs?
9          So, first, let's see if we can get kind
10 of is there a continuum that you would use of
11 degrees of skill?
12     A.  There is. We're indebted to Hubert and
13 Stuart Dreyfus who developed a model that we're
14 using. And in their categorization, the continuum
15 begins with novice, advanced beginner, competent,
16 proficient, expert, and master.
17     Q.  Let's talk about each of those
18 individually. What do you mean by, "novice"?
19     A.  Novice is someone who has not yet
20 mastered the rules of whatever skill it is you're
21 trying to learn.
22     Q.  So the novice is asking the question,
23 "What are the rules"?
24     A.  Right. We would think of a novice as

Page 56

1  someone who has just entered medical school. And
2  advanced beginner --
3     Q.  Just before you go on, what do you mean
4  by, "the rules"? Can you give me an example of a
5  rule in this context?
6     A.  I think, in the case of medicine, it
7  requires a broad knowledge base in all of the
8  relevant sciences.
9          So anatomy -- it would be good that you
10 know that the liver is on the right side of the
11 body.
12     Q.  Okay.
13     A.  And believe it or not I've seen medical
14 students who thought it was on the left side of the
15 body. It would be good if you knew that the heart
16 was where it is, rather than examining the abdomen
17 for the heart. And so, at a very fundamental level,
18 you learn anatomy. You learn the structure of the
19 human body.
20         You might, then, learn the function of
21 the human body. "So the kidney, how does it work
22 and how does it manage the excretory products
23 produced by the metabolism of the body? How does
24 the heart pump the blood?" And you sort of learn

14 (Pages 53 to 56)

Page 57

1  that in physiology. You learn how the nerves work
2  and how the muscles work.
3       You then may branch out to learn
4  histology and pathology and look at the microscopic
5  level and see how the human body is structured,
6  microscopically, and how those various cells work.
7       And then you would advance a little bit
8  to pathophysiology and understand what happens in
9  renal failure. "How does that work? What are the
10 various categories of illness that can affect the
11 kidneys so that the kidneys don't work?" It would
12 be the same with virtually any system in the body --
13 the neurologic system, the muscular system, the
14 joints, and arthritis, and so on.
15  Q.   So those are that basic information?
16  A.   That's basic information.
17  Q.   And you would refer to that as the rules,
18 knowing the rules?
19  A.   That's one category of the rules. The
20 other category of the rules are things that medical
21 students carry around in their pockets -- as do
22 residents -- called the Washington Manual, which is,
23 "What do you do if you have a patient with a fever?"
24       And you sort of have a little compendium

Page 58

1  of things you would do if you were investigating a
2  fever. It's a little checklist. And you sort of,
3  "There I did that."
4       And so you know the rules of how to do
5  that. "What do you do if the blood pressure drops
6  precipitously? What do you do if someone faints?
7  What do you do if a woman goes into labor
8  prematurely? What do you do if you have abdominal
9  pain."
10       I mean, the textbooks are each this size,
11 (indicating). And there are hundreds of textbooks.
12 So there are a lot of rules.
13  Q.   Now, are those rules learned before in
14 medical school, or are they learned in the residency
15 program, or both?
16  A.   Both. And, I think, once you achieve a
17 certain level, we would -- on the Dreyfus Model --
18 consider you an advanced beginner when you enter a
19 residency program.
20       In other words, you understand the way
21 the human body works, and when it's healthy, and
22 when it's sick, and the various beginning categories
23 of how it gets sick, and sort of a cook book
24 approach of what to do when it does get sick.

Page 59

1  Q.   So if the question that the novice asks
2  is, "What are the rules," what's the question that
3  the advanced beginner asks?
4  A.   They would begin to apply those rules to
5  certain context.
6  Q.   So, "How do I apply the rules"?
7  A.   So, now, I'm your patient. And I
8  actually have a fever. And you begin to sort of
9  think about why I might have a fever. And you begin
10 to apply those rules.
11       Now, to make sure that you don't kill me,
12 there is -- if, by now, you're a first year
13 resident, say, there might be a senior resident who
14 would also see me, and make an independent
15 determination, and keep an eye on you. And there
16 would be an attending physician who is responsible
17 for my care and who is keeping an eye on the senior
18 resident and on you and has the final authority
19 about what to do next.
20       So you might think that I have an
21 infection in my kidney causing the fever. But it
22 turns out that I've got an infection on my heart
23 valve; and it has spread widely through my body; and
24 I'm near death.

Page 60

1       And so maybe you've said, "Well, the
2  urine looked a little funny. And I gave this
3  antibiotic which could cure a kidney infection."
4  But it turns out it's much more complicated than
5  that, and the patient died.
6       Well, we don't want that to happen. And
7  so we have people who are of various levels of
8  training so that -- for example, a novice learns the
9  most, actually, from an advanced beginner. And an
10 advanced beginner learns the most from someone who
11 is competent. And someone who is competent learns
12 the most from someone who is proficient. Someone
13 who is proficient learns the most from someone who
14 is expert. Someone who is expert learns the most
15 from someone who is a master.
16       And by the time you're at the master
17 level, you are very attentive to context -- to the
18 particulars of the patient. You've learned the
19 rules a long time ago, and you're current on that.
20       But you know that a good clinical
21 decision is driven by the particulars of the
22 patient. And these rules are there to help you, but
23 you're not dictated by the rules. You're dictated
24 by the particulars of the patient.

15 (Pages 57 to 60)

Page 61

1    So you have to have enough experience
2 with patients with various diseases and various
3 circumstances. Or, if you're procedurally inclined,
4 you have to have done the procedure enough times
5 that you know, and recognize, and are driven by the
6 particulars of the patient rather than by the rules,
7 even though the rules are there to help you.
8    Q.   So if a novice is looking at the rules,
9 what is the advanced beginner looking at then?
10    A.   The rules as applied to context; but in a
11 gentle way for the most part.
12    You know, if you're a surgical resident,
13 you start with hemorrhoids and you end up doing
14 heart transplants. You don't start with heart
15 transplants. And so you start with simple
16 procedures and master those. And then it gets more
17 complicated.
18    As you do that, you're applying the rules
19 to simpler cases and then more -- a wider range of
20 cases and cases of deeper complexity -- and then
21 you're competent. So we think -- and the certifying
22 boards require that every program director sign a
23 statement that you're competent. You're not yet
24 proficient. You're not yet an expert. You're not

Page 62

1 yet a master. But you're competent when you
2 graduate from a residency program.
3    Q.   And by, "competent" -- if the novice
4 looks at what are the rules, and the advance
5 beginner looks at those rules in some context, what
6 does the competent person/physician do?
7    A.   A competent person has applied the rules
8 in enough types of context. "I've seen a wide
9 enough range of patients with varying degrees of
10 severity of illness," that they are now -- in the
11 minds of the experts -- able to practice without
12 supervision and independently.
13    And they pop out with competent on their
14 forehead. And then the rest of their life they
15 ideally improve those skills and become proficient,
16 expert, and master more and more. And so you will
17 find people who are extremely good with these very
18 complex cases, and they could not do that when they
19 graduated from residency.
20    But as a mechanism to protect the public,
21 we think you have to be, at least, competent when
22 you come out. And so it requires three -- and
23 sometimes ten -- years of training in order to
24 develop the practical experience you need to

Page 63

1 function independently.
2    Q.   And to function competently?
3    A.   Yes.
4    Q.   And then -- just so we can complete it --
5 what do you mean by proficient then?
6    A.   Proficient is -- it's a very interesting
7 term. It is said that, in order to become
8 competent, you have to feel bad. And by that what
9 happens is, you apply the rules; but you're not yet
10 paying enough attention to the particulars of the
11 patient.
12    So you come in and you're short of
13 breath. And, I say, "Oh, I think this is
14 pneumonia." But I'm wrong. I didn't pay enough
15 attention to you. This is a tension pneumothorax.
16 Your lung has collapsed.
17    And now you're in big trouble. And
18 someone has to put a chest tube in. And I blew it.
19 And I feel bad. And I could go back to advance
20 beginner and say, "I'm going to develop a new rule.
21 Shortness of breath on Tuesday night is a tension
22 pneumothorax." It's a silly rule, but that's the
23 only one I could develop. And I can manage my
24 behavior with an ever bigger set of rules.

Page 64

1    Or, I can go back and say, "What did I
2 miss about you," and really get into the details of
3 you and understand how I made that mistake.
4    In the course of feeling bad, different
5 faculties open up. So it's no longer just my
6 intellect. It's now my intuitive capacities
7 available to me. And I can now be fully present.
8    So proficient is someone who has those
9 intuitive capacities. They've seen enough that they
10 basically use pattern recognition rather than rules.
11 And, they say, "That's Aunt Evelyn. I've seen it
12 enough. That's Aunt Evelyn."
13    And then they'll go through a very
14 careful process of proving it's Aunt Evelyn; but
15 they know -- within seconds sometimes -- this is
16 pneumonia, this is a tension pneumothorax, this is a
17 hot gallbladder. And they're using intuitive
18 capacity supplemented by their intellect, rather
19 than just a rule-based approach.
20    The experts are people who everybody
21 knows who they are because you call them when you're
22 in trouble. So if you're an experienced
23 physician -- now well out of residency -- and you're
24 proficient, and you're a very good doctor, and you

16 (Pages 61 to 64)

Page 65

1  find yourself in trouble, you will call an expert,
2  because they have -- they're better than you. And
3  they have more experience in this particular
4  illness. They have -- they can help you.
5          And a master is someone who has
6  integrated that into their personal style. And so,
7  in the training program -- you can see this in the
8  training program.
9          So let's imagine that I'm your first year
10 resident and you're my attending. I will get the
11 patient's story. And then I'll present the case to
12 you. But I'll convert the patient's story into a
13 doctor's story.
14         And then I present a nice coherent story
15 to you. And, you say, "David, that was wonderful.
16 It's clear that you understand the pathophysiology
17 of the disease. Everything you said was orderly,
18 and logical, and coherent."
19         But to create that doctor's story, I
20 pruned the details of the patient's story that I
21 couldn't explain. And they're on the floor, and
22 I've eliminated those details.
23         If you look at a master, the only thing
24 they talk about are those details. They say, "I saw

Page 66

1  the weirdest case last night." And they talk about
2  these unique cases, because they're totally dwelling
3  on the particulars of the patient. And they love
4  these quirky details that actually inform their
5  judgment tremendously.
6          Whereas, the early learner doesn't know
7  how to explain them. So they don't mention them.
8  And they focus on the explainable doctor's story.
9  And so to get from here to here where you're no
10 longer just trying to create a coherent story, but
11 you're actually trying to help the patients and get
12 into the particulars of the patient -- that's the
13 journey you take to and through competency and
14 beyond.
15     Q.   If the range of the continuum is novice
16 to advanced beginner, to competent, to proficient,
17 to expert, to master — and that's the continuum
18 that you've described -- what is the goal of the
19 ACGME standards to determine at what level you are
20 when you graduate from a residency program?
21     A.   We do not look at individuals. We look
22 at programs. The certifying boards look at
23 individuals.
24         So we would judge, in a sense, "Is the

Page 67

1  program competent; i.e., can it habitually produce
2  competent graduates?" The certifying boards would
3  say, "Is Ted Martin a competent doctor?"
4     Q.   Let's go through that.
5          If I understood what you said, the ACGME
6  does not accredit individuals. It accredits
7  institutions and programs?
8     A.   Right.
9     Q.   And its goal is to have standards that
10 result in programs that produce competent
11 physicians?
12     A.   Correct.
13     Q.   Not master's and not advanced beginners?
14     A.   Right.
15     Q.   Competent?
16     A.   Right. And they do it habitually; i.e.,
17 they're a competent program. This program is
18 habitually producing competent graduates.
19     Q.   So accreditation is about the
20 institutions and the programs. And the individual,
21 then, is certification?
22     A.   Correct.
23         MR. LYONS: Objection as to form.
24         MR. MARTIN: Okay. I'll rephrase it for him.

Page 68

1  BY MR. MARTIN:
2     Q.   Would you explain the difference between
3  accreditation and what that relates to -- and what
4  board certification relates to?
5          And maybe, if you could, give, maybe, a
6  simple overview; and then we can go into details.
7     A.   An accreditation determines whether a
8  program or an institution meets the published
9  accreditation standards of the ACGME. So the unit
10 of analysis is the program, not the individual.
11         The certification process determines
12 whether an individual is competent in that
13 particular specialty. So when I finished training,
14 in my internal medicine residency program, I then
15 appeared before the American Board of Internal
16 Medicine and, among other things, took an exam, and
17 became board certified.
18         They cared whether David Leach was
19 competent. It's a bad example, because I'm old
20 enough that the ACGME didn't exist when I went
21 through. But during that time period, the Residency
22 Review Committee in internal medicine determined
23 that my program was competent, was accredited.
24         And so that tension between the unit of

17 (Pages 65 to 68)

Page 69

1  analysis being the individual or being the program
2  came about historically when certification came
3  first and then people couldn't pass the exams. And
4  it was thought that the profession needed to give
5  more direction to the residency programs, which
6  would enable them to systematically produce
7  graduates who could pass the exams.
8      And so attention was paid to the program
9  as a unit of analysis.
10    Q.  In order to sit for -- maybe I'll begin
11 earlier.
12        To become board certified, does a person
13 have to take an exam?
14    A.  Yes.
15    Q.  And to become board certified, are there
16 certain requirements that are common among
17 specialties and subspecialties?
18    A.  In general, there are. You must graduate
19 from an ACGME accredited program in your relevant
20 specialty. You must have a letter -- from the
21 program director -- saying you're competent, and
22 eligible, and that you meet certain professional
23 standards.
24        And then you appear before the board.

Page 70

1  And they will either admit you or not to the
2  certification exam.
3     Q.  Okay. And then do you have to pass the
4  exam?
5     A.  Yes, to become certified.
6     Q.  So you've described accreditation of
7  institutions and programs and board certification
8  that individuals can receive.
9         How is licensing related to either of
10 those two things, if it is?
11    A.  There are three phenomena that it might
12 be helpful to consider -- licensing, certification,
13 and credentialing.
14        And for all these of those, the unit of
15 analysis is the individual, not the program.
16 Accreditation does programs and institutions.
17        Licensing -- to get a license to practice
18 medicine, you would go to the various states. And
19 it's actually more than states, because there are, I
20 think, maybe, 79 licensing jurisdictions, or
21 something, because some states have multiple boards.
22        And you present, to the Licensing Board,
23 evidence that you went to medical school -- either
24 in the United States or in another country -- that

Page 71

1  you have passed examinations established by not the
2  certifying boards, but by the National Board of
3  Medical Examiners. And those two things get you a
4  ticket into licensure.
5         Now, a licensure in many states requires
6  only one year of an ACGME accredited program. In
7  many others, it requires two years. And in most
8  states, for international medical graduates, it
9  requires three years.
10        The states vary. And, again, it reflects
11 our history of states' rights. And so each state
12 determines the criteria for licensure. There's no
13 national licensing body in medicine. Each state
14 determines their own criteria.
15        In general, those are the criteria. You
16 must spend, at least, some time in an ACGME program.
17 You must have graduated from medical school. You
18 must pass these exams. And you can get a license to
19 practice.
20        The certification system we've talked
21 about. In that case you have to graduate from an
22 ACGME residency. The credentialing process is done
23 at a given hospital.
24        And so my license -- for example, I'm a

Page 72

1  licensed physician -- is unrestricted. I,
2  theoretically, could do a heart transplant. I've
3  never done a heart transplant. It would be really
4  bad for me to do a heart transplant.
5     MR. LYONS:  Not to mention the patient.
6  BY THE WITNESS:
7     A.  Not to especially mention the patient.
8         And so to protect the patient, I would go
9  to the hospital, Northwestern Hospital, and say, "I
10 would like to do a heart transplant. Here is my
11 training. I'm an endocrinologist, and I'm fully
12 licensed. And my license says I can do a heart
13 transplant."
14        They would say, "You can't do a heart
15 transplant. You've never done one. You're not
16 certified by the American Board of Thoracic Surgery.
17 You can't do it."
18        And so the credentialing committees of
19 the various hospitals vary tremendously. But they
20 determine what you can actually do in their
21 hospital.
22        Now, there are little chinks in this
23 armor, because increasingly there's ambulatory
24 surgery, for example. And I would not have to go

18 (Pages 69 to 72)

DAVID C. LEACH, M.D., APRIL 20, 20

## Page 73

1  through a credentialing committee. And I could open
2  an office and do something that would actually harm
3  patients.
4        And so the profession is constantly
5  looking for ways to close those chinks to protect
6  the public. But right now that's an open chink.
7  BY MR. MARTIN:
8     Q.   And at most hospitals is there a
9  relationship between getting credentials and being
10 board certified?
11    A.   Increasingly, yes, so that there are some
12 hospitals that would not require you to be board
13 certified.
14       But the vast majority do. I should say
15 the Credentials Committee also requires that you
16 typically graduate from an ACGME residency, and
17 you're board certified, and have a license in good
18 standing.
19       And in addition to that, they want to see
20 the experience you've actually had in your practice.
21 And then they will recredential you.
22       So once I'm credentialed to remove
23 gallbladders, on an ongoing basis -- sometimes
24 annually -- the Credentialing Committee of that

## Page 74

1  hospital will look at my experience in removing
2  gallbladders and make sure that I'm still, at least,
3  competent in that.
4     Q.   What you've described so far about
5  accreditation as compared to programs/institutions,
6  board certification of individuals in specialties or
7  subspecialties, licensing of individuals, and
8  credentials issued by individual hospitals, was that
9  true during the period of 1997 through 2004, too?
10    A.   Yes.
11    Q.   Throughout today's deposition, if an
12 answer you're going to be giving would have been
13 different from that period of time, if you could
14 just tell us so that everybody understands it, that
15 will be helpful.
16       If not we'll just assume your answers are
17 reflective of what was true during the period 1997
18 through 2004.
19    A.   Just to be clear about that, the six
20 competencies were endorsed in February of '99. So
21 from '97 to '99, that language was not there.
22    Q.   Right. Even though the ACGME had not
23 adopted the six competencies or not begun that
24 process, was the goal of the ACGME still to have

## Page 75

1  programs which produced competent people?
2     A.   Yes.
3     Q.   Competent physicians?
4     A.   Yes.
5     Q.   If the goal of the ACGME is to develop
6  standards that will make sure institutions and
7  programs produce competent physicians, has it looked
8  at how is it that physicians learn to become
9  competent physicians?
10    A.   Yes.
11    Q.   And can you just kind of give an overview
12 of how do physicians learn to become competent
13 physicians? Can you learn that in a book?
14    A.   No.
15    Q.   How do you learn that then?
16    A.   You learn it by practice. You learn it
17 by actually seeing patients who are sick or in need
18 of certain procedures.
19       And you learn by mimicking people who
20 actually do know what they're doing, and observing
21 them, and then doing it under close supervision, and
22 then doing that in a graduated way so that you are
23 assuming more and more responsibility as you go
24 through the residency program.

## Page 76

1     Q.   There was a person -- I believe he was
2  from the 19th century -- named Osler. Are you
3  familiar --
4     A.   Yes.
5     Q.   Is it Dr. Osler?
6     A.   Was.
7     Q.   Are you familiar with the statement
8  attributed to him -- that physicians learn at the
9  bedside?
10    A.   Yes.
11    Q.   Is that, in any way, reflected in the
12 ACGME standards?
13    A.   Yes. We require practical bedside
14 experiences, ambulatory experiences, operating room
15 experiences -- depending on the relevant
16 specialty -- for all of the specialties.
17    Q.   I want to talk about an issue that may
18 have evolved over time; and that is the concept of
19 duty hours.
20    A.   Yes.
21    Q.   The ACGME currently has duty hour
22 requirements; is that right?
23    A.   Yes. Yes.
24    Q.   Now, when you graduated from your

19 (Pages 73 to 76)

## Page 77

1 residency program, were there duty hour requirements
2 in place?
3     A.   Only at the very highest abstract level.
4 They were not specified.
5     Q.   So can you tell me the evolution of the
6 ACGME's duty hour requirements -- kind of give me an
7 overview of that?
8     A.   Yes.  The ACGME has always thought that
9 every patient deserved an awake, alert physician.
10           And as the practice patterns changed --
11 and, I think, there are sort of three things that
12 happened that changed the practice patterns.
13           One was the introduction of DRGs, the
14 payment system that rewarded hospitals for shorter
15 lengths of stay.  So the time became compressed in
16 the hospital.  When I was in training, the average
17 length of stay might be two weeks.  Now, it's two
18 days or three days.  It's a much more intense period
19 of time.
20           Secondly, there were tremendous advances
21 in knowledge and technology and the abilities to
22 help people, which is good.  But there's a lot of
23 new things to learn and master, a lot more to be
24 done.

## Page 78

1           And, third, given the financial
2 constraints that hospitals were under, there was
3 less support staff.  So the number of nurses was
4 less, and so on.
5           So it became apparent that residents were
6 doing more in less time with less help; and that the
7 model of sort of living in the hospital -- once the
8 words residents and house officer evolved -- was not
9 adequate, that the workload was too intense.
10           I mean, when I was a resident, my
11 schedule for four years was, I would come to work,
12 and work for 36 hours, and have 12 hours off, and
13 then come back to work, and work for 36 hours, and
14 then have 12 hours off, and then come back to work
15 for -- I did that for four years.  But, in fact,
16 during the night, I would be in an on-call room.
17 And I could easily get -- and always -- not,
18 "always," but almost always -- two to four hours of
19 sleep, and many nights six hours of sleep.
20           That was not happening anymore.  People
21 were working all of the time because of the acuity
22 of patients and because of this compressed time.
23           So ACGME began with its Internal Medicine
24 Review Committee.  And I can't remember the exact

## Page 79

1 date; but it was sometime in the '80s that they
2 introduced an 80-hour limit to the resident duty
3 period in a given week.  And then the ACGME in 2003
4 had duty hour requirements written for all
5 specialties.
6           So for all specialties, you could not be
7 on duty, in any continuous period, for more than 24
8 hours -- with a six-hour period after that to do
9 other work, but you couldn't see new patients.  And
10 you had to -- you could not be on call more
11 frequently than every third night.
12           And on average you could not be attending
13 to clinical and educational duties for more than 80
14 hours a week.  And you must have one day out of
15 seven away from the hospital.
16           So those requirements, for the first
17 time, then, applied across all specialties.  That
18 occurred after the period in question for your case,
19 I think.  But that's a little bit of the evolution
20 of the duty hours story from ACGME.
21     Q.   Were there any driving factors that led
22 the ACGME to move in this direction that you can
23 recall?
24     A.   There were.

## Page 80

1     Q.   You mentioned a number of them.  One
2 was --
3     A.   Yes.
4     Q.   -- the changes in --
5     A.   Yes.
6     Q.   -- in the hospital environment, the
7 increasing explosion of knowledge.
8     A.   There were others.  In New York there was
9 a case -- the Libby Zion case -- which, on review --
10 and my only personal opinion was this was a failure
11 of supervision.  This was an attending physician who
12 did not come in.
13           But, nonetheless, a tired resident was
14 involved in the care of a patient who died and,
15 perhaps, didn't need to die.  That led to reforms
16 through the New York public health regulations --
17 the 405 regulations -- to regulate duty hours in the
18 state of New York.
19           For a long period of time they were not
20 enforced; but they were there.  But it was
21 interesting because we monitor programs in New York
22 as well; and there was really no difference.  And
23 then, in recent years, those regulations were, in
24 fact, enforced with penalty by the state of New

20 (Pages 77 to 80)

## Page 81

1  York.
2       Other states were beginning to look at
3  this. Like New Jersey proposed similar regulations,
4  again, at the state level. And John Conyers -- a
5  representative from Detroit, Michigan -- was
6  proposing national legislation that would regulate
7  duty hours.
8       My own thoughts -- and the thought of my
9  organization -- was that it was better that the
10 profession do this than Congress do this. And we
11 thought that for a couple of reasons. One, nobody
12 knows whether 80 hours is the right number.
13      Dr. Bell of the Bell Commission in New
14 York admits publically that he picked 80 hours out
15 of the air. And it's essentially an arbitrary
16 number. If, in fact, experience were to dictate
17 that, maybe, 60 hours is the right number, ACGME is
18 more flexible in the way it develops requirements
19 and could react to that quicker than taking the bill
20 through Congress with all that that entails.
21      Also, the apparatus -- the reason the New
22 York regs weren't enforced was, it's very expensive
23 to visit the hospitals and monitor whether all the
24 institutions are complying with the regulations. To

## Page 82

1  do that, on a national level, would be redundant and
2  needlessly expensive.
3       So I met with Conyers, actually. And he
4  expressed gratitude that ACGME was doing this. And
5  I expressed gratitude that he created a little umpph
6  for us to make this change. But he was happy with
7  the ACGME doing it.
8       But that, to answer your question, was
9  another set of vectors in play that led us to do
10 this.
11 Q.   The quality of patient care and patient
12 safety, obviously, is a major concern on the duty
13 hour requirements?
14 A.   Yes.
15 Q.   Was there any concern about how limiting
16 the duty hours would affect the educational nature
17 of the programs?
18 A.   Yes.
19 Q.   And tell me about that.
20 A.   Well, there remains concern. And we, in
21 a sense, solved one problem and created another,
22 because continuity of care is very important.
23      There are times, if I've been watching
24 you very carefully with a serious illness -- and I

## Page 83

1  see how you react to interventions, and how the
2  illness is unfolding -- that, even though I'm tired,
3  I might be of greater service to you than an equally
4  advanced beginner, competent person, who is rested
5  but doesn't know you at all and is just sort of
6  meeting you for the first time.
7       And it is true you do get, when you watch
8  an illness closely, certain sources of information
9  that you can't get otherwise. And so you're with
10 the patient in this evolution. So there was concern
11 about the continuity of care. There was concern
12 about whether adequate numbers of patients or
13 procedures could be done.
14      So, in other words, the surgeons aren't
15 going to change the 500 to 1,000 cases, major cases,
16 that have to be done. But maybe, now, it would take
17 six years, or seven years, or eight years, and
18 extend the length of training in an already very
19 long training period for physicians.
20      As we've looked at that, we've seen many
21 hospitals adapt in very constructive ways and
22 develop an accountability system that is more
23 dependent on teams of people. And so these
24 hospitals can be very dangerous places. And

## Page 84

1  residents know that. And some residents feel that
2  the system of patient safety depends on their
3  individual vigilance.
4       Instead, a new culture is emerging that
5  makes it a team responsibility so that people can go
6  away and rest adequately, without breaching the
7  continuity of care, because there's overlap and a
8  broader number of people familiar with the case.
9       Likewise, through our case log system --
10 as I've mentioned, we've got about 4 million cases a
11 year. We have an archive of 40 million cases -- we
12 have not seen dramatic drops in the case volume
13 since we've imposed duty hours. Now, it's still too
14 early to make a definitive statement about that.
15 But we're monitoring this very closely.
16      There are three areas of concern that we
17 worry about. One is the educational experience, and
18 is that compromised. Another is patient safety, of
19 course, and whether we've done damage by doing this.
20 And the third is resident safety and well-being.
21      You read periodically about very tired
22 residents driving home from work, falling asleep,
23 and getting into an accident, or just being under
24 acute and chronic sleep depravation to the point

21 (Pages 81 to 84)

## Page 85

1  their function is impaired.
2       I think, to your earlier question,
3  another variable that was very important -- in the
4  ACGME's establishing of these duty hour
5  requirements -- was the new science emerging from
6  sleep science, which showed the effects of acute and
7  chronic sleep depravation. And while it is true
8  that people are variable, there is a certain
9  threshold beyond which your human performance is
10 impaired.
11      And so we could not ignore that data. We
12 had to tell people to go home and sleep. The old
13 model of sort of hanging around and seeing cases was
14 no longer appropriate.
15  Q.  Explain that just for a second. You've
16 talked about the duty hour requirements and some of
17 the counter-balancing issues.
18      If my son is in the hospital and the
19 resident decides to, you know, leave at
20 5:00 o'clock, but my son is still showing
21 symptoms --
22  A.  Right.
23  Q.  -- I can imagine that I would have some
24 concern about that.

## Page 86

1   A.  Right.
2   Q.  So there is a patient care issue.
3       But how does that affect the education to
4  the residents? I'm not sure if I understand that.
5       If the resident goes home at 5:00,
6  how does that help or hurt his educational
7  experience?
8   A.  Well, I think it's true in all cases.
9  But to make the point, let me change from your son
10 to a pregnant woman in labor.
11      And you've been, now, with her watching
12 her through the various stages of labor. And the
13 minute hand sweeps 12:00, and you walk away. And
14 she delivers an hour later. And you don't get to
15 see the delivery. You don't get to participate
16 in the delivery. Your education has been
17 compromised.
18      Now, the same principle is true if I'm
19 following a patient with ketoacidosis and I'm
20 manipulating potassium, and various doses of
21 insulin, and so on. And I'm watching them get
22 better. But they're still in acidosis, and it's
23 time for me to go home. I don't get to see the
24 resolution of that acute illness, because illness

## Page 87

1  doesn't go by the clock. And so you're missing the
2  opportunity to see that.
3       So it is new territory. And we're trying
4  to preserve -- and think we are, actually,
5  preserving -- the educational experiences. But we
6  don't have the right answer on this yet I'm
7  convinced.
8       And one of the things the ACGME has done
9  is, it's converted its ad hoc task force on duty
10 hours that develop these requirements. And it's, in
11 its stead, put a committee on innovation in the
12 learning environment that's actively seeking out
13 and publishing examples of how you can adapt to
14 duty hours in a way that preserves the education
15 and preserves patient safety and resident
16 safety.
17  MR. MARTIN:  It's five to 12:00. Let's take a
18 break.
19      (WHEREUPON, the deposition was
20       recessed until 12:53 p.m., this
21       date.)
22
23
24

## Page 88

1       IN THE UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF OHIO
3            WESTERN DIVISION
4  UNITED STATES OF AMERICA,    )
5       Plaintiff,    )
6  vs.                ) No. 1:05-CV-445
7  UNIVERSITY HOSPITAL, INC.,   )
8       Defendant.    )
9
10         APRIL 20, 2007
11          12:53 p.m.
12
13      The deposition of DAVID C. LEACH, M.D.,
14 resumed pursuant to recess at Suite 4400, One North
15 Wacker Drive, Chicago, Illinois.
16
17
18
19
20
21
22
23
24

22 (Pages 85 to 88)

Page 89

1  PRESENT:
2      U.S. DEPARTMENT OF JUSTICE,
3      (PO Box 55,
4      Washington, DC 20044,
5      202-307-6553), by:
6      MR. STEPHEN T. LYONS,
7      stephen.t.lyons@usdoj.gov,
8      MS. ELIZABETH LAN DAVIS,
9      elizabeth.lan@usdoj.gov,
10     MS. WENDY J. KISCH,
11     wendy.j.kisch@usdoj.gov,
12         appeared on behalf of the Plaintiff;
13     BAKER & HOSTETLER, LLP,
14     (312 Walnut Street, Suite 3200,
15     Cincinnati, Ohio 45202-4074,
16     513-929-3416), by:
17     MR. TED T. MARTIN,
18     tmartin@bakerlaw.com,
19         appeared on behalf of the Defendant.
20
21
22
23
24

Page 90

1  PRESENT (CONT'D):
2      WILDMAN, HARROLD, ALLEN & DIXON, LLP,
3      (225 West Wacker Drive, Suite 3000,
4      Chicago, Illinois 60606,
5      312-201-2643), by:
6      MR. DOUG R. CARLSON,
7      carlson@wildmanharrold.com,
8          appeared on behalf of the Deponent.
9
10  ALSO PRESENT:
11     MR. THOMAS C. GENTILE, JR., MSA.
12
13
14
15  REPORTED BY: JENNIFER L. BERNIER, C.S.R.,
16         CERTIFICATE NO. 84-4190
17
18
19
20
21
22
23
24

Page 91

1          DAVID C. LEACH, M.D.,
2  called as a witness herein, having been previously
3  duly sworn, was examined and testified as follows:
4          EXAMINATION (CONT'D)
5  BY MR. MARTIN:
6      Q.   For what years have you been the
7  executive director of the ACGME?
8      A.   Since September 1997 until now.
9      Q.   And prior to 1997, did you participate,
10 in any way, in activities related to Graduate
11 Medical Education?
12     A.   I was a program director from 1984 to
13 1997; and I was, in ACGME parlance, a designated
14 institutional official from 1984 to 1997.
15     Q.   Thank you. Would you take a look at
16 page 11 of Gentile Exhibit No. 2. That's the green
17 book.
18     MR. LYONS: 11, did you say?
19     MR. MARTIN: Page 11, yes.
20 BY MR. MARTIN:
21     Q.   And I'm going to refer you to, under the
22 subheading, "Introduction." It reads that the ACGME
23 is jointly sponsored by the American Board of
24 Medical Specialties, the American Hospital

Page 92

1  Association, the American Medical Association, the
2  Association of American Medical Colleges, and the
3  Council of Medical Specialty Societies.
4          Do you see that?
5      A.   I do.
6      Q.   Was that true throughout the period --
7      A.   Yes.
8      Q.   -- '97 through 2004?
9      A.   Yes.
10     Q.   And if you see below that, it states,
11 "The mission of the ACGME is to improve the quality
12 of health, in the United States, by ensuring and
13 approving the quality of Graduate Medical Education
14 experience for physicians in training. The ACGME
15 establishes national standards for Graduate Medical
16 Education by which it approves and continually
17 assesses educational programs under its aegis" --
18 a-e-g-i-s.
19         And was that true throughout the period
20 of 1997 through 2004?
21     A.   Yes.
22     MR. LYONS: Objection. It calls for an
23 opinion. But you can answer.
24

23 (Pages 89 to 92)

Page 93

BY MR. MARTIN:
1
2    Q.   Okay. Well, you knew what the mission
3    was throughout the period; did you not?
4    A.   Yes.
5    Q.   I would like you to look, now, at page 31
6    of the same exhibit. And you had described for us
7    earlier the three phases of Graduate Medical -- I'm
8    sorry. Strike that.
9          Looking at page 31 of the same exhibit,
10   you described the three phases of medical education,
11   the second phase being Graduate Medical Education.
12         And I would like, now, to look at the
13   paragraph that reads, "The single most important
14   responsibility of any program of GME is to provide
15   an organized educational program, with guidance and
16   supervision of the residents, facilitating the
17   resident's professional and personal development
18   while ensuring safe and appropriate care for
19   patients. A resident takes on progressively greater
20   responsibility, throughout the course of a
21   residency, consistent with individual growth and
22   clinical experience, knowledge, and skill."
23         Was this, according to the ACGME, the
24   single most important responsibility of the program

Page 94

1    during the period that we've been talking about?
2    A.   Yes.
3    MR. LYONS: Objection. I'll move to strike on
4    the basis it's opinion. It does say what you read
5    it into the record to say.
6    BY MR. MARTIN:
7    Q.   Well, for the period in question, was
8    that how the ACGME viewed its responsibility?
9    A.   Yes.
10   MR. LYONS: Objection. Calls for opinion.
11   BY MR. MARTIN:
12   Q.   Throughout the period, was that how the
13   ACGME viewed GME?
14   MR. LYONS: Objection. Opinion.
15   BY THE WITNESS:
16   A.   Yes. This is right at the heart of our
17   work and the heart of a Graduate Medical Education
18   program.
19         And that is what we monitor. That is
20   what is required to begin to become in compliance
21   with our standards.
22   BY MR. MARTIN:
23   Q.   Do you see the statement, in the next
24   paragraph below, "Educational quality and patient

Page 95

1    care quality are interdependent and must be pursued
2    in such a manner that they enhance one another."
3    A.   Yes.
4    Q.   What does the ACGME mean by that?
5    MR. LYONS: Objection. Calls for an opinion.
6    BY THE WITNESS:
7    A.   It means, as we talked a little bit about
8    earlier, the linkage between the quality of resident
9    education and the quality of patient care; that if
10   you cannot deliver good patient care, you cannot
11   teach others how to develop their skills in patient
12   care. And so they are interdependent.
13         Likewise, the patient care is enhanced by
14   having more conversations about the particulars of
15   the patient than any single physician could provide.
16   So there's built into the educational program a
17   reflection on the experiences of the various people
18   encountering the patient, shared conversations, a
19   certain level of discipline, and dialogue that does
20   not occur in the absence of an educational program.
21   BY MR. MARTIN:
22   Q.   Let's assume a program that wished to be
23   accredited by the ACGME said to you -- to the
24   ACGME -- "It's fine. But we don't want -- we want

Page 96

1    to be accredited. But we don't want our residents
2    to have to witness or participate in patient care.
3    But we'd still like them to be accredited."
4    A.   They would not be accredited. The
5    purpose is to organize experiences, in this
6    educational program, in a way that allows for
7    graduated responsibility and accumulation of patient
8    care skills. And you cannot do that in the absence
9    of patients.
10   Q.   And my memory is going to be a little
11   faulty here for a second.
12         But my recollection is that somewhere --
13   in either the institutional requirements, or program
14   requirements, or both -- that there are some
15   requirements about the residents receiving stipends?
16   A.   In the institutional requirements, on
17   page 36, Section 2(c)(1), the statement reads,
18   "Adequate financial support of residents is
19   necessary to ensure that residents are able to
20   fulfill the responsibilities of their educational
21   programs."
22         So we have that requirement in place to
23   ensure that the educational nature of the program is
24   not compromised by a need to support themselves

24 (Pages 93 to 96)

DAVID C. LEACH, M.D., APRIL 20, 200

Page 97

1  financially by, for example, getting another job or
2  doing that.
3      Q.   Has the ACGME monitored, in any way, the
4  amount of debt that --
5      MR. LYONS: I'm sorry. The amount of what?
6  BY MR. MARTIN:
7      Q.   The amount of debt that medical students
8  are entering residency programs with?
9      MR. LYONS: Objection. No foundation.
10 BY THE WITNESS:
11     A.   No. ACGME does not, in any way formal
12 way, monitor the debt load of graduates. We read
13 the paper, and other bodies do that.
14          And we know that residents entering --
15 medical school graduates entering residency programs
16 typically have a very heavy debt load.
17 BY MR. MARTIN:
18     Q.   I would like to go back briefly to the
19 duty hour limitations. And in response to the duty
20 hour limitations, the 80-hour limits --
21     A.   Yes.
22     Q.   -- in monitoring that, have you found any
23 tendency of residents to try to seek to circumvent
24 those and participate in the programs more than 80

Page 98

1  hours a week?
2      A.   Yes. There are some specialties where
3  it's more apt to be the case -- particularly,
4  surgery -- with some residents, in general, for two
5  reasons.
6          One, they want very much to acquire the
7  experience of surgical cases. And if they're not
8  there, they are missing that experience. And then
9  they also feel a particular obligation to the
10 patient. And if a system is not in place whereby a
11 team of individuals is accountable for that patient,
12 they do not want to abandon the patient.
13          So, in general, we do survey residents.
14 And we have about 3 percent of the 100,000 residents
15 report working more than 80 hours a week. And if
16 you probe into that 3 percent, that's what you find.
17     Q.   Following up on that, in terms of the
18 residents sometimes seeking to avoid the hour limits
19 because they want the experience, is it your sense
20 that the residents that are in the residency
21 programs there for the stipend or because
22 they're seeking the education and training?
23     MR. LYONS: Objection. Calls for opinion and
24 speculation.

Page 99

1  BY THE WITNESS:
2      A.   Only an insane person would enter a
3  residency to get a job. It is not a job.
4          It is a prerequisite to independent
5  practice. And it's an intense experience. It is a
6  journey to authenticity as a physician.
7          And so their motives are to become an
8  authentic physician, but, more practically, to
9  become able to practice independently and to enter
10 the profession in a way in which they've met all of
11 the criteria for entering the profession.
12          And you would literally have to be insane
13 to enter it for any other reason.
14 BY MR. MARTIN:
15     Q.   Sometimes the line between opinion and
16 fact is very -- fact testimony is a little unclear.
17          But just, to the extent you've given any
18 opinions today, do you hold those opinions to a
19 reasonable degree of professional certainty?
20     A.   Yes.
21     Q.   Now, I want to just touch briefly on the
22 six competencies.
23          And you told me -- told the Court -- a
24 little bit about those six competencies. Maybe, if

Page 100

1  we could, just go through those so that I understand
2  each of them.
3          One of the six competencies is patient
4  care that is compassionate, appropriate, and
5  effective; is that right?
6      A.   Yes.
7      Q.   And the second is, am I right, that it's
8  medical knowledge about established and evolving
9  biomedical, clinical, epidemiological, and social
10 behavioral sciences?
11     A.   Yes.
12     Q.   And is the third patient-based learning
13 improvement that involves investigation and
14 evaluation of patient care?
15     A.   You said patient-based. And I think it's
16 practice-based learning and improvement.
17     Q.   And the fourth is interpersonal and
18 communication skills?
19     A.   Yes.
20     Q.   And the fifth is -- do you recall what
21 the fifth is?
22     A.   Systems-based practice.
23     Q.   And the sixth?
24     A.   Oh, the fifth is professionalism; and the

25 (Pages 97 to 100)

Page 101

1 sixth is systems-based practice.
2     Q.   How did you develop these -- how did you
3 narrow it down to six?
4     A.   For as long as ACGME has existed, we paid
5 attention to physician competence. In 1999 --
6 actually, in 1997 the ACGME committed to using the
7 Educational Outcomes as an accreditation tool. And
8 so we went through a process for two years and, in
9 February of '99, deconstructed physician competence
10 into six physician competencies.
11         That process began with a literature
12 search that identified a potential for
13 84 competencies. We clustered those into 13
14 categories, and displayed all 84, and conducted a
15 survey and focus groups of lots of people who know a
16 lot about graduate education, and asked -- for each
17 of the 84 -- "Is this a relevant competence," and,
18 "Is it feasible to measure it?"
19         And we came back with a narrower list and
20 realized that most of our friends could remember six
21 things; but not all of them could remember seven.
22 And we didn't want this to be in a book. We wanted
23 this to be in people's hearts and minds. And so
24 they had to be able to memorize it.

Page 102

1         We knew -- and the only reason you sort
2 of deconstruct any phenomenon is to measure it and
3 improve it. And we wanted the world, using our
4 leverage, to begin to measure and improve a broader
5 range of competencies than just medical knowledge
6 and patient care skills.
7         We wanted them to learn how to analyze
8 their practice and see if they were delivering good
9 patient care. We wanted them to learn the skill of
10 improving in making an intervention to improve
11 patient care and determine whether the intervention
12 was an improvement.
13         There was a deep hunger for a return to
14 professionalism and the values. When things are in
15 a state of radical change, it's very good to pay
16 attention to -- you know, Dee Hock says, "Substance
17 is enduring. Form is ephemeral. Preserve
18 substance. Modify form. Know the difference."
19         So the forms of medicine have changed
20 dramatically over the last few decades. But there
21 was a hunger to identify and be clear about the
22 substance of medicine -- i.e., the values of
23 professionalism -- and to be both faithful and
24 effective physicians. And so that is why we picked

Page 103

1 professionalism.
2         And in surveys that we didn't do -- but
3 others have done abundantly -- there was, and
4 continues to be, a tremendous need to improve
5 communication skills and interpersonal relations.
6 Not only with patients -- although, especially with
7 patients -- but also with other colleagues.
8         As care has gotten complex, we've moved
9 from a model of a one-to-one relationship -- doctor
10 and patient -- to, maybe, a twenty-to-one
11 relationship with various types of doctors, and
12 nurses, and physical therapists, and other
13 colleagues.
14         And communicating actually enhances
15 patient safety. So we wanted to develop those
16 skills. And then we wanted to pay attention to the
17 systems that healthcare is delivered in.
18         It was not enough to pay just attention
19 to individual competence. You can be a perfectly
20 functioning kidney cell. But if the heart fails,
21 you're going to fail. And that metaphor applies to
22 complex systems where delivering safe and effective
23 patient care depends on more than you.
24         And so, while we've always been

Page 104

1 interested in programs demonstrating that they can
2 graduate competent physicians, we thought broadening
3 the agenda a bit, by adding these four other
4 competencies to medical knowledge and patient care,
5 was appropriate; and that the education of the
6 modern physician required that we deconstruct into
7 those six elements and measure -- or have the
8 programs measure, demonstrate that they're measuring
9 them and that they're improving them. So that's why
10 we did that.
11     Q.   Are you aware of any other professional
12 educational programs which are -- strike that.
13         Are you aware of any other educational
14 programs of other professionals that are evaluated
15 for whether or not they are producing competent
16 individuals or competent professionals?
17     A.   I'm not. I'm aware of the use of
18 different forms of competency-based learning and
19 colleges in the traditional undergraduate colleges.
20 But I'm not aware of really any other profession
21 that has national standards.
22         So, for example, law and engineering.
23 When you get out of school, you go and work for a
24 law firm, or Motorola, or something like that. And

26 (Pages 101 to 104)

DAVID C. LEACH, M.D., APRIL 20, 200

Page 105

1 they may have a corporate training program. They
2 usually have some sort of educational program. But
3 it is designed to serve the needs of the corporation
4 and is created by the corporation.
5        It's not reviewed by a national body.
6 You're not teaching to a national standard. You're
7 teaching to a corporate standard. And there is a
8 wide variability across the various corporations.
9        I think, as a patient safety issue,
10 medicine is so important that the education
11 programs -- in the Graduate Medical Education
12 period -- must meet national standards and not meet
13 corporate standards. That would take us back to the
14 earlier history that I alluded to where there was a
15 lot of variability in the training and the country
16 was not well served.
17    Q.   A final few questions from me.
18        It is permissible for people sometimes,
19 who are testifying as experts, to receive
20 compensation for their time.
21        Are you receiving any compensation from
22 anybody for your time here today?
23    A.   No.
24    Q.   Okay.

Page 106

1    A.   No. I feel that I'm an expert in medical
2 education. But I'm not anybody's expert. I'm not
3 beholding to you. I'm not beholding to the
4 government.
5        And I feel that, by being just beholding
6 to the truth, I can speak more freely and don't have
7 to shake my arguments to serve either side of the
8 case.
9    Q.   Before today's deposition, you and I
10 spoke.
11        Did you speak with anybody representing
12 the government before today's deposition?
13    A.   Yes.
14    MR. MARTIN:  I'll pass the witness. Steve,
15 would you like to sit here?
16    MR. LYONS:  No.
17        EXAMINATION
18 BY MR. LYONS:
19    Q.   This may be a little late to ask this
20 question. But are you taking any medication that
21 might impair your ability to testify here today?
22    A.   No.
23    Q.   Okay. Mr. Martin just asked you if you
24 had talked to us. And you talked to him.

Page 107

1        Did you talk to anyone else in
2 preparation for your testimony today?
3    A.   No. I've had conversations with my
4 attorney. But they were -- for example, I have been
5 subpoenaed to be here today, and the subpoena was
6 delivered to him. He told me I was subpoenaed.
7    Q.   Be here --
8    A.   Right.
9    Q.   -- or else, right?
10    A.   Right.
11    Q.   Okay. But that was the extent of your
12 conversations with Mr. Carlson?
13    A.   Right.
14    Q.   Okay. And at lunch today you didn't talk
15 about your testimony?
16    A.   We talked about whether we could get fish
17 and chips in 30 minutes.
18    Q.   Okay. I hope you were successful.
19    A.   We were.
20    Q.   Okay. Did you happen to look at any
21 documents in preparation for your testimony here
22 today?
23    A.   No. I looked at our own, ACGME's,
24 requirements, institutional requirements, and some

Page 108

1 of the programmatic requirements.
2        I looked at my CV. I looked at our
3 annual report and our data book just to sort of
4 refresh my memory about things that you might ask
5 me.
6        But I have not seen, for example,
7 anybody's testimony or even the argument in the
8 case. I have not seen any of those documents.
9    Q.   And this was done at your own behest as
10 opposed to a request from someone else?
11    A.   Correct.
12    Q.   Nobody asked you to look at certain
13 documents?
14    A.   No.
15    Q.   I believe your counsel, Mr. Carlson, was
16 kind enough to inform us of this. But let me just
17 make sure.
18        In arranging for all of this for the
19 testimony here today, were there any exchange of
20 e-mails with anybody?
21    A.   I don't think so.
22    Q.   Okay. None that you recall?
23    A.   Right.
24    Q.   Okay.

27 (Pages 105 to 108)

Page 109

1    A.   I would hate to say that. It sounds like
2  I'm a crook. But I don't think that -- I recall no
3  e-mails.
4    Q.   Okay. In this day and age, it's hard to
5  say no e-mails. But it's possible?
6    A.   Right.
7    Q.   Okay. Have you ever been deposed before?
8    A.   Yes.
9    Q.   Okay. A great number of times, a small
10 number?
11   A.   A small number of times.
12   Q.   Two, three, four?
13   A.   Yes, two or three.
14   Q.   And could you just generally describe for
15 me what the reasons for those depositions were?
16   A.   I am an endocrinologist. And my first
17 deposition was about a child with psychosocial
18 dwarfism. And I was called in as an expert to
19 inform the Court about that particular disease.
20        On another occasion, I was called in as
21 an expert to talk about a case in a malpractice
22 case. I don't think I have been deposed since I
23 have been at ACGME.
24   Q.   So those two are the ones that you

Page 110

1  remember?
2    A.   Right.
3    Q.   And they were both as expert witnesses?
4    A.   Right.
5    Q.   And you're not appearing here today as an
6  expert; is that correct?
7    A.   Again, I feel like I'm an expert. But I
8  am not -- and I don't know the legal definition of
9  an, "expert."
10        I'm not being paid. I have not produced
11 a report. I am not defending either side of this
12 case.
13   Q.   Let me rephrase my question. Perhaps, it
14 would be better to ask that you have not been
15 retained by either side as an expert.
16   A.   That's correct.
17   Q.   Okay. And you're appearing here in your
18 individual capacity as opposed to a representative
19 of the ACGME; is that correct?
20   A.   That's correct.
21   Q.   So your views that have been expressed
22 today -- to the extent that they have been
23 expressed -- are those of your own and not
24 necessarily those of the ACGME; is that correct?

Page 111

1    A.   That's correct, with the exception of
2  we've reviewed some institutional and program
3  requirements on the competencies and duty hours.
4  And those words are the official opinion of the
5  ACGME.
6    Q.   That's why I say they may not necessarily
7  be your -- or the views of the ACGME.
8        Sitting here today, you're not
9  representing the ACGME?
10   A.   That's correct.
11   Q.   Okay. Fine.
12        Now, I don't know whether your attorney
13 or Mr. Martin has explained this to you.
14        But you're, obviously, aware that this
15 case is in Cincinnati?
16   A.   Yes.
17   Q.   You're in Chicago. And neither one of us
18 can force you to come to a trial if it comes to
19 that. We're hoping it doesn't, but we never know.
20        If either Mr. Martin or I, or both of us,
21 had asked you to come to Cincinnati to testify on
22 behalf of either one or both of us, would you be
23 willing to voluntarily come, because we cannot force
24 you to come?

Page 112

1    A.   That's a hypothetical question. And I
2  don't know the answer to it unless it's a real
3  question. And I would have to think about it.
4    Q.   In other words, your answer is, "It
5  depends"?
6    A.   It depends.
7    Q.   Okay. You're not saying, "yes." You're
8  not saying, "no."
9    A.   I'm saying that it depends.
10   Q.   That's fine. Okay. Now, I'm sensing
11 that -- certainly, since 1997 -- you have not been
12 clinically active; is that correct?
13   A.   That's correct.
14   Q.   Up until that point in time, you said, I
15 think, you were a program director at Ford?
16   A.   That's correct.
17   Q.   Okay. And you were also clinically
18 active at that point in time?
19   A.   Yes.
20   Q.   Okay. So your clinical activity, if you
21 will, ceased starting in '97 when you became
22 executive director?
23   A.   That's correct.
24   Q.   Okay. And I believe your Website

## Page 113

1 indicates that you're retiring in September of this
2 year?
3    A.    That's correct.
4    Q.    Okay. Any plans?
5    A.    Yes. We're moving to Asheville, North
6 Carolina.
7    Q.    Up in the mountains?
8    A.    Up in the mountains.
9    Q.    Okay. Moving into the Vanderbilt home?
10    A.    How did you know? If I was going to do
11 that, I would have to be a retained expert.
12    Q.    Will it be a full-blown retirement, or
13 are you just --
14    A.    For 12 months, at least. I'm taking that
15 time to write a little bit, and to reflect, and to
16 celebrate. And then, after that, I don't know what
17 will happen.
18    Q.    Okay. But for 12 months you're just
19 going to enjoy life?
20    A.    I enjoy life every day, but I'm going to
21 enjoy it in the mountains.
22    Q.    Okay. Now, let me just go back for one
23 minute in connection with this expert witness.
24         Had Mr. Martin's client asked you to

## Page 114

1 appear as an expert in this case?
2    A.    I don't think so. And I'm not clear
3 exactly.
4         I know I volunteered that I would not be
5 an expert. And I think I did that before they had
6 the opportunity to ask me to be an expert.
7    Q.    Nipped it in the bud, if you will?
8    A.    Right.
9    Q.    Now, as Mr. Martin explained -- in some
10 of his questions to you -- there's a fine line
11 between opinions and facts.
12         I'm sensing, from your testimony here
13 with Mr. Martin, that your intention was not to give
14 any opinions; is that correct?
15    A.    I don't know the legal definition of,
16 "opinions." And I've sworn and have tried, to the
17 best of my ability, to tell the truth.
18    Q.    Okay. So you're not sure whether you
19 gave opinions or not depending on how you define
20 opinion; is that correct?
21    A.    Depending on how you define opinion. I
22 don't know the legal definition of opinion.
23    Q.    What would you call an opinion?
24    A.    I think I observe various phenomena in

## Page 115

1 this case about Graduate Medical Education -- and I
2 observe it from a national perspective -- and see a
3 lot of what's happening in Graduate Medical
4 Education.
5         And I also lead an apparatus that
6 conducts 2100 site visits a year; and that develops
7 and holds programs accountable to educational
8 standards. And so, from that point of view, I can
9 share observations that are factual and that reflect
10 personal opinion about what I've observed.
11    Q.    So based on that definition here today,
12 you've both given a factual observation and an
13 opinion observation?
14    MR. MARTIN:  Object to form.
15 BY THE WITNESS:
16    A.    I think, "both," is the operant word.
17 And I think that there are times, when it's clearly
18 factual, reading and agreeing that those are the
19 words.
20         And there are times when -- for example,
21 I've talked about the history of Graduate Medical
22 Education. I wasn't there in Colonial America. So
23 I don't have -- I'm reporting the facts that
24 historians have reported.

## Page 116

1         And so I would consider that sort of a
2 factual interpretation of medical education.
3 BY MR. LYONS:
4    Q.    Okay. Perhaps, I can quote you from
5 another perspective; and that is what you didn't
6 say.
7         And that is that you're not rendering any
8 opinion here today as to whether these medical
9 residents are more like employees than students in
10 terms of whether or not they can qualify for the
11 Social Security exemption; is that correct?
12    MR. MARTIN:  Objection to form.
13 BY MR. LYONS:
14    Q.    You can answer.
15    MR. MARTIN:  Sometimes I have to make an
16 objection just for the record.
17    MR. LYONS:  Yeah. That's fine.
18 BY THE WITNESS:
19    A.    Again, one thing I'm not an expert in is
20 the definition of an employee. And so I have no
21 opinion about that.
22         I do know that at the very heart of
23 Graduate Medical Education is the student's agenda.
24 And we think, and act, and organized, and behave --

29 (Pages 113 to 116)

Page 117

1  on society's behalf -- around the principle that
2  residents are students.
3  BY MR. LYONS:
4      Q.    And the core of this whole idea is
5  that -- you're talking about the Graduate Medical
6  Education enterprise now, right?
7      A.    Yes.
8      Q.    And at the core of this Graduate Medical
9  Education enterprise is the resident performing this
10 patient care; is that correct?
11     A.    It is the resident being enrolled in an
12 organized educational program that has a curriculum
13 that assesses the resident's development that
14 evaluates and provides highly supervised graduated
15 experiences in patient care.
16           It is more than patient care. It
17 includes didactic sessions. There are many
18 elements, in the 300 pages of requirements, that
19 don't deal with patient care. But that is one piece
20 of it.
21     Q.    I think that you had said -- in your
22 earlier testimony -- something to the equivalent
23 that without patients and patient care there would
24 be no GME experience; is that correct?

Page 118

1      A.    That's correct.
2      Q.    Okay. So if we don't have patient care,
3  we don't have GME; is that right?
4      A.    That's correct.
5      Q.    Okay. And I think that you had indicated
6  right here, at the very end, that, if a resident had
7  either refused to do patient care or wasn't part of
8  the program, there would be no accreditation; is
9  that correct?
10     A.    If the program did not provide patient
11 care experiences, or if a resident refused to see
12 patients and was not managed by the program, we
13 would withdraw accreditation of that program.
14     Q.    And if the resident had refused to
15 perform the patience care, he'd be immediately
16 fired, right?
17        MR. MARTIN: Object to the term. Object to
18 form.
19 BY MR. LYONS:
20     Q.    He would be immediately terminated?
21        MR. MARTIN: Object to form.
22 BY MR. LYONS:
23     Q.    Okay. You can answer.
24     A.    I think the reasons why a resident might

Page 119

1  not want to see a patient are myriad. And I think
2  the organization would come to some decision; and,
3  actually, it probably would not be immediate.
4           I think our standards would require some
5  sort of probationary period or some opportunity to
6  remediate and to understand the circumstances. And
7  so I think that it probably -- if it, in fact, was
8  not an isolated incident -- would result in the
9  resident being put on educational probation.
10 BY MR. LYONS:
11     Q.    Let me give you an extreme hypothetical
12 example here.
13           That is, if the resident refused to
14 perform any patient care, under any circumstances,
15 his contract would be terminated at that point; is
16 that correct?
17     A.    If the resident -- again, I can't
18 second-guess the program. We would review the
19 program and make a determination of whether the
20 program remained in substantial compliance to our
21 requirements.
22     Q.    Okay. Go ahead.
23     A.    So I would need to know the particulars,
24 and I would need to know how the program responded

Page 120

1  to those particulars. We would keep our eye on the
2  program.
3      Q.    One of the contractual requirements --
4  and we'll get into the contract later. But while
5  we're here, let me pursue it for a moment.
6           One of the requirements, in a resident's
7  contract, is that he perform patient care services;
8  is that correct?
9      A.    We have the ACGME template of a
10 contract --
11     Q.    Right.
12     A.    -- on page 36.
13     Q.    That's right. And one of those
14 requirements is that he perform patient care
15 services; is that correct?
16     A.    Could you direct me to the language that
17 you're referring to?
18     Q.    Certainly. I've got the year 1999-2000
19 one. Let's see here.
20           Well, I'm assuming that this is the same
21 one. It says here that the agreement must also
22 delineate a reference to specific policies regarding
23 a resident's responsibilities.
24           Do you see that?

30 (Pages 117 to 120)

Page 121

1    A.   Yes, I do.
2    Q.   Okay.
3    A.   So we're referring, in the 2000-2001, to
4    2C, 4A.
5    Q.   Yep.
6    A.   Okay.
7    Q.   And, obviously, from what you have told
8    me today, one of the responsibilities -- and one of
9    the main major responsibilities -- of a resident is
10   to perform patient care; is that correct?
11       MR. MARTIN:  Object to form.
12   BY THE WITNESS:
13       A.   Your question was suggesting that the
14   resident contract specifies that they must take care
15   of patients.
16   BY MR. LYONS:
17       Q.   Fine.
18       A.   Our standard requires that the agreement
19   delineate specific policies about resident
20   responsibilities.
21       Q.   Okay.  And, most clearly, one of the
22   requirements of the ACGME -- in terms of the
23   resident's responsibility -- is that he perform
24   patient care; is that correct?

Page 122

1    A.   I think that the focus on education
2    requires the presence of patient care.  I think the
3    patient care is primarily the responsibility of the
4    attending physician.
5        And the resident participates and
6    contributes to patient care, but is not ultimately
7    responsible for patient care.
8    Q.   So is your answer that a resident does
9    not have a patient care responsibility?
10       A.   No.  My answer was, as I just stated,
11   that the ultimate responsibility for patient care
12   rests with the attending physicians; and that the
13   resident participates in the patient care as a
14   learning experience and as one of the elements
15   contributing to patient care, but does not have
16   ultimate responsibility for the patient.
17       Q.   Then you would agree with me, though,
18   wouldn't you, that a resident has some -- not,
19   maybe, ultimate, but a responsibility -- for patient
20   care; is that correct?
21       A.   The resident has a responsibility to
22   develop their skills; and it is essential that they
23   see patients to do that.
24       Q.   Okay.  So let me go back to my question

Page 123

1    again.
2        Based on what the ACGME has stated here,
3    isn't it fair to read, at paragraph 4A, that the
4    resident's responsibilities have to be in the
5    contract; and that one of those responsibilities of
6    a particular resident is the performance of some
7    kind of patient care under supervision?
8        MR. MARTIN:  Object to form.
9    BY THE WITNESS:
10       A.   The first part of your question is
11   certainly correct, that the agreement delineates --
12   the institutional programmatic agreement with the
13   resident must delineate or reference specific
14   policies regarding resident responsibilities.  They
15   are broader than patient care.
16   BY MR. LYONS:
17       Q.   But do they include --
18       MR. MARTIN:  Wait.  Excuse me.  Would you let
19   the witness finish, please?
20   BY MR. LYONS:
21       Q.   Go ahead.
22       A.   They are broader than patient care.  They
23   do include patient care.  But only as a contributor
24   with others to the care of the patient and only

Page 124

1    under very careful supervision.
2        Q.   Let me pose the question this way then.
3        If a resident refused, under all
4    circumstances, to perform any -- and, I mean,
5    "any" -- form of patient care, would he be in
6    violation of the ACGME rules?
7        A.   The ACGME rules hold the program to a
8    standard.  They do not hold the resident to a
9    standard.
10       We would review the program.  And if the
11   program didn't make it clear that this is an
12   educational program at the heart of which is
13   acquiring the practical skills needed to practice
14   independently, and that to do that you had to have
15   graduated, supervised encounters with patients -- if
16   they took that off the board and didn't respond to
17   that, we would withdraw the program's accreditation.
18   But we would not have a comment about the resident.
19       Q.   So it is the institution who is
20   responsible for making sure that the contract terms
21   are met, not the ACGME?
22       A.   Correct.
23       Q.   Okay.  But I think that, as you've just
24   said a few minutes ago, certainly, one of the

31 (Pages 121 to 124)

Page 125

1  requirements that the ACGME has of its residents is
2  that there is a component of patient care involved
3  in the Graduate Medical Education experience?
4      MR. MARTIN: Objection to form.
5  BY THE WITNESS:
6      A.  I would agree with that. I would not
7  derive that from the resident agreement. I would
8  derive it from one of the six competencies.
9  BY MR. LYONS:
10     Q.  They were not there until 1999, though,
11 right?
12     A.  They were not approved by the ACGME board
13 until 1999; and they were not in the requirements
14 until 2000.
15     Q.  So your answer would be only from 2000
16 forward?
17     A.  No. There's other references, in the
18 various curricular pieces of the requirements, that
19 referred to patient care before the competencies
20 came on board.
21     Q.  Okay. I think, if there's one thing
22 that's clear here today to all of us, it is that
23 patient care is a good part of what you do in
24 Graduate Medical Education, correct?

Page 126

1      MR. MARTIN: Object to form.
2  BY MR. LYONS:
3      Q.  Would that be fair?
4      A.  Yes. I mean, we would see it as a
5  violation of the educational agenda. By linking it
6  to the contract, you suggested it was a violation of
7  some other agenda.
8          And I agree with the conclusion that
9  patient care is part of it because of the
10 educational agenda.
11     Q.  Okay. And so in this case, if the
12 hospital determined that the resident wasn't doing
13 what he was contractually obligated to do, then it
14 would be up to the hospital to determine whether or
15 not they terminate him or not?
16     MR. MARTIN: Object to form.
17 BY THE WITNESS:
18     A.  Correct.
19 BY MR. LYONS:
20     Q.  Okay. I'm going to go to the 1999-2000
21 one, because that's the one I copied.
22     MR. LYONS: Can you mark that for me?
23
24

Page 127

1          (WHEREUPON, a certain document was
2          marked Leach Deposition Exhibit
3          No. 2, for identification, as of
4          04-20-2007.)
5  BY MR. LYONS:
6      Q.  Turn over to page 30, if you don't mind.
7  And this is going to follow up with where we just
8  were.
9          By the way, this is part of what I think
10 you referred to as the, "Essentials"?
11     A.  Correct.
12     Q.  Okay. And just refresh my recollection
13 as to what exactly the, "Essentials," are?
14     A.  Well, in particular, you referred me to
15 the institutional requirements.
16     Q.  Okay.
17     A.  There are two general categories of
18 requirements -- institutional and program.
19          Institutional requirements are designed
20 to set standards for the administrative support of
21 all educational programs in a given institution.
22 And all sponsoring institutions must meet these
23 requirements.
24          Program requirements get into the

Page 128

1  particular curricular items of a given specialty.
2      Q.  Okay. So we're talking here, under 2C,
3  about the institutional as opposed to the program
4  requirements?
5      A.  That's correct, and the administrative
6  support for all educational programs.
7      Q.  Okay. And part of the requirements are
8  that there be a contract -- one of the requirements?
9      A.  Correct.
10     Q.  Okay. And this employment contract sets
11 forth certain things -- like the salary that's to be
12 paid, the fringe benefits that are to be received;
13 is that correct?
14     MR. MARTIN: Objection to form. You called
15 it, "an employment contract."
16          He's already testified he didn't know
17 whether it was an employment relationship or not.
18 BY MR. LYONS:
19     Q.  You can answer it.
20     A.  Could you either restate it or --
21     Q.  I'll just have her read it back.
22     A.  Okay.
23     MR. MARTIN: Same objection.
24 BY THE WITNESS:

32 (Pages 125 to 128)

Page 129

1    A.    So the agreement with the resident has to
2 have certain elements in it, as 2C indicates --
3 including financial support.  For example, the
4 stipend that's given to the resident.
5         And applicants must see the agreement
6 before they commit to join the program.  And under
7 C3 it references particular elements of the program.
8 BY MR. LYONS:
9    Q.    Under C, in the heading, what does it
10 say?
11    A.    "The sponsoring and participating
12 institutions."
13    Q.    No, no.  The heading.
14    A.    "Resident Support Benefits and Conditions
15 of Employment."
16    Q.    We have, "Conditions of Employment."  And
17 down on three we have a, "Contract."
18         Wouldn't it be fair to say that what this
19 contract is is a contract for conditions of
20 employment?
21    MR. MARTIN:  Objection to form.
22 BY THE WITNESS:
23    A.    Again, I'm not an expert on what
24 constitutes employment.

Page 130

1 BY MR. LYONS:
2    Q.    Okay.  You would agree that the words,
3 "Conditions of Employment," appear there in the
4 heading of paragraph C?
5    A.    I do.
6    Q.    2C?
7    A.    Yes.
8    Q.    Did you write that?
9    A.    No.  I didn't write it.  It was approved
10 by ACGME in 1998, which probably means the
11 institutional review committee crafted the language.
12 It was read and approved by ACGME at that time.
13         So it, probably -- with the vetting
14 process and everything -- antedated my arrival.  But
15 I did not write it, no.
16    Q.    But you were the executive director?
17    A.    I was.
18    Q.    So you ultimately would have had to
19 approve this, right?
20    A.    No.  The board of ACGME has authority
21 over that.  In that case I do know what an opinion
22 is.
23         And I might have an opinion about it.
24 But I would not have to approve it.

Page 131

1    Q.    Okay.  Would you have ever looked at it
2 before it went to the board?
3    A.    Yes.
4    Q.    Okay.  Do you recall making any changes
5 to it?
6    A.    No.
7    Q.    Okay.  So, at least, as far as it was
8 concerned, when it went through your hands, you
9 approved it?
10    A.    I wouldn't use the word, "approved."  I
11 had no comment on it.
12    Q.    I suppose, by passing it along without
13 comment, one could conclude that you approved it?
14    MR. MARTIN:  Object to form.
15 BY THE WITNESS:
16    A.    That's one possible interpretation.
17 BY MR. LYONS:
18    Q.    Well, let's put it this way.  If you had
19 disapproved of it, you certainly would have made a
20 comment on it, I suppose, being the kind of person
21 that you are?
22    A.    I would have rendered an opinion and
23 taken that opinion with the rest of the opinions of
24 everyone -- everybody who commented about these

Page 132

1 requirements -- to the Program Requirements
2 Committee and then to the board.
3    Q.    But you did make no such comments; is
4 that correct?
5    A.    Correct.
6    Q.    Okay.  Well, let me ask you this.
7         Part of the ACGME requirements of the
8 contract are that the resident be paid.  I'll call
9 it a salary.  You call it a stipend.  Although, in
10 an article, you called it a salary in 1986.  But
11 we'll get to that later.
12         But, anyhow, the ACGME requirements are
13 that the resident be paid a sum of money, be given
14 fringe benefits.  And in return for that
15 compensation -- I do believe the word,
16 "compensation," appears in here somewhere -- but at
17 any rate, in turn for these payments, one of the
18 things that the resident is required to do is
19 perform patient care; is that correct?
20    MR. MARTIN:  Object to form.
21 BY MR. LYONS:
22    Q.    One of the things.  Not the only thing,
23 but one of the things?
24    MR. MARTIN:  Object to form.

33 (Pages 129 to 132)

Page 133

1  BY THE WITNESS:
2      A.   Again, your question implies -- by,
3  "perform patient care" -- that that's done in
4  isolation. They contribute to patient care as part
5  of a larger unit. And the ultimate responsibility
6  is borne by the attending physician.
7          I think your reference to compensation
8  does appear under C as, "Compensation of residents
9  and distribution of resources for the support of
10  education should be carried out with the advice of
11  the Graduate Medical Education committee."
12  BY MR. LYONS:
13      Q.   Yep. I guess my question here is, we
14  have a contract. The contract requires payment of a
15  sum of money to a resident. It requires that the
16  hospital in this case provide fringe benefits. And
17  because it is a contract, there's two sides to this.
18          And in return for this compensation, the
19  resident has to do something. What does the
20  resident do for that compensation?
21      A.   Acquire the practical skills needed to
22  practice independently.
23      Q.   And one of the things that a resident
24  does to acquire those skills is to perform patient

Page 134

1  care; is that correct?
2      A.   In the context of a larger unit
3  performing patient care, yes.
4      Q.   Okay.
5      A.   We got into this territory because of the
6  fundamental -- the view of the ACGME is that
7  financial support is provided to maintain the
8  educational agenda.
9          So the amounts paid, for example, are
10  much less than they would be in comparable
11  professions with comparable experiences. But they
12  have to receive some stipend, because, otherwise --
13  given their debt load and given the realities of
14  their advanced training programs -- they would, in
15  fact, have to work rather than be in an educational
16  program. And that would compromise the educational
17  program.
18      THE REPORTER: Hold on one second.
19          (WHEREUPON, a recess was had.)
20  BY MR. LYONS:
21      Q.   Let me try one more thing here, and then
22  we'll move on. Let me ask you this.
23          What would you call an agreement between
24  two parties where one party pays fringe benefits,

Page 135

1  pays a salary, and in return receives some form of
2  service? What would you call that?
3      MR. MARTIN: I object to form.
4      MR. LYONS: Fine. Noted.
5  BY THE WITNESS:
6      A.   I think that the -- I would not call it
7  what happens in GME. I would think that everything
8  is right until -- I think it's an educational
9  contract.
10          I think that the exchange of benefits for
11  service may take people down the path of an
12  employment contract. And it's the exchange of
13  benefits for -- and the resident's obligation is
14  more of a duty to the educational agenda, which
15  includes some elements of patient care.
16          But it is not true to say that this is an
17  exchange of benefits for service.
18  BY MR. LYONS:
19      Q.   So the hospital got nothing out of this?
20      A.   The hospital is in this because of their
21  educational mission. That is why hospitals do it.
22  We require that they do that. We require that the
23  governing board make this commitment to an
24  educational agenda.

Page 136

1          There are probably 6,000 hospitals in the
2  United States. There are probably 2,000 hospitals
3  that are actively engaged in Graduate Medical
4  Education. And they have committed to education as
5  a mission, as opposed to the 4,000 hospitals that
6  have not done that. So they're serving their
7  mission.
8      Q.   And in serving that mission, they get
9  large sums of money from the United States
10  government and state governments; don't they?
11      A.   They do get some money from the federal
12  and sometimes from the state.
13      Q.   Large sums in total?
14      A.   In total, I think --
15      Q.   Billions, right?
16      A.   I think in aggregate it's on the order of
17  $6 billion down from $8 billion ten years ago. And
18  so they're getting less.
19          But I don't think that they are doing it
20  to get money. I think they're doing it to serve
21  their educational mission.
22      Q.   The fact is they do get money. And in
23  '97 through 2004, you said they were getting,
24  approximately, 8, 9 billion?

34 (Pages 133 to 136)

Page 137

1      MR. MARTIN: Are you referring to University
2  Hospital getting 8, 9 billion?
3      MR. LYONS: No. No. In total.
4  BY THE WITNESS:
5      A.  This is the national.
6  BY MR. LYONS:
7      Q.  Right, national.
8      A.  And I do not know the amount that
9  University Hospital got.
10     Q.  I'm not asking that.
11     A.  The range is extremely variable. There
12  are well-established teaching hospitals that get
13  zero. There are others that get more money. I
14  think there are -- if your purpose is patient
15  care --
16     Q.  You've answered my question.
17     MR. MARTIN: No. Please, let him answer the
18  question.
19     MR. LYONS: No. No. He's already answered my
20  question.
21  BY MR. LYONS:
22     Q.  Anyhow, Doctor --
23     MR. CARLSON: Have you finished answering the
24  question?

Page 138

1  BY THE WITNESS:
2      A.  I think, if the purpose of the hospital
3  is just patient care, there are more efficient ways
4  of doing this and making money than having residency
5  programs.
6  BY MR. LYONS:
7      Q.  And you had mentioned that there has been
8  a decrease currently in what used to be the payments
9  on a nationwide basis; is that correct?
10     A.  Correct.
11     Q.  Okay. What I want to do is take you back
12  to the years we have, which is '97 -- and then we
13  skipped '98 -- and we go to 2004.
14        During that point in time, it was more
15  than what it is currently today?
16     A.  I think that's correct.
17     Q.  Okay. Now, has the ACGME always required
18  that a resident sign a -- I'm going to call it an
19  employment contract, but a contract?
20     MR. MARTIN: Objection to form.
21  BY THE WITNESS:
22     A.  I don't know the answer to that question.
23  To answer that I would have to go back to 1981 and
24  see the requirements at that point in time.

Page 139

1         And at that point in time, there were not
2  institutional requirements. There were just program
3  requirements.
4  BY MR. LYONS:
5      Q.  Okay.
6      A.  So my guess is, they probably did not
7  require that. But I don't know that.
8      Q.  And when they started you're not really
9  sure?
10     MR. MARTIN: Objection. Form.
11  BY THE WITNESS:
12     A.  In the late '80s.
13  BY MR. LYONS:
14     Q.  Okay. Before you got there?
15     A.  Correct.
16     Q.  Okay. And so, at the time that you came
17  there, these contract -- in the words of the
18  ACGME -- these contracts regarding the conditions of
19  employment -- to use the words of the ACGME there --
20  they were there.
21        And the conditions were in place for
22  these contracts when you got there?
23     MR. MARTIN: Objection. Form.
24  BY THE WITNESS:

Page 140

1      A.  Yes.
2  BY MR. LYONS:
3      Q.  Okay. Now, these contracts regarding
4  conditions of employment are not signed by medical
5  students; are they?
6      MR. MARTIN: Objection. Form.
7  BY THE WITNESS:
8      A.  I don't know that. I don't think so.
9  BY MR. LYONS:
10     Q.  Okay.
11     A.  Medical schools are quite variable. I
12  don't have a comprehensive knowledge of all of them.
13  But I think you're right.
14     Q.  Okay. At least, as you sit here today,
15  you think they do not?
16     A.  Correct.
17     Q.  Okay. Do you know why that is?
18     A.  No.
19     Q.  Also, under this contract of conditions
20  of employment, the ACGME requires the hospital to
21  provide certain fringe benefits; is that correct?
22     MR. MARTIN: Objection to form.
23  BY THE WITNESS:
24     A.  Correct.

35 (Pages 137 to 140)

1 BY MR. LYONS:
2    Q.   Okay.
3    A.   It requires the sponsoring institution to
4 provide it --
5    Q.   And in --
6    A.   -- which may be a hospital. It may not.
7    Q.   In this case the contract is with the
8 University Hospital.
9    A.   (Whereupon, no verbal response.)
10    Q.   Okay. Medical students don't get fringe
11 benefits; do they?
12    MR. MARTIN: Objection to form.
13 BY THE WITNESS:
14    A.   Again, I don't know. I think they are
15 protected in cases of liability. And if a medical
16 student has a needle stick and gets AIDS, they're
17 protected under some form of disability. I don't
18 know the nature of that.
19         But they also have call rooms, for
20 example, when they're taking call at night. So I
21 don't know what you mean by, "fringe benefits."
22 They are protected so that their educational mission
23 is enabled.
24

1 BY MR. LYONS:
2    Q.   Sick or annual leave, they don't get sick
3 or annual leave?
4    MR. MARTIN: Objection to form.
5 BY THE WITNESS:
6    A.   They may. I don't know. But if a
7 medical student gets sick, they go home and lay
8 down, or they go in the hospital, or they do
9 whatever they need to do to get better. And they're
10 not kicked out of medical school because of that.
11 BY MR. LYONS:
12    Q.   One thing for certain is they're not
13 paid; is that correct?
14    MR. MARTIN: Objection to form.
15 BY THE WITNESS:
16    A.   I think that's correct.
17 BY MR. LYONS:
18    Q.   Okay. Turn over to page 25 of --
19    MR. LYONS: Jennifer, what did we call this,
20 Exhibit 1?
21    THE REPORTER: The first one I marked was 1.
22 BY THE WITNESS:
23    A.   That's 2.
24    MR. LYONS: So we're up to -- this is 3?

1    THE REPORTER: Yes.
2    MR. MARTIN: No. That's 2, I believe, Steve.
3 BY MR. LYONS:
4    Q.   All right. On page 25 there, under B,
5 "Graduate Medical Education," it says there -- and I
6 quote -- "The programs are based in hospitals or
7 other healthcare institutions."
8         Do you see that?
9    A.   I do.
10    Q.   Okay. Once again, this is.the ACGME
11 Essentials?
12    A.   Correct.
13    Q.   Okay.
14    A.   This is the preface to the Essentials,
15 correct.
16    Q.   Okay. But it's part and parcel of the
17 Essentials?
18    A.   It is.
19    Q.   Okay.
20    A.   It's descriptive. It's not a standard.
21 But it's a descriptive preface to the standards.
22    Q.   Anyhow, that part of that sentence that I
23 just read indicates that GME programs are based in
24 healthcare institutions, or hospitals, or other

1 healthcare institutions.
2         But they're based in healthcare
3 institutions?
4    A.   Correct.
5    Q.   Okay. As far as you know, that's a
6 correct statement?
7    A.   Yes.
8    Q.   Okay. And healthcare institutions don't
9 include medical schools; do they?
10    A.   No.
11    Q.   Okay. And the reason that the GME
12 programs are based in healthcare institutions -- at
13 least, one of the reasons -- is because of the need
14 for patients, and patient care, and the GME
15 experience; is that correct?
16    A.   Correct.
17    Q.   And down -- let's see, one -- to the
18 third paragraph there on that page, there is a
19 sentence in there that says -- and I quote -- "The
20 quality of this experience, the GME experience, is
21 directly related to the quality of patient care,
22 which is always the highest priority."
23         Do you see that?
24    A.   I do.

36 (Pages 141 to 144)

Page 145

1    Q.    Is that a correct statement?
2    A.    In the context of the paragraph, the
3  education of resident physicians relies on an
4  integration of didactic activity in a structured
5  curriculum with diagnosis and management of
6  patients, under appropriate levels of supervision
7  and scholarly activity, aimed at developing and
8  maintaining life-long learning skills.
9          The quality of this experience is
10  directly related to the quality of patient care,
11  which is always of the highest priority.
12  Educational quality and patient care quality are
13  interdependent and must be pursued in such a manner
14  that they enhance one another.
15          A proper balance must be maintained so
16  that a program of GME does not rely on residents to
17  meet service needs at the expense of educational
18  objectives.
19    Q.    So if I read this correctly, in the
20  context in which you just stated it, patient care is
21  always of the highest priority; is that correct?
22    A.    Correct, in the context in which I just
23  read this, that's correct.
24    Q.    And that's because a medical resident can

Page 146

1  only get through, successfully, a residency program
2  if patients and patient care are available; is that
3  correct?
4    A.    That is one element of it.  I think
5  another is that, for example, a junior resident
6  doing something they are not adequately prepared to
7  do would compromise patient quality.
8          And we don't want them to use an
9  educational agenda to threaten patient care.  They
10  can't get an experience just to get an educational
11  experience.
12    Q.    That's what attendings are for, right?
13    A.    Right.  Right.
14    Q.    Okay.  I guess another reason why the
15  programs are based in healthcare institutions is
16  because -- as opposed to medical schools -- no
17  patient care goes on in a medical school; would that
18  be fair?
19    A.    If you think of a medical school as a
20  building, that is usually true.  If you think of a
21  medical school as including senior -- junior and
22  senior -- medical students, they usually function in
23  healthcare institutions, because part of the medical
24  school curriculum requires that as well.

Page 147

1    Q.    But, once again, that's done in a
2  hospital setting and not in the medical school,
3  itself?
4    A.    Correct.
5    Q.    Okay.  Let me have you turn over to
6  page 31.  Do you see paragraph D down there?
7    A.    Yes.
8    Q.    It talks about work environment?
9    A.    Yes.
10    Q.    Okay.  And it states that institutions
11  must ensure that the GME programs provide
12  appropriate supervision, as well as a duty hour
13  schedule, and a work environment that is consistent
14  with proper patient care; do you see that?
15    A.    Yes.
16    MR. MARTIN:  Actually, the rest of the
17  sentence reads, "Consistent with proper patient
18  care, the educational needs of residents, and the
19  applicable program requirements."
20    MR. LYONS:  Okay.  You can ask him a follow-up
21  question, if you want.  I'm focusing --
22    MR. MARTIN:  No.  No.  You didn't read the
23  whole sentence.
24    MR. LYONS:  I did that on purpose, because I'm

Page 148

1  not going to ask him about that.  You can ask him
2  about that, if you want.
3    MR. MARTIN:  I'm sorry.  I thought you just
4  didn't see it.
5    MR. LYONS:  I'm quoting a portion of it that I
6  want to ask him a question about.
7  BY MR. LYONS:
8    Q.    At any rate, that statement there --
9  first of all, is that an accurate statement?
10    A.    Yes.
11    Q.    Okay.
12    MR. CARLSON:  Could we clarify?  The statement
13  that you just read or the one that he's reading?
14    MR. LYONS:  Okay.  I'll clarify that for you,
15  Doug.
16    MR. CARLSON:  Thank you.  Excuse my
17  interruption.
18    MR. LYONS:  No.  Not a problem.  Not a
19  problem.
20  BY MR. LYONS:
21    Q.    Okay.  Let me see if I can understand
22  what this really is saying here.
23          It is that here, again, we're in the
24  institutional part of the Essentials, right?

37 (Pages 145 to 148)

Page 149

1    A.    Correct.
2    Q.    That the institution must provide a work
3  environment that is consistent with proper patient
4  care; is that correct?
5    MR. MARTIN: Objection. Form.
6  BY MR. LYONS:
7    Q.    You can answer.
8    A.    Yes.
9    Q.    Okay. Fine.
10    So would it be fair to say that -- at
11  least, according to paragraph D here -- the part
12  we're talking about is that the patient care takes
13  place in a, quote, "work environment," according to
14  the ACGME?
15    MR. MARTIN: Objection. Form.
16  BY THE WITNESS:
17    A.    The part of the sentence and paragraph
18  that you've read says the GME programs provide
19  appropriate supervision for residents, as well as a
20  duty hour schedule and a work environment, that is
21  consistent with proper patient care.
22  BY MR. LYONS:
23    Q.    And my question was, that means, then,
24  that the patient care will take place in a, quote,

Page 150

1  "work environment"?
2    A.    Correct.
3    Q.    Okay.
4    MR. MARTIN: Objection to form.
5  BY MR. LYONS:
6    Q.    Let's flip back over to page 28 for just
7  a second. Yeah. Right up at the very top under,
8  "Paragraph," it would be 3C.
9    Do you see, it says, "Sponsoring
10  Institution"? And then, it says, "The institution
11  that assumes the ultimate responsibility for a
12  program of GME"?
13    A.    Yes.
14    Q.    Okay. That's the ACGME's definition of a
15  sponsoring institution?
16    A.    Yes.
17    Q.    Okay. So that means that -- just
18  speaking generally first -- that the sponsoring
19  institution has the responsibility for everything
20  that goes on in the program; is that correct?
21    A.    Correct.
22    Q.    The ultimate -- quote, "ultimate
23  responsibility."
24    So that would mean that it would have the

Page 151

1  responsibility for both the day-to-day activities of
2  the program, as well as executive and policy
3  decisions that are made with respect to that
4  program?
5    A.    More accurately, the sponsoring
6  institution has ultimate authority for all of the
7  programs.
8    Each program has a program director, who
9  has the executive responsibility for that program.
10  And then the sponsoring institution reviews every
11  program --
12    Q.    Okay.
13    A.    -- to make sure it's compliant with ACGME
14  institutional requirements.
15    Q.    So to just clarify in my mind, then, the
16  ultimate responsibility -- and I include ultimate to
17  be from the day-to-day operations of the programs
18  and including and up to executive policy
19  decisions -- ultimately rests with the sponsoring
20  institution; is that correct?
21    A.    Correct.
22    Q.    Do you know who the sponsoring
23  institution is in this case?
24    A.    I did not look it up. I think it is the

Page 152

1  hospital, but I don't know that for sure.
2    Q.    University Hospital?
3    A.    Okay.
4    Q.    Okay. So in this particular case, then,
5  it would be University Hospital who had this
6  ultimate authority, if you will, if they were the
7  sponsoring institution?
8    MR. MARTIN: Objection to form.
9  BY THE WITNESS:
10    A.    Through the Graduate Medical Education
11  Committee; but, yes.
12  BY MR. LYONS:
13    Q.    Okay. But, ultimately, as someone might
14  say, the ball stops there?
15    MR. MARTIN: Objection to form.
16  BY THE WITNESS:
17    A.    I think the ball stops when the
18  Institutional Review Committee says, "You're in
19  compliance with the institutional requirements, or
20  we withdraw accreditation."
21  BY MR. LYONS:
22    Q.    I'm just trying to see if this definition
23  places the ultimate responsibility for all of the
24  programs on the sponsoring institution.

38 (Pages 149 to 152)

Page 153

1    A.  Yes.
2    Q.  Okay.  And that's in the broadest sense
3  of ultimate responsibility?
4    A.  Yes.
5    Q.  Okay.  Do you recall what page the six
6  competencies were on?
7         Not on the Exhibit 2.  By the way, you
8  can give Exhibit 2 back -- for the time being -- to
9  Jennifer.
10    MR. LYONS:  You're the keeper of the pile,
11  right?
12    THE REPORTER:  Yes.
13  BY THE WITNESS:
14    A.  This is Exhibit 1.
15  BY MR. LYONS:
16    Q.  I know you referred to them --
17    A.  This, (indicating).
18    Q.  -- the six competencies.
19    A.  Gentile 2 is early enough.  Let me make
20  sure that it has the competencies in it -- because
21  it may not -- because the institutional requirements
22  in Exhibit 2 were approved in September of 1998.
23  And that antedated the competencies.
24    Q.  Okay.  So it may not have it.  Okay.  No

Page 154

1  problem.
2         I've got them copied for a later year.
3  Why don't I just go with that?
4    A.  Okay.
5         (WHEREUPON, a certain document was
6         marked Leach Deposition Exhibit
7         No. 3, for identification, as of
8         04-20-2007.)
9  BY MR. LYONS:
10    Q.  On page 19 of what is the 2005-2006
11  Essentials, there is listed -- under paragraph D --
12  the six competencies?
13    A.  Yes.
14    Q.  Okay.  Now, if I understood your
15  testimony early this morning about the six
16  competencies, this is still a work in progress?
17    A.  It will be forever a work in progress;
18  but these competencies were established and have
19  been stable now for several years.
20    Q.  Okay.
21    A.  What makes them a work in progress is
22  developing more sophisticated tools to evaluate them
23  and to track resident experiences.
24    Q.  Okay.  And I think there's some 2011

Page 155

1  deadline for something like that?
2    A.  Correct.
3    Q.  Okay.  So a part of the competency
4  project, if you will, is still evolving?
5    A.  Correct.
6    Q.  Okay.  Now, I noticed that the very first
7  competency is patient care.
8    A.  Correct.
9    Q.  Okay.  That was a conscious decision, on
10  the part of the ACGME, to make it first?
11    A.  It does not mean it's first in
12  importance.  In fact, other organizations change the
13  order.  We don't prioritize them.  All six are
14  required.
15    Q.  Okay.  But it has always been -- since
16  they were published in 1999, patient care has always
17  been listed first; is that correct?
18    A.  No.  In fact, the American Board of
19  Medical Specialties adopted the same six
20  competencies, but listed -- and continues to list --
21  medical knowledge first.
22    Q.  I'm talking ACGME.
23    A.  Yes.  It's always been first at ACGME.
24    Q.  Okay.  And since that's all we're talking

Page 156

1  about here today -- okay.  And is your statement --
2  well, let me back up.
3         Is there a reason why it was listed
4  first?
5    A.  No.  As I said all six competencies are
6  of equal importance, and we insist on the whole.
7    Q.  Would it be fair to say that a common
8  thread that runs throughout all six of these
9  competencies is patients and patient care?
10    A.  It would be equally fair to say that
11  communication skills runs through all of the
12  competencies.
13    Q.  That wasn't my question.
14    A.  So --
15    Q.  My question was, would it be fair to say
16  that a common thread -- a common thread -- that runs
17  throughout all six competencies is patient and
18  patient care?
19    A.  Yes.
20    Q.  Okay.  And I think that earlier in our
21  conversation you indicated that no patient care, no
22  GME experience; is that correct?
23    MR. MARTIN:  Excuse me.  I'm sorry.  I didn't
24  hear the question.

39 (Pages 153 to 156)

Page 157

1    MR. LYONS:  You can read it back.
2         (WHEREUPON, the record was read by
3         the reporter.)
4    MR. MARTIN:  Objection.  Form.
5  BY MR. LYONS:
6    A.   Let me restate it, because what she took
7  down and what I said, I think, were just a little
8  bit different.
9  BY MR. LYONS:
10   Q.   In our prior conversations, I think that
11  we had agreed that without the patient care element
12  of the GME experience there would be no GME
13  experience; is that correct?
14   MR. MARTIN:  Objection to form.
15  BY THE WITNESS:
16   A.   Correct.
17  BY MR. LYONS:
18   Q.   And as far as this patient care element
19  of the six competencies, that competency is obtained
20  through the performance of patient care services; is
21  that correct?
22    MR. MARTIN:  Objection.  Form.
23  BY THE WITNESS:
24    A.   The resident is obligated to require the

Page 158

1  skills of patient care.  And it is that those skills
2  are acquired in a variety of ways, including direct
3  contact with patients under appropriate supervision.
4  BY MR. LYONS:
5    Q.   So one way to acquire the patient care
6  competency would be to, in fact, perform patient
7  care; is that correct?
8    A.   Under appropriate supervision.
9    Q.   I think some people have said or
10  characterized it as learning by doing?
11   MR. MARTIN:  Objection to form.
12   MR. CARLSON:  Is that a question?
13   MR. LYONS:  That is a question, yeah.
14  BY MR. LYONS:
15   Q.   Would it be fair to say that patient care
16  skills — in part, at least -- are acquired by doing
17  the patient care; i.e., learn by doing?
18   A.   I think direct contact with patients is
19  crucial to developing the skills of patient care.
20         I think doing patient care implies more
21  than the -- it implies a broader set of contributors
22  than the resident, including the attending
23  physician, and senior residents, and nurses, and the
24  whole healthcare team.

Page 159

1    Q.   But the learning process, itself, if you
2  will -- as far as the patient care is concerned --
3  is accomplished -- at least, in part -- by
4  performing patient care?
5    MR. MARTIN:  Objection to form.
6  BY THE WITNESS:
7    A.   So the resident sits with the patient,
8  gets a history, examines the patient, reviews the
9  laboratory data, presents that to an attending
10  physician and others.  And the way the resident
11  learns is to sit, and interview, and examine the
12  patient.
13         But it could be very, very bad learning
14  to just sort of go and take care of a bunch of
15  patients by yourself -- when you don't know what
16  you're doing -- and there's no supervision.
17  BY MR. LYONS:
18   Q.   Let's take the surgeon, for example, the
19  500 to 1,000 procedures that he must perform in
20  order to get a completion certificate.
21         And I assume what you're saying there is
22  he must perform these procedures under supervision;
23  is that correct?
24   A.   Correct, and in a graduated way so that

Page 160

1  the first year resident is doing simple cases and
2  the chief resident is doing more complex cases.
3    Q.   But, nevertheless, at each level he is,
4  quote, "doing," in some form or fashion?
5    A.   In some form.
6    Q.   Okay.  And in a graduated way?
7    A.   In a graduated way, under supervision
8  with others.
9    Q.   Okay.
10   A.   Right.
11   Q.   Now, you had mentioned earlier that -- I
12  think you said on average there was about 3.7 years
13  between reviews of a particular institution's
14  residency program; is that correct?
15   A.   Correct.
16   Q.   Okay.  So if my numbers are correct, that
17  would mean that there are, approximately -- I don't
18  have a calculator here -- but, approximately, 2,000
19  reviews a year?
20   A.   Correct.
21   Q.   Okay.  Because I think you said there
22  was, roughly, 8,000 programs?
23   A.   That's correct.  There are, roughly,
24  8,000 programs.  We do about 2100 site visits a

40 (Pages 157 to 160)

Page 161

1 year.
2    Q.   Okay.  And during the course of those
3 site visits, the ultimate result could be full
4 accreditation to termination?
5    A.   Just for clarity, none of that happens
6 during the site visit.  And the site visit report
7 with other data is presented to the Residency Review
8 Committee.
9         And their action is expressed in a
10 notification letter, which includes the options
11 you've mentioned.  Okay.
12    Q.   Ultimately, each one of these 2100 site
13 visits could result in complete accreditation, or in
14 complete nonaccreditation, or somewhere in between?
15    A.   Hypothetically, yes.
16    Q.   Okay.  I don't know whether you have
17 mentioned it today or not, because there's been a
18 lot of organizations mentioned.
19         But you're familiar with an organization
20 by the name of AAMC?
21    A.   Correct.
22    Q.   That's the American Association of
23 Medical Colleges?
24    A.   Correct.  The Association of American

Page 162

1 Medical Colleges, yeah.  Right.
2    Q.   Okay.  And one of its former presidents
3 is a fellow named Dr. Jordan Cohen?
4    A.   Correct.
5    Q.   A good friend of yours?
6    A.   I know him very well.
7    Q.   A long time?
8    A.   For several years.  I've never been to
9 his house and had dinner with him.  I don't know
10 what your definition of a friend is.  But we are
11 friendly.
12    Q.   Okay.  You know him?
13    A.   I know him.  Okay.
14    Q.   Okay.  Know him to be a competent
15 administrator?
16    A.   Yes.
17    Q.   Okay.  Well-respected, as far as you
18 know?
19    A.   Yes.
20    Q.   Okay.  Dr. Cohen, like yourself, has
21 written a lot of articles.  You know that, right?
22    A.   Yes.
23    Q.   Okay.  Let me hand you one of them.
24

Page 163

1         (WHEREUPON, a certain document was
2         marked Leach Deposition Exhibit
3         No. 4, for identification, as of
4         04-20-2007.)
5    MR. CARLSON:  I don't know if you've read it
6 or not.  But I'm sure Mr. Lyons will give you ample
7 opportunity to read it --
8    MR. LYONS:  Sure.
9    MR. CARLSON:  -- as is necessary to respond to
10 his questions.
11 BY THE WITNESS:
12    A.   Thank you.  Thank you.
13 BY MR. LYONS:
14    Q.   That looks like Jordan?
15    A.   It does.
16    Q.   Okay.  Okay.  In the -- one, two, three,
17 fourth -- fourth paragraph starting off, "By
18 contrast," Dr. Cohen notes that, "While there have
19 been many changes over the years in technology," and
20 so forth, he notes -- and I quote -- "The structure
21 of residency training has changed hardly at all even
22 with the long overdue restrictions on duty hours."
23         Do you see that?
24    A.   I do.

Page 164

1    Q.   Do you agree with that statement?
2    A.   Not in -- this was written in January of
3 2005.
4    Q.   Right.
5    A.   And, no, I don't agree with that
6 entirely.
7    Q.   Okay.  What is it that you disagree with
8 your long-term friend?
9    A.   I think the change in residency training
10 has been both incremental and quantum; and there
11 were significant incremental changes in residency
12 training over the 40 years Dr. Cohen is referring
13 to.
14    Q.   He's referring to the structure of the
15 residency program, not the incremental changes.  And
16 my reference is that the structure of residency
17 training programs, he states, "has changed hardly at
18 all."
19         And that's the question I have for you
20 is, do you agree with that statement that the
21 structure of residency training has changed hardly
22 at all?
23    MR. MARTIN:  Object to form.
24 BY THE WITNESS:

41 (Pages 161 to 164)

Page 165

1    A.   No. I don't agree.
2        For example, the Internal Medicine
3    Residency Review Committee, in this period that he's
4    talking about, put in place requirements for
5    associate program directors. They restricted the
6    number of patients that residents can see. They had
7    more to say about the faculty.
8        Dr. Cohen, himself, was at one time --
9    before I came to ACGME -- the Chair of the Residency
10   Review Committee in Internal Medicine. And he,
11   himself, wrote requirements that insisted on
12   teaching rounds being discrete and protected.
13       I would consider that a significant
14   structural change, even if he doesn't.
15   BY MR. LYONS:
16   Q.   Okay. So you have a, quote, "difference
17   of opinion" --
18   A.   Correct.
19   Q.   -- if you will? Whatever, "opinion," is?
20   A.   Correct. That's right.
21   Q.   Let me ask you this.
22       One thing that hasn't changed over the
23   years is, that the learning process has always
24   evolved -- at least, in part -- from patient care

Page 166

1    services?
2    A.   Correct.
3    Q.   Okay. In that sense, that structure has
4    never changed?
5    A.   As you said earlier, that's a thread
6    that's been constant throughout residency education.
7    Q.   Okay. Perhaps, you would have to wait
8    for Mr. Cohen to opine on that. But maybe that's
9    the structure he's talking about.
10       Who knows? But, anyhow, I appreciate
11   your comments.
12       MR. CARLSON: Could you read the question
13   back? I don't know if that ended with, "patient
14   care," or if there was a, "services," stuck in
15   there.
16       (WHEREUPON, the record was read by
17       the reporter.)
18   MR. LYONS: And his answer was, "yes."
19   MR. CARLSON: I know. I wanted to make sure
20   he heard the whole question, too. Thank you.
21   BY MR. LYONS:
22   Q.   Now, over this same period --
23   MR. LYONS: Excuse me. You know what? Do you
24   want to take a five-minute break?

Page 167

1    MR. MARTIN: Yes.
2        (WHEREUPON, a recess was had.)
3    BY MR. LYONS:
4    Q.   Right when we broke we were talking about
5    Dr. Cohen's 40 years and so forth. And let me ask
6    you this.
7        Prior to, let's say, 1998, 1999, were you
8    aware of any programs, residency programs --
9    Graduate Medical Education residency programs, with
10   the exception of those who hired public employees --
11   who are not paying Social Security taxes, if you
12   know?
13       MR. MARTIN: Objection to form.
14   BY THE WITNESS:
15   A.   I don't know.
16   BY MR. LYONS:
17   Q.   You just have no knowledge one way or the
18   other?
19   A.   That's correct.
20   Q.   Okay. That was an issue that you just
21   never got involved in?
22   A.   No.
23   Q.   Okay.
24   A.   I really know nothing about it.

Page 168

1    Q.   And the ACGME has never been involved in
2    that issue either; has it?
3    A.   No. As stated we do view residents as
4    students; but we have not paid attention to whether
5    FICA payments are made or not.
6    Q.   Just so I'm clear here, from the ACGME's
7    perspective, they've never taken the position as to
8    whether these payments to residents, during Graduate
9    Medical Education, should or should not be subject
10   to FICA tax; is that correct?
11   A.   We have no opinion about whether the
12   stipends are subject to FICA payments or not.
13   Q.   Okay. And since its inception in 1981,
14   the ACGME has never tailored or structured its
15   institutional and program requirements in an attempt
16   to either come within or come without the Social
17   Security system with respect to the resident
18   payments; is that correct?
19   MR. MARTIN: Objection to form.
20   BY THE WITNESS:
21   A.   Right. That's right. We have no
22   knowledge of the Social Security payment system.
23       As already stated, we view the residents
24   as students. We do not know the implications of

42 (Pages 165 to 168)

Page 169

1  that vis-a-vis FICA payments.
2  BY MR. LYONS:
3      Q.   And in putting together all of these
4  380-some pages every year of information, no thought
5  was ever given one way or the other as to whether or
6  not these payments would be subject to Social
7  Security; is that correct?
8      A.   No.  No thought was given into whether
9  the stipends would be subject to Social Security.
10  That's correct.
11      MR. LYONS:  Okay.  What are we up to,
12  Jennifer?
13      THE REPORTER:  5.
14      MR. LYONS:  Mark that.
15          (WHEREUPON, a certain document was
16          marked Leach Deposition Exhibit
17          No. 5, for identification, as of
18          04-20-2007.)
19  BY MR. LYONS:
20      Q.   Doctor, I'm sure --
21      MR. MARTIN:  Is the rest of the case
22  available?  Maybe it's just my copy.
23      MR. LYONS:  No.  No.  No.  No.  I have
24  purposely just picked out the portions I'm going to

Page 170

1  ask him questions about.
2      MR. MARTIN:  I object to the use of the
3  document.
4      MR. LYONS:  That's fine.
5      MR. MARTIN:  And providing it to the witness
6  without giving him the whole document.
7      MR. LYONS:  That's fine.
8  BY MR. LYONS:
9      Q.   Doctor, at the very top --
10      MR. CARLSON:  Have we established that he's
11  seen it before?  I don't know that he answered that.
12      MR. LYONS:  Oh, I'm sorry.  I'm sorry.
13      MR. CARLSON:  Yeah, sure.
14  BY THE WITNESS:
15      A.   I have not seen this before.
16  BY MR. LYONS:
17      Q.   You have not seen it.  Okay.
18      MR. CARLSON:  Do you want him to read it so
19  that he can answer your questions?
20      MR. LYONS:  Let me do this, Doug, if it's okay
21  with you.
22          Let me direct him to the portion I'm
23  going to ask him questions about.  And then he can
24  tell me, "I need to read this," or, "I need to do

Page 171

1  that."  Is that okay?
2      MR. CARLSON:  Yes, it is.
3  BY MR. LYONS:
4      Q.   There is a time and date stamped across
5  the top of each page, some numbers.
6          And the first one I'm going to direct
7  your attention to, it says, "page 4 of 30."  It's
8  going to be the second -- I believe it's the second
9  page here of that exhibit.  Do you see that?
10      A.   I do.
11      Q.   Okay.  And the -- let's see -- the second
12  full paragraph, just read that to yourself, please.
13      A.   Just to be clear, the paragraph
14  beginning, "The Sixth Circuit."
15      Q.   Yeah.
16      A.   Okay.
17      Q.   Okay.  And I want to focus on the
18  statement in there where the Court held that the
19  sums paid to residents were wages because they were
20  in return for the performance of very valuable
21  services; i.e., patient care.
22          Do you agree with that statement?
23      MR. MARTIN:  Objection to form.
24      MR. LYONS:  Sure.

Page 172

1  BY THE WITNESS:
2      A.   I don't know this case at all.  I don't
3  know whether residents were paid sums.
4          I don't know whether they were paid in
5  return for anything.  So I can't comment on this
6  statement.
7  BY MR. LYONS:
8      Q.   Okay.  Let me generalize the question for
9  you.
10          Based on everything you know about the
11  ACGME -- the residency programs for Graduate Medical
12  Education -- do you believe that the payments to the
13  residents were in return for the performance of very
14  valuable services; i.e., patient care?
15      MR. MARTIN:  Objection.  Form.
16  BY THE WITNESS:
17      A.   In general -- and, again, I know nothing
18  of this particular case.  But, in general, stipends
19  paid to residents are not in exchange for, quote,
20  "very valuable services; i.e., patient care."
21  BY MR. LYONS:
22      Q.   Okay.
23      A.   They are educational stipends.  In fact,
24  we have requirements that will cite programs, if

43 (Pages 169 to 172)

DAVID C. LEACH, M.D., APRIL 20, 200

Page 173

1  there is an excessive reliance on patient care
2  duties, such that the educational agenda is
3  compromised.
4      Q.  But that's not to say that there would be
5  no patient care services. Only that there has to be
6  this happy medium between education and patient care
7  services?
8      MR. MARTIN: Objection. Form.
9  BY THE WITNESS:
10     A.  There would be no patient care, rather
11 than patient care services. I think patient care is
12 a crucial part of residency education.
13 BY MR. LYONS:
14     Q.  Patient care clearly includes patient
15 care services rendered by a resident, right?
16     MR. MARTIN: Objection. Form.
17 BY THE WITNESS:
18     A.  No. It does not. I think the patient
19 care services implies giving a service to a patient.
20     And a novice learner interviewing and
21 examining a patient may contribute and detect
22 observations not detected by others; but they are
23 not primarily delivering patient care services when
24 they are in direct contact with patients.

Page 174

1  BY MR. LYONS:
2      Q.  What would you call a surgical resident
3  who performs an appendectomy under the supervision
4  of an attending? Is that patient care service?
5      A.  That's direct patient care. And if the
6  attending is supervising properly, the service is
7  rendered to the patient.
8      But to claim that a resident is providing
9  direct service to the patient is not uniformly true.
10     Q.  In my example, though, if the surgical
11 resident is operating on a particular patient, that
12 is patient care in your view -- patient care service
13 in your view?
14     MR. MARTIN: Objection to form.
15 BY THE WITNESS:
16     A.  That's a form of direct patient care, but
17 in this instance includes experience in the
18 operating room.
19 BY MR. LYONS:
20     Q.  You seem to be unwilling to use the word,
21 service?
22     A.  Service implies a transaction between the
23 patient and the provider so that the patient care
24 service is provided in exchange for payments for

Page 175

1  patient care services. And that is not at all the
2  case in residents.
3      Q.  Okay. But let me see if I can be clear
4  here.
5      In my hypothetical where the surgeon
6  actually cuts the appendix out, sews the patient
7  back up, and sends him on his way, would you
8  consider that as patient care service?
9      A.  Not -- no, not necessarily. I think,
10 again, the entire encounter -- diagnosing the
11 appendicitis is present, getting the right
12 laboratory tests, making a judgment about whether
13 surgery is needed, performing the surgery, providing
14 postoperative care, all of that -- is borne by the
15 attending physician.
16     The resident is having direct contact
17 with patients -- in this case in the operating
18 room -- and doing things where they're learning.
19 But the attending physician is providing the
20 service.
21     Q.  Even though he's just watching?
22     A.  Correct.
23     Q.  And you're suggesting that this resident,
24 who actually cut the person open and sewed him back

Page 176

1  up, is not performing a patient care service?
2      A.  Not -- no. If they were to do that, and
3  submit a bill for patient care services, and didn't
4  yet acquire a license to practice medicine, they
5  would be guilty of assault.
6      Q.  Suppose this was a licensed doctor, who
7  was doing the surgical procedure, who was a
8  resident?
9      A.  If they were providing patient care
10 services, there would be no need for anybody else.
11     Q.  Let me ask you this. Are you saying
12 that, in order to provide patient care services, you
13 must be licensed and you must be able to bill for
14 the service?
15     A.  I think I'd have to think about that a
16 little longer. But, yes. That's right.
17     Q.  Okay. So in that case, then, your view
18 would be that residents could never perform patient
19 care services because they can't bill for their
20 services?
21     A.  Correct. They provide encounters with
22 patients. They have direct patient contact. They
23 provide elements of what is habitually done by those
24 providing patient care services.

44 (Pages 173 to 176)

Page 177

1     But they are inadequately prepared to
2 provide full services to the patient.
3     Q.   Now, the attending physician can bill for
4 the services performed by the resident, though,
5 right?
6     A.   The attending physician provides services
7 performed by the attending. They may delegate some
8 of those responsibilities to others.
9     Q.   For example, residents?
10    A.   Again, under supervision. And there are
11 others they can delegate things to -- physician
12 assistants and so on.
13    Q.   Okay. Can you turn over to what's
14 denominated as page 9 there?
15        Do you see where it says, "page 9 of 30"?
16    A.   I do.
17    Q.   Okay. Would you just look at that -- the
18 first paragraph there -- where it starts,
19 "Moreover"?
20        Just read that to yourself for just a
21 moment, please.
22    A.   It begins --
23    Q.   "Moreover, although."
24    A.   Okay.

Page 178

1     Q.   Just read that to yourself.
2     MR. MARTIN: I would object to the use of this
3 exhibit without giving the witness the benefit of
4 the full paragraph. Objection to the form.
5     MR. LYONS: It's on the previous page.
6     MR. MARTIN: The full document.
7     MR. LYONS: The full document is a different
8 thing.
9 BY THE WITNESS:
10    A.   Okay.
11 BY MR. LYONS:
12    Q.   All right. There the Court notes that
13 there is an educational component to Graduate
14 Medical Education. It's through the resident's
15 patient care that the educational component is
16 achieved. Do you see that?
17    A.   I do.
18    Q.   Do you agree with that statement?
19    A.   The patient care -- direct encounters
20 with patients is an element of the educational
21 component. So it is an educational component. It's
22 not the entirety of the experience.
23    Q.   But it's a part of it?
24    A.   Correct.

Page 179

1     Q.   Okay. So the Court's statement that this
2 educational component is achieved through patient
3 care is accurate as far as you know?
4     A.   It depends. I can't tell, from this
5 paragraph, what the larger element is that they are
6 describing of which there is an educational
7 component.
8         I think the resident's entire experience
9 is education. And the fact that the wording is such
10 that they say, "educational component," suggests
11 that there is a noneducational component. And with
12 that I don't agree.
13        I think education is a full-time duty of
14 the resident and of the residency program.
15    Q.   Did I hear you correctly to say that, as
16 far as you are concerned, your opinion is that there
17 is no component to the GME other than education?
18 There is nothing else?
19    A.   Correct.
20    Q.   Okay.
21    A.   It includes direct contact with patients.
22 It includes didactic experiences.
23        But it is a consuming experience to
24 achieve the skills necessary to practice

Page 180

1 independently.
2     Q.   I think you told me earlier, though, that
3 this educational component is achieved -- at least,
4 in part -- through patient care; is that correct?
5     A.   No. I think I agreed to the fact that
6 patient care is a component of the educational
7 experience rather than saying the educational
8 component which, again, implies there is a
9 noneducational component.
10    Q.   I've got to digest that one for a minute.
11        And then I think you did suggest to me,
12 though, that, if we remove the patient care element
13 from the Graduate Medical Education experience, we
14 have no Graduate Medical Education experience; is
15 that correct?
16    A.   That's correct. It would be a fatally
17 incomplete graduate education experience.
18    Q.   Okay. Fine. Let me just follow up just
19 with that last question.
20        Because you can't have a GME experience
21 without patient care, wouldn't you agree with me
22 that patient care is a component of the GME
23 experience?
24    A.   Yes.

45 (Pages 177 to 180)

Page 181

1    Q.    Okay.
2    A.    What I was not agreeing to was that there
3  was an educational component and a noneducational
4  component.
5        But I do agree that patient care is a
6  component of the Graduate Medical Education
7  experience.
8    Q.    And patient care is one form of obtaining
9  this learning experience, if you will?
10    A.    Correct.
11    Q.    Okay. I'm sure that, over the years that
12  you've been the executive director, you've traveled
13  to many of these different GME sites; is that
14  correct?
15    A.    That's correct.
16    Q.    Okay. You've been to University
17  Hospital, I assume?
18    A.    Actually, I don't believe I have.
19    Q.    One of the few?
20    A.    There are 8,000 of them, and I have not
21  been to all of them.
22    Q.    All right. Oh, I thought you said there
23  was only 1274 actual sites with 8,000 programs?
24    A.    Sponsoring institutions.

Page 182

1    Q.    Yes. Sponsoring institutions.
2    A.    Yes. There are. If I can refresh my
3  memory, there are currently 697 sponsoring
4  institutions. And I have not been to all of them.
5    Q.    Okay. And University Hospital is one
6  that you have not been to?
7    A.    Correct.
8    Q.    Okay. You've never been asked to speak
9  there?
10    A.    I don't think so.
11    Q.    Okay. Or if you had, you couldn't go?
12    A.    Correct.
13    Q.    Okay. The ACGME puts out an annual
14  report --
15    A.    That's correct.
16    Q.    -- every fiscal year?
17    A.    Correct.
18    Q.    It comes out at the same time as the GME
19  directory?
20    A.    No. It's a little different. It comes
21  out once a year, but the timing is a little
22  different.
23    Q.    Okay. And in the 2004-2005 year, a
24  Mr. Cassimatis was the Chairman?

Page 183

1    A.    Correct.
2    Q.    Okay.
3    A.    Actually, not correct. Dr. Cassimatis
4  was the Chairman.
5    Q.    I'm sorry. I said, "Mr.," instead of
6  "Dr."
7    A.    That's all right.
8    MR. LYONS:  What are we up to?
9    THE REPORTER:  6.
10        (WHEREUPON, a certain document was
11        marked Leach Deposition Exhibit
12        No. 6, for identification, as of
13        04-20-2007.)
14    MR. CARLSON:  I'm sorry. Would you like him
15  to read this?
16    MR. LYONS:  You can take a quick look at it.
17  BY THE WITNESS:
18    A.    Okay.
19  BY MR. LYONS:
20    Q.    You're a fast reader. You've probably
21  seen this before.
22    A.    I've seen this before.
23    Q.    Okay. At the beginning of the third
24  paragraph, Dr. -- is it Cassimatis?

Page 184

1    A.    Yeah, Cassimatis. Yes.
2    Q.    -- Cassimatis, okay, states that the
3  ultimate goal of the GME is the improvement of
4  patient care.
5        Do you see that? I'm paraphrasing.
6    A.    No, I don't. I see a sentence underlined
7  that says, "We are, of course, far from alone in our
8  efforts to improve medical education and ultimately
9  patient care."
10    Q.    Okay. All right. His statement is,
11  basically, that the ultimate goal here is the
12  improvement of patient care; is that correct?
13    A.    The ultimate goal is to improve medical
14  education and ultimately patient care is what he
15  says.
16    Q.    Maybe I'm reading too much into this.
17        But the way I read it was that the
18  ultimate goal of medical education is to improve
19  patient care; is that fair?
20    A.    One of the goals of medical education is
21  to prepare physicians so that they are fully
22  trained. And by doing that, they improve patient
23  care.
24    Q.    Okay. So one of the ultimate goals of

46 (Pages 181 to 184)

Page 185

1  medical education is to improve patient care?
2      A.    To prepare physicians so that patient
3  care will be improved, yes.
4      Q.    Okay.  You can -- oh, you did.  We've got
5  the pile there.
6      A.    She's got the pile.
7      Q.    You had talked at length with Mr. Martin
8  about the work hour requirements of
9  80 hours per week, average, over four weeks?
10     MR. MARTIN:  Object to form.
11  BY MR. LYONS:
12     Q.    Do you recall that?
13     A.    As part of the testimony this morning?
14     Q.    Yeah.
15     A.    Yes.
16     Q.    Okay.  And as I remember it, you said
17  that in 1989, based on the Zion case, Section 405
18  regs were passed in New York state?
19     A.    Yes.  I did refer to the 405 regs.  I
20  didn't mention 1989.  I did mention, though, the
21  Libby Zion case.
22     Q.    They were passed in 1989, right?
23     A.    I don't know that.  That sounds about
24  right.  Sorry.

Page 186

1      Q.    And then, in July 1 of 2003, the ACGME --
2  under some legislative pressure from the
3  gentleman/congressman you mentioned from Detroit,
4  the ACGME passed its version of the work hour
5  restriction?
6      MR. MARTIN:  Actually, object to form.
7  BY MR. LYONS:
8      Q.    Do you recall that?
9      A.    The duty -- the ACGME duty hour
10  requirements went into effect in July of 2003,
11  correct.
12     Q.    And -- at least, in part -- in response
13  to some legislative pressure from Congressman
14  Conyers?
15     A.    In response to a variety of things that I
16  mentioned in my earlier testimony, including the
17  interest of Congress --
18     THE REPORTER:  "The interest of Congress"?
19  BY THE WITNESS:
20     A.    -- in doing this.
21  BY MR. LYONS:
22     Q.    Now, are similar work environment
23  restrictions placed on medical students --
24  particularly, third and fourth-year medical

Page 187

1  students?
2      MR. MARTIN:  Object to form.
3  BY THE WITNESS:
4      A.    The ACGME does not set standards for
5  medical schools.  I'm aware of some medical schools
6  that, in fact, have medical students, on their
7  clinical years, mimic the requirements of ACGME.
8      But we have no direct knowledge of
9  whether the LCME has anything to say about duty
10  hours.  I haven't read their standards lately.
11     Q.    As far as you know, as you sit here
12  today, though, the LCME has never published anything
13  similar to the ACGME's 80-hour-work rule?
14     MR. MARTIN:  Object to form.
15  BY THE WITNESS:
16     A.    Correct.  As far as I know, what you've
17  said is true.
18  BY MR. LYONS:
19     Q.    Do you know why that's true?
20     A.    No.
21     Q.    Okay.  You mentioned that there's some
22  medical schools that do restrict the third and
23  fourth year students in their clinical work?

Page 188

1      A.    Yes.
2      Q.    Okay.  Do you know if those are in
3  writing, or are they just understandings?
4      A.    I don't.  And I don't have direct
5  knowledge of that.
6      I've just talked to faculty members who
7  are saying that, to prepare medical students, they
8  function under similar local rules.
9      Q.    Okay.  And when you and I talked a month
10  or two ago, we talked about a couple of things.
11     But one of the things that you had
12  mentioned to me was that, in your view, the medical
13  students were more observers than doers.
14     Do you recall that?
15     A.    I do.
16     Q.    That statement, as far as you're
17  concerned today, is still true?
18     A.    Yes.
19     Q.    Okay.  Are you familiar with an
20  organization called COGME?
21     A.    Somewhat, yes.
22     Q.    It stands for what?
23     A.    I think it's the Committee on Graduate
24  Medical Education -- or Commission on Graduate

47 (Pages 185 to 188)

**Page 189**

1  Medical Education.
2     Q.    It's a Congressionally created
3  organization?
4     A.    Yes, as I understand it.
5     Q.    And it was created to advise both
6  Congress and the Department of Health and Human
7  Services?
8     A.    I think that's right.
9     Q.    Okay. Do you know who is on this
10 council?
11    A.    I don't.
12    Q.    Okay. Have you ever had any contact with
13 it yourself?
14    A.    When I first came to ACGME, I attended, I
15 think, two COGME meetings just to get a sense of
16 what they do.
17    Q.    This was in '97?
18    A.    Probably, '98. And I have not been back.
19    Q.    Do you have any knowledge of its
20 reputation?
21    A.    Not really. They issue many reports that
22 are available for perusal by a wide audience. They
23 are forever endangered and want to know whether
24 they're going to be renewed by Congress or not.

**Page 190**

1        They deal with issues that we don't deal
2  with -- like sort of manpower issues, and
3  projections of physician supply, and so on. And we
4  are not concerned with that.
5        We're only concerned with the quality of
6  the educational program. And we don't raise or
7  lower our standards to manipulate subsequent
8  physicians applying.
9     Q.    Do you have any views as to the
10 reliability of their reports?
11    A.    I don't.
12    MR. LYONS: These are excerpts.
13        (WHEREUPON, a certain document was
14             marked Leach Deposition Exhibit
15             No. 7, for identification, as of
16             04-20-2007.)
17 BY MR. LYONS:
18    Q.    I'm assuming you've never seen this
19 before?
20    A.    I think I've seen the cover and didn't
21 read the -- sorry.
22    Q.    Like the way I read a newspaper
23 sometimes.
24    DR. GENTILE: It's called looking over or

**Page 191**

1  overlooking.
2  BY THE WITNESS:
3     A.    Right.
4  BY MR. LYONS:
5     Q.    Anyhow, do you see the section there, on
6  the first page, that says, "Overview."
7        Would you mind just reading that for a
8  moment?
9     A.    This is from the summary page of the
10 Fifteenth Report --
11    Q.    Exactly.
12    A.    -- and of the Council On Graduate Medical
13 Education, COGME.
14       "Overview: As used in this report" --
15    Q.    No. Just read it to yourself.
16    A.    I see. All right.
17    Q.    Do you see it? Have you had a chance to
18 read that?
19    A.    I have. Thank you.
20    Q.    Okay. In the middle of that, "Overview,"
21 paragraph, the council states -- and I quote -- "The
22 residents, who are serving a form of apprenticeship,
23 provide patient care under the supervision of a
24 teaching physician."

**Page 192**

1        Do you agree with that statement of the
2  council?
3     MR. MARTIN: First, I object to the form.
4  BY THE WITNESS:
5     A.    The words, "provide patient care," I
6  would want clarification on, because I think they do
7  have direct contact with patients.
8        I think, for reasons previously stated,
9  that they are not fully trained and, therefore, not
10 able to really provide patient care services.
11 BY MR. LYONS:
12    Q.    Okay. Any other comments?
13    A.    I agree that they are under the
14 supervision of a teaching physician.
15    Q.    Okay. Other than those comments, are you
16 agreeing with that statement?
17    A.    Yes.
18    Q.    Okay. Let me turn you over to page 5,
19 which is the second page, actually, there.
20       Would you just read that to yourself?
21 I'm sorry. Let me just focus you. The "Healthcare
22 Provider Model," is what I'm talking about. The
23 bottom part there I'm not concerned about.
24    MR. MARTIN: I'm going to object to the use of

Page 193

1 the document, unless you give him the full thing.
2 BY THE WITNESS:
3    A.   I've read the first paragraph.
4 BY MR. LYONS:
5    Q.   Could you read all the way down to where
6 it says, "Education Model"?
7    A.   Okay. Okay.
8    Q.   All right. The third sentence there, at
9 the very top, it says, "It," the current healthcare
10 model.
11       This, by the way, is -- what did we say?
12 It was 2000. Right, December 2000.
13       "The current healthcare model treats
14 clinical training costs as patient care costs as
15 opposed to educational costs?"
16       Do you see that?
17    MR. MARTIN: First of all, I object. That's
18 not what it says. Is says, "It." It doesn't say
19 what the antecedent to, "it," is.
20 BY THE WITNESS:
21    A.   It does not say, "current model." It
22 refers to the healthcare provider model.
23 BY MR. LYONS:
24    Q.   Okay.

Page 194

1    A.   But from this fragment, I don't even know
2 if that's the current model in their parlance. And
3 then it says, "It treats clinical training costs as
4 patient care costs as opposed to educational costs."
5    Q.   Is that part of the statement true?
6    MR. MARTIN: Object to form.
7 BY THE WITNESS:
8    A.   I can't answer it. I don't know what,
9 "it," is -- whether it's hypothetical or real.
10       And I don't know enough about the
11 reimbursement model to know if that's true, even if
12 it is the real current model.
13 BY MR. LYONS:
14    Q.   That was where I'm going to go next.
15       You're not familiar with Medicare
16 reimbursement rules?
17    A.   Not really, only in the broadest sense.
18    Q.   Fine.
19    A.   From ACGME's perspective, as our
20 standards state, we want there to be adequate
21 financial support so that the educational program is
22 not compromised. And the institution has to do many
23 things to meet our requirements that require
24 resources.

Page 195

1       We do not have knowledge of, nor do we
2 care, where the source of that money comes from. We
3 just want to make sure that there's adequate support
4 for the educational programs.
5    Q.   Okay. In other words, it's out of your
6 bailiwick?
7    A.   Correct.
8    Q.   Now, Dr. Leach, I have noticed from your
9 CV that you've written a lot of articles.
10    A.   I don't know how many. Somewhere between
11 30 and 40, probably.
12    Q.   That's a lot to me, because I haven't
13 written but about one or two.
14    A.   If you say the truth once, you don't need
15 to say anything else.
16    Q.   Okay. There you go.
17       In one of those articles, you wrote about
18 the values in Graduate Medical Education in relation
19 to rules, right. Do you recall that?
20    A.   Yes.
21    Q.   1985?
22    A.   I would need something to refresh my
23 memory. But values and rules are words that I use
24 from time to time.

Page 196

1       (WHEREUPON, certain documents were
2       marked Leach Deposition Exhibit
3       Nos. 8 & 9, for identification, as
4       of 04-20-2007.)
5 BY THE WITNESS:
6    A.   Yes.
7 BY MR. LYONS:
8    Q.   Do you recognize this article?
9    A.   I do.
10    Q.   It was written while you were at Ford?
11    A.   Let's see. Is it dated? The date where
12 it says, "Posted," is blurred.
13    Q.   I'm sorry. No. I'm sorry. My mistake.
14    A.   I think it is later.
15    Q.   This is 2005?
16    A.   This was 2005. So I was at ACGME.
17    Q.   I'm sorry. I'm thinking of another
18 article.
19       Down there -- at the bottom of the first
20 page and going up to the top of the second page --
21 you state that you have to pay attention to both the
22 rules and values of medicine in physician formation.
23       Do you see that?
24    A.   I do.

49 (Pages 193 to 196)

Page 197

1    Q.    Physician formation is just another way
2  of saying the GME experience?
3    A.    No.
4    Q.    It's broader than that?
5    A.    It's broader. It begins in kindergarten.
6  It is highlighted in medical school and in
7  residency. And it goes well beyond residency. I
8  think mature physicians are formed as well.
9    Q.    And you also observed that values must be
10  preserved. Rules can be modified.
11    A.    Correct.
12    Q.    Okay. And these values that you speak of
13  are both with respect to the teaching hospital as
14  well as the residency program?
15    A.    Values include things like integrity, the
16  ability to discern and tell the truth. So that
17  applies to an individual as they learn how to
18  discern and tell the truth.
19          It also can apply to an institution, for
20  example, posting clinical outcomes on their Website
21  in a way that's truthful. So that would be one
22  example of one value that could apply to both
23  individuals and an institution.
24    Q.    And, I guess -- in this statement that

Page 198

1  you make in the context of the GME experience --
2  that statement could apply to both the teaching
3  hospital as well as the individual programs; is that
4  correct?
5    A.    Yes.
6    Q.    Okay. Now, are you familiar with a
7  teaching hospital by the name of Brigham And Women's
8  Hospital in Boston?
9    A.    I am.
10    Q.    It's affiliated with the Harvard Medical
11  School?
12    A.    Yes.
13    Q.    A world renown teaching hospital?
14    A.    It is an ACGME accredited teaching
15  hospital.
16    Q.    It's more than that; isn't it? It's one
17  of the best in the world?
18    A.    I think that I have -- I lack adequate
19  knowledge to make that statement. I think I would
20  have to know all of the hospitals in the world and
21  compare this one. It has a very good reputation.
22    Q.    Okay. I want to show you what I've
23  copied off of their Website. I want to separate
24  these here.

Page 199

1    A.    Okay.
2    Q.    Okay. In speaking of values for this
3  teaching hospital, the very first one says -- and I
4  quote -- "Quality Patient Care: Delivering quality
5  patient care is the center of everything we do."
6          Do you see that?
7    A.    I do.
8    Q.    Okay. Would you agree that the quality
9  of patient care is the center of everything we do at
10  a teaching hospital?
11    MR. MARTIN: Object to form.
12  BY THE WITNESS:
13    A.    To accept that statement, I would have to
14  see data about the quality of patient care.
15          And I would have to be convinced that the
16  quality of patient care was, in fact, better; and
17  that it was transparent data that the public could
18  go to the hospital and understand the quality of
19  patient care; and that there was evidence that they
20  were, actually, working to improve patient care.
21          I think this is a statement that, as I
22  see it now, is nothing more than aspiration.
23  BY MR. LYONS:
24    Q.    It's certainly an aspiration of every

Page 200

1  teaching hospital; isn't it?
2    A.    True.
3    MR. MARTIN: Object to form.
4  BY THE WITNESS:
5    A.    I think that is probably true.
6  BY MR. LYONS:
7    Q.    Okay. And it certainly would be included
8  in one of your values that you speak of in this
9  article; is that correct, as it relates to GME
10  experiences?
11    A.    Correct. I think the linkage between the
12  quality of patient care and the quality of physician
13  formation is very real.
14    Q.    Okay. And that's consistent with your
15  statement, in your article there, that the rules and
16  values have an equal place in physician formation;
17  is that correct?
18    A.    Yes, although they're not entirely
19  equal -- that values are enduring and rules are
20  ephemeral, and they're modified from time to time.
21    Q.    But they both have a place in the GME
22  experience?
23    A.    Right.
24    Q.    And this is also consistent with the fact

50 (Pages 197 to 200)

Page 201

1 that this common thread -- or one of the common
2 threads that runs throughout the six competencies --
3 is patient and patient care; is that correct?
4   A.   Correct.
5   Q.   And to the extent that this statement by
6 Brigham And Women's Hospital is aspirational, I
7 think you said that that aspiration would apply
8 equally to all teaching hospitals in this country;
9 is that correct?
10   A.   Correct.
11   Q.   Okay.  Now, we're going back to Henry
12 Ford.
13   A.   Back when I was a novice or an advanced
14 beginner?
15   Q.   Advanced beginner.
16       (WHEREUPON, a certain document was
17       marked Leach Deposition Exhibit
18       No. 10, for identification, as of
19       04-20-2007.)
20 BY THE WITNESS:
21   A.   Okay.  I haven't read the whole thing;
22 but you've taken me back 21 years.
23 BY MR. LYONS:
24   Q.   Yeah.  That's what I was going to ask

Page 202

1 you.
2   I see down here at the bottom it was
3 submitted for publication on October 20th, 1986.
4 And I assume it was published on November 25th of
5 1986.
6   A.   I think we're operating under the same
7 assumptions.  It was published in the Henry Ford
8 Hospital Medical Journal, Volume 34, No. 4, 1986.  I
9 don't know what month that was.
10   Q.   Okay.  All right.  I'm just trying to get
11 a time frame here.  Towards the end of '86, anyhow,
12 it was published?
13   A.   Right.
14   Q.   Was this a peer reviewed article?
15   A.   I think so.  The Henry Ford Hospital
16 Medical Journal was an in-house journal.  And I
17 actually don't know whether it ever achieved
18 recognition by Index Medicus.
19       It may have.  If so, it was peer
20 reviewed.  So I don't know if this particular
21 article was peer reviewed.
22   Q.   But probably?
23   A.   Probably.
24   Q.   Okay.  At the very top up there, it says,

Page 203

1 "The direct cost of GME is estimated to be
2 3 billion, which includes salaries and benefits for
3 house staff."
4       Okay.  Do you see that?
5   A.   I do.
6   Q.   These salaries and benefits for house
7 staff -- that you talk about there -- are these the
8 payments we're talking about?
9   A.   Correct.
10   Q.   Okay.  So you characterize them in 1986
11 as salaries, right?
12   A.   When I was a novice, I called them
13 salaries.
14   Q.   Maybe when you didn't care what you
15 called them?
16   MR. MARTIN:  Object to form.
17 BY MR. LYONS:
18   Q.   Okay.  But, anyhow, for whatever reason,
19 you called them salaries back in 1986?
20   A.   Correct.
21   Q.   Okay.
22   A.   Correct.
23   Q.   Now, let's go forward 12 years to 1997.
24       Is there any reason to believe that

Page 204

1 things change that would make these payments other
2 than salaries in 1997 when they were -- at least,
3 according to you -- salaries in 1986?
4   A.   I think, in that intervening period of
5 time, it became more important to be clear about
6 this issue.  Because of the previously mentioned
7 dynamics of shortened length of stays, more acutely
8 ill and severely ill patients, more technology and
9 knowledge, and reduced support staff, it could be
10 tempting to some hospitals to excessively rely on
11 residents for service.
12       And so it became very important to be
13 clear that that was taboo and not, in fact, the
14 purpose of a residency program.
15   Q.   That did, in fact, happen, though -- that
16 the hospitals used the residents as labor?
17   MR. MARTIN:  I'll object to form.  Are you
18 saying all hospitals, or some hospitals, or one
19 hospital, University Hospital?
20   MR. LYONS:  We're talking generally now.
21 BY MR. LYONS:
22   Q.   You mentioned --
23   A.   I don't know your definition of labor.  I
24 know that one of the ACGME institutional standards

51 (Pages 201 to 204)

Page 205

1  states that the educational goals of the program and
2  learning objectives of residents must not be
3  compromised by excessive reliance on residents to
4  fulfill institutional service obligations.
5  BY MR. LYONS:
6      Q.   That was written when?
7      A.   That was the reference we used earlier
8  this morning effective September 1998, Reference
9  Gentile 2.
10         And we do cite the programs.  Programs
11 that do that violate our standards.  We cite them.
12 We threaten to withdraw their accreditation if they
13 do that.
14     Q.   And my question to you, though, was that,
15 during this period from '86 to '97, that there were,
16 to your knowledge, hospitals that were using
17 residents in performing services that sometimes had
18 been performed by others -- other nonresident,
19 nondoctors -- is that correct?
20    MR. MARTIN:  Object to form.
21 BY THE WITNESS:
22     A.   The only way I could answer that -- I
23 think you're right.  But the only way I could answer
24 that with certainty is to look at how many

Page 206

1  institutions were cited for violating that standard.
2         Because if they did that, that would
3  violate the accreditation standard.
4  BY MR. LYONS:
5      Q.   But as you sit here today, with all of
6  the vast knowledge that you have, you know that that
7  happened, from time to time, at teaching hospitals;
8  is that correct?
9      A.   I know that, from time to time, we cite
10 programs who are violating that standard.
11     Q.   Okay.  So it goes on even today then?
12     A.   From time to time, even today we cite
13 programs if they violate that standard.
14     Q.   Okay.  My question is, you do, in fact,
15 cite them?
16     A.   Yes.
17     Q.   It happens?
18     A.   It happens.
19     Q.   Okay.  Down in the second paragraph
20 there, you state that -- you make four points in
21 this article.
22         First, only a fraction of the additional
23 costs of operating a teaching hospital is
24 attributable to teaching; and elimination of the

Page 207

1  teaching programs will not eliminate those costs.
2         Do you see that?
3      A.   Yes.
4      Q.   Okay.  Are you saying there that the GME
5  programs only added a small fraction to the
6  additional costs of being a teaching hospital?
7      A.   As an example the system I was working
8  with had a $2 billion budget.  And I don't know the
9  direct cost of the system at the time.
10        But it was a few to several -- probably,
11 double digits -- millions of dollars compared to
12 $2 billion.
13     Q.   But as I understand what you're saying
14 here, if you eliminate a GME program, you don't
15 eliminate those costs.  Do you see that?
16     A.   Correct.
17     Q.   And maybe I should ask you.  What did you
18 mean by that?
19     A.   As stated only a fraction of the
20 additional costs of operating a teaching hospital is
21 attributable to teaching.
22     Q.   Okay.  The rest -- sorry.
23     A.   And if you eliminated the teaching
24 programs in this system that I was working in -- in

Page 208

1  the journal that this was published in -- saw
2  2-and-a-half to 3 million outpatient visits a year.
3         If you eliminated the residency programs,
4  the cost of doing that would change in a minor way.
5      Q.   Okay.  Turn the page over to 264.  Do you
6  see that?
7         It's at the very top, the word, "Under --
8  under this system."  Do you see that?
9      A.   Yes.
10     Q.   Down at the bottom of the next paragraph,
11 "It is an act of faith," do you see that?
12     A.   Yes.
13     Q.   Okay.  The last sentence of that
14 paragraph says -- and I quote -- "The policy that is
15 adopted must recognize that most of the high costs
16 characteristic of great teaching hospitals have
17 little to do with teaching, and that elimination of
18 teaching programs can have little impact on reducing
19 those costs."
20         Do you see that?
21     A.   Yes.
22     Q.   So you're suggesting that the high costs
23 of a teaching hospital have little or no, nothing,
24 to do with the actual teaching; is that correct?

52 (Pages 205 to 208)

Page 209

1     A.   I think I'm referring to the 1983
2  Commonwealth Fund Report that is referenced earlier
3  in that section.
4     Q.   Mm-hmm.
5     A.   That points out that large urban teaching
6  hospitals tend to have higher costs for a variety of
7  reasons not related to teaching.
8          They tend to have a higher wage index.
9  They tend to see more indigent patients. They tend
10 to have more advanced technology, and need to have
11 more specialists of different types, and to have
12 them present more often.
13         And those things, which are inherent in
14 the cost of delivering patient care for that large
15 teaching hospital, are not inherently related to
16 teaching.
17    Q.   I think it's — maybe, today we could
18 call these the indirect costs?
19    A.   I think you probably would.
20    Q.   Okay. Over on page 265, you highlighted
21 down on the bottom there. It says, "Good
22 residents." Let me just read it into the record.
23    A.   Okay.
24    Q.   It's a quote from your article. It's on

Page 210

1  the other column there.
2          But, anyhow, it says, "Good residents are
3  good business for hospitals. Not only do they
4  provide better patient care, but also improve
5  marketing, conduct more cost-effective practice, and
6  contribute to efficient hospital management."
7          Do you see that?
8     A.   I do.
9     Q.   Okay. That statement was true when you
10 made it then?
11    A.   I did write that.
12    Q.   Was it true when you wrote it?
13    A.   I think that —
14    Q.   I think you can answer that, "yes," or,
15 "no."
16    MR. MARTIN: Objection. If he wants to answer
17 it, he should be allowed to answer it.
18    MR. LYONS: Well, he can say, "yes," or, "no,"
19 and then explain.
20    MR. MARTIN: Okay.
21 BY THE WITNESS:
22    A.   Given my novice status, given my
23 observations at the time, it was true.
24

Page 211

1  BY MR. LYONS:
2     Q.   It was what?
3     A.   True, yes, is the answer.
4     Q.   Okay. Is it true today?
5     A.   I think it is my observations are
6  broader. My scope is national. I've seen a lot of
7  things that I have not seen in 1986. And I would
8  write a different paragraph now.
9     Q.   The question I have, though, is, is that
10 statement true today?
11    A.   Not necessarily. It depends.
12         For example, the statement that, "Good
13 residents are good business," I think I was
14 referring to the fact that, if you attract talented
15 residents, the system is helped. If you attract
16 poor residents, the system is harmed. I think that
17 part is still true —
18    Q.   Today?
19    A.   — today. And that's true today.
20         I think the role of a residency
21 program — it has become more complex, because we
22 know so much more about the quality of patient care.
23 And we know about the system issues in patient care.
24         So I think you could have good residents

Page 212

1  in a dysfunctional system and actually not have it
2  be good for patient care.
3     Q.   How do good residents improve marketing?
4     A.   Patients can be attracted to a system
5  that has an explicit teaching mission.
6     MR. LYONS: Can we take a break for just one
7  second?
8          (WHEREUPON, a recess was had.)
9          (WHEREUPON, Mr. Thomas Gentile left
10         the deposition proceedings.)
11         (WHEREUPON, the record was read by
12         the reporter.)
13 BY MR. LYONS:
14    Q.   And teaching hospitals are not just
15 explicit — have an explicit, a sole, mission of
16 teaching, right?
17    A.   It's not a sole mission; but it needs to
18 be an explicit mission.
19    Q.   Okay. Obviously, they have a patient
20 care mission as well?
21    A.   Right.
22    Q.   Okay. And from an economic perspective,
23 that's the great majority of where the revenue is
24 generated is from their patient care?

53 (Pages 209 to 212)

**Page 213**

1      MR. MARTIN: Objection. Form.
2  BY MR. LYONS:
3      Q.   That was a, "yes"?
4      A.   Yes.
5      Q.   Okay. One thing that I did forget to ask
6  you. I asked you about the validity of that one
7  statement that I read into the record today. And
8  you indicated that you'd probably write it a little
9  differently.
10         What about 1997, which was 11 years
11  later? Would you have changed it at that point?
12      A.   I think -- and, again, this is my memory
13  from 21 years ago. I think the point that I was
14  trying to make is that, if you attract a good
15  resident as opposed to a bad resident -- i.e., if
16  your educational program is attractive to the very
17  best medical students so they come to your
18  program -- good things happen throughout the system,
19  because you've got talented people there.
20         If you've got a poor educational program
21  and attract poor medical students, bad things happen
22  to your system, because you have not gotten talented
23  people there.
24      Q.   Hard to market?

**Page 214**

1      A.   So, for example, you mentioned marketing.
2  And I would have used a different word for that.
3         But if a resident -- who is very smart
4  and very bright -- is sitting with a patient,
5  getting a history, and examining the patient, the
6  patient feels good because it's obvious this person
7  is bright and attentive.
8         If you've got somebody who is stupid and
9  doing that, the patient is not as competent in the
10  system. And so I think that was the point I was
11  trying to make.
12      Q.   Okay. What is the exhibit number on that
13  one?
14      A.   Exhibit 10, Leach 10.
15      Q.   Okay. We'll bring you up to -- a little
16  closer to current events here.
17      MR. LYONS: There's one for you and one for
18  him.
19             (WHEREUPON, a certain document was
20             marked Leach Deposition Exhibit
21             No. 11, for identification, as of
22             04-20-2007.)
23  BY MR. LYONS:
24      Q.   This is an article that you wrote, in

**Page 215**

1  December of 2000, for the academic medicine?
2      A.   Yes.
3      Q.   Is that a journal, a magazine?
4      A.   It's a journal.
5      Q.   Okay.
6      A.   It's a peer reviewed publication from the
7  Association of American Medical Colleges.
8      Q.   And this is a peer reviewed article?
9      A.   Yes.
10      Q.   Okay. And at this point in your career,
11  you're beyond that early stage where you might
12  regret some of the things you might have said?
13      A.   Oh, never.
14      Q.   I thought you never made a mistake.
15  Okay. All right.
16         Anyhow, over on the second page of this
17  2000 article -- right at the top of the page
18  there -- it says, "These behaviors," which, I
19  believe, is working too long. Is that what you have
20  reference to there?
21      A.   I was referencing the program
22  requirements in surgery which -- and the language is
23  graduate education in surgery requires a commitment
24  to continuity of patient care.

**Page 216**

1         "The continuity of care must take
2  precedence without regard to the time of day, the
3  day of the week, the number of hours already worked,
4  or on-call schedules. At the same time, patients
5  have a right to expect a healthy, alert,
6  responsible, responsive physician dedicated to
7  delivering affective and appropriate care.
8         The program director must establish an
9  environment that is optimal for both resident
10  education and for patient care while ensuring that
11  undo stress and fatigue among residents is avoided.
12  It is his or her responsible to ensure assignment of
13  appropriate in-hospital duty hours so that the
14  residents are not required to perform excessively
15  difficult or prolonged" --
16      Q.   I'd hate to interrupt you. But I don't
17  want you to read this whole thing into the record,
18  unless you feel it necessary. But certainly not for
19  me.
20      A.   All right. "These behaviors," and then
21  you're suggesting --
22      Q.   Maybe just read it to yourself.
23      A.   Okay. I was trying to answer your
24  question.

54 (Pages 213 to 216)

Page 217

1    Q.    Yeah.
2    A.    And the reference is in 1999. The
3    Surgery Residents Review Committee reviewed 69
4    surgery programs and cited 36 of those programs.
5         And so the behaviors are a violation of
6    these requirements and not just working too long?
7    Q.    Okay.
8    A.    That's my point.
9    Q.    Okay. That's fine. But it included
10   working too long, but others as well?
11   A.    Right.
12   Q.    Okay. But at any rate these behaviors
13   may reflect a lack of clarity about the purposes of
14   Graduate Medical Education.
15        And then you state, "I would propose that
16   the overriding purpose of GME is to improve patient
17   care." Do you see that?
18   A.    Yes.
19   Q.    So your view, in the year 2000, was that
20   the overriding purpose of GME is to improve patient
21   care; is that correct?
22   A.    By creating a fully trained physician
23   workforce.
24   Q.    Okay. And just so that we're clear, that

Page 218

1    statement that you believe the overriding purpose of
2    the GME is to improve patient care -- while it was
3    made in the year 2000 -- that certainly would have
4    been applicable in 2004 as well, right?
5    A.    Yes.
6    Q.    Okay. Now, in connection with this
7    article, just generally, one of your points -- it
8    looks like to me -- is that, once again, that one of
9    the ways in which this learning experience takes
10   place is through patient care; is that correct?
11   A.    That's correct.
12   Q.    Okay. And this patient care, if you
13   will, is done in ever increasing increments, in
14   terms of the complexity of the procedures, as one
15   goes through the training program; is that correct?
16   A.    Correct.
17   Q.    Okay. Now, at some point during a
18   particular resident's program, there comes a time
19   when they have done these procedures a sufficient
20   number of times and successfully where they can, in
21   fact, be credentialed for that particular procedure
22   in a hospital; is that correct?
23   A.    There's two parts to your question. The
24   credentialing for that procedure, at the particular

Page 219

1    hospital, may have other requirements -- such as
2    graduating from an ACGME-accredited program --
3    before they can be credentialed for anything.
4    Q.    Okay.
5    A.    Also, I think the number of procedures is
6    only one element of the part -- for example, the
7    Surgery Residents Review Committee limits the
8    numbers of procedures -- as well as requires a
9    minimum -- to make sure that the resident is not
10   being unduly relied upon to provide patient care.
11        And so the quality of the experience, as
12   well as the number of times people have participated
13   in it, are important.
14   Q.    You were aware, though, that there are
15   some programs who will allow their residents to
16   perform a particular procedure, or who will
17   credential a resident for a particular procedure, if
18   he is qualified to do that procedure prior to the
19   time he leaves the residency program.
20        You're aware of those situations?
21   A.    I can think of things like starting IVs
22   and things like that once you've done it a certain
23   amount of time. Some hospitals have credentialed
24   residents do things like that.

Page 220

1    Q.    And that would be in an unsupervised
2    setting, right?
3    A.    No. There's always supervision in the
4    setting. The level of supervision varies depending
5    on the experience of the resident.
6    Q.    Okay.
7    A.    So, for example, in the early period, you
8    are inches away from someone who knows what they're
9    doing.
10        And as you get more advanced in your
11   training, you're still supervised by them; but they
12   may not be inches away from you anymore,
13   Q.    A phone call away?
14   A.    Sometimes a phone call away, sometimes in
15   the operating room and scrubbed, but not
16   participating directly.
17   Q.    My point is that sometimes the attending
18   may not be physically present; is that correct?
19   A.    Correct.
20   Q.    Okay.
21   A.    It depends on the specialty, and it
22   depends on the circumstances.
23   Q.    Okay.
24   A.    But the resident is always supervised.

55 (Pages 217 to 220)

Page 221

1    Q.    Okay. Let me take it to one step
2    further.
3        In the fellowship situation, which you
4    had talked with Mr. Martin about, the fellow is
5    typically a -- no, "typically" -- but almost always
6    is an individual who has got a completion
7    certificate from a specialty, correct?
8    A.    Usually. Sometimes they have not yet
9    taken the examination. They're eligible for it and
10   frequently have achieved certification in the
11   primary specialty, yes.
12   Q.    But in order to get accepted into a
13   fellowship, you, first of all, have to have
14   completed some, quote, "specialty residency
15   program"?
16   A.    Yes.
17   Q.    Okay. So that would mean, then, that a
18   lot of fellows could, in fact, be board certified by
19   the time they begin the fellowship?
20   A.    Correct.
21   Q.    They also could, under the ACGME rules,
22   moonlight, right?
23   A.    Moonlighting exists. We have a lot of
24   cautions about it. And many programs prohibit it.

Page 222

1        We feel the educational program is a
2    full-time duty. And so we require that the program
3    director approve all moonlighting. We prohibit it
4    ever from being mandated. You cannot have mandatory
5    moonlighting.
6        Any moonlighting that is done in-house
7    must count for the resident duty hour regulations.
8    So we recognize the phenomenon. We put constraints
9    around it. But you're right. It does happen.
10   Q.    And so I'm clear, the ACGME does not
11   specifically prohibit it?
12   A.    No. We constrain it.
13   Q.    Okay.
14   A.    We prohibit mandatory moonlighting.
15   Q.    Fine. And so that would mean, in the
16   case of a fellow who is board certified and
17   licensed, he could use some of his fellowship
18   time -- if he so chose and was approved -- to go out
19   and practice medicine unsupervised?
20   A.    He could. That's correct. He could
21   practice medicine.
22       He could not -- for example, if he is a
23   cardiology fellow, he could not practice cardiology.
24   But he could practice general internal medicine.

Page 223

1    Q.    And, in fact, that happens quite often to
2    fellows; doesn't it?
3    A.    It happens. We actually don't know how
4    often it happens. It's impossible to monitor.
5    Q.    Does the ACGME have an interest in trying
6    to monitor it, or has it just given up?
7    A.    No.
8    MR. MARTIN: Object to the form.
9    BY MR. LYONS:
10   Q.    You can answer it.
11   A.    We do monitor it if it occurs in the
12   teaching hospital. And we require that it be
13   monitored so that it comes under the constraints of
14   our duty hours.
15       But it is a free world. And if you leave
16   that hospital, and go to a nonteaching hospital, and
17   work in an emergency room, we have no way of knowing
18   whether that's happening.
19   Q.    Even though you have to get approval,
20   before you do it, from the program director?
21   A.    Correct.
22   Q.    They may have the records, but you don't?
23   A.    Correct. When we do a site visit, we ask
24   to see those approval mechanisms. And they're in

Page 224

1    place or we cite them.
2        But we don't know that Resident "A"
3    worked one Saturday a month, and Resident "B" worked
4    two Sundays a month, or something like that.
5    Q.    Okay. While we're on this work hour
6    situation, let me go to the other end of the
7    spectrum.
8        Are you aware of any residency programs
9    where the resident would work less than 40 hours a
10   week?
11   MR. MARTIN: Object to the form.
12   BY THE WITNESS:
13   A.    I would not use the word, "work."
14   BY MR. LYONS:
15   Q.    All right.
16   A.    For all of the reasons stated, we used
17   the word, "duty." In fact, in your reference to the
18   much earlier institutional requirements where
19   language like, "employment," and, "work," exist, we
20   have now modified our language, in more recent
21   requirements, to make sure we're absolutely clear
22   about our position on this.
23       So using the word, "duty," there are
24   residency programs where the duty typically is the

56 (Pages 221 to 224)

Page 225

1  order of magnitude you've suggested, 40 hours or so.
2      Q.   Are you aware of any that are less than
3  40?
4      A.   I think that residencies vary by the
5  nature. So, for example, in a dermatology
6  residency -- which tends to be a daytime practice,
7  not a heavy in-patient load -- it's quite possible
8  to have direct patient contact during half-day
9  sessions five days a week, or something like that,
10  and have other didactic sessions or other sessions
11  in pathology.
12          And it's conceivable you'd be in the
13  realm of 40. I can't answer whether there's --
14      Q.   31 or --
15      A.   -- 39, or this one is 38, or something
16  like that.
17      Q.   Okay. But by and large, most of the
18  programs are in excess of 40?
19      A.   Correct.
20      Q.   Okay.
21      A.   I think our resident duty hour survey
22  would suggest that on average most programs are
23  around 60 hours of duty.
24      Q.   Yeah. There's a couple of them close to

Page 226

1  80. But you're right on average. I think you're
2  probably about right.
3      A.   Yes.
4      Q.   Once again, this duty hour/work hour,
5  whatever you want to call it --
6      A.   Duty hours.
7      Q.   We'll call it duty hours, fine. We have
8  a work environment. We have duty hours. Okay.
9      MR. MARTIN: I move to strike.
10  BY THE WITNESS:
11      A.   We no longer have a work environment.
12  BY MR. LYONS:
13      Q.   Okay. I'm talking about the ACGME
14  Essentials --
15      A.   Yeah, right.
16      Q.   -- that were in play during our period.
17      A.   Right.
18      Q.   The words, "work environment," was used,
19  right?
20      A.   In the 1998 requirements, the word, "work
21  environment," was used, correct -- words.
22      Q.   In 1999 and 2000?
23      A.   I think that's right.
24      Q.   Okay.

Page 227

1      A.   I would have to check. It is no longer
2  used.
3      Q.   Okay. Do you know when it went out?
4      A.   I don't. I would have to refresh my
5  memory by looking at every year sequentially.
6      Q.   Okay. Whether it was before or after
7  2004, you're just not sure?
8      A.   It was before 2004. It was out by July
9  of 2003. I don't know when before then it went out.
10      Q.   Okay. But it had been used in the past?
11      A.   Correct.
12          (WHEREUPON, a brief interruption was
13          had.)
14      MR. MARTIN: Excuse me. Can I have your
15  indulgence?
16      MR. LYONS: Sure.
17          (WHEREUPON, a recess was had.)
18  BY MR. LYONS:
19      Q.   Well, let me go back.
20          Anyhow, during this period of time --
21  maybe not for every year -- the ACGME used the terms
22  "duty hour, work hours, work environment."
23          We're all in agreement on that, right?
24      A.   Yes.

Page 228

1      Q.   Do you know whether the ACGME ever put in
2  writing anything about -- with respect to their
3  accredited programs -- anything that referred to
4  educational hours?
5          Specifically, has that ever been written
6  before as far as you know?
7      A.   It may have. It would require reviewing
8  the 300 pages into the curricular elements. There
9  are statements about the frequency of various
10  conferences, the frequency of rounding of different
11  types -- including educational rounds.
12          So it's possible that language exists.
13      Q.   But as you sit here today, without going
14  through all of this, you can't point me to anything
15  that uses the specific term, "educational hours"?
16      A.   Let me stall as I look through the
17  medicine program requirements.
18          Well, for example, again, I have not done
19  a thorough review. But teaching rounds must occur,
20  at least, for a minimum total of 4.5 hours per week.
21          There's a particular subsection of
22  educational activities known as teaching rounds; and
23  it has to be 4.5 hours a week. It does not say,
24  "educational hours."

Page 229

1  Q.  That's what I'm asking.
2  A.  Right.
3  Q.  Okay.  In your conversation with
4  Mr. Martin, you had talked about some of the reasons
5  why residents go into residency programs.
6       One of those reasons -- I'm not sure you
7  mentioned it.  I don't think you did.  But one of
8  those reasons would be so that they can become board
9  certified.  Would that be correct?
10  A.  That's correct.
11  Q.  Okay.  And you also indicated that you
12  didn't believe that a resident went into a residency
13  program to get a big salary?
14  A.  Yeah.  Correct.
15  Q.  Okay.  But what they do do is, they make
16  an investment in themselves so three years later
17  they can get a big salary; is that right?
18  A.  They make the investment so they can
19  practice independently.  Once graduated and
20  practicing independently, the salary ranges are
21  quite extreme.
22       And some physicians make a big salary and
23  some physicians make a modest salary; and, yet, the
24  various specialties attract residents preparing for

Page 230

1  all of those possibilities.
2       So I'm not -- I don't think you enter a
3  residency in order to make a big salary a few years
4  down the road.  If you were doing that, the lower
5  reimbursed specialties would not attract residents,
6  and they do.
7  Q.  But by accepting a lower -- or accepting
8  a low -- I think the term is, "low salary," you are,
9  in effect, investing in your future; is that
10  correct?
11  A.  Correct.
12  Q.  Okay.  Thank you.
13  MR. MARTIN:  Objection.  I don't think he used
14  the word, "salary," in his prior testimony.
15  MR. LYONS:  In 1986 he did.
16  MR. MARTIN:  Okay.  But you were referring to
17  his earlier testimony, at that point, when you used
18  the phrase, "salary."
19  MR. LYONS:  I don't care.
20  BY MR. LYONS:
21  Q.  Would you mind pulling out Exhibit 2.
22  Turn over to page 25.
23       By the way, this is the 1999-2000
24  Essentials; is that correct?

Page 231

1  A.  That's correct.
2  Q.  Okay.  Under B there, it says -- the
3  second sentence says -- "GME focuses on the
4  development of clinical skills and professional
5  competencies and on the acquisition of detailed
6  factual knowledge in a medical specialty."
7       Do you see that?
8  A.  I do.
9  Q.  And under this paradigm, the resident
10  gains, progressively, skills in competency and
11  knowledge as he goes through the residency program;
12  is that correct?
13  A.  Correct.
14  Q.  Okay.  Doesn't this, in many ways,
15  describe what goes on in any work environment --
16  particularly, a highly skilled work environment?
17  A.  And it includes the life-long learning of
18  physicians after they graduate from ACGME accredited
19  residency programs.
20  Q.  So your answer is, "yes"?
21  A.  Yes, in the sense that it is inherent in
22  any educational process, regardless of where along
23  the continuum, that you are developing skills and
24  competencies.

Page 232

1  Q.  Now, in our discussions of the focus of
2  the ACGME, its focus is primarily on the resident
3  and the residency programs; is that right?
4  A.  Its focus is on the residency program,
5  yeah, residency programs and the sponsoring
6  institution.
7  Q.  And the relationship the resident has to
8  the residency program?
9  A.  Our standards are program standards.
10  They're not resident standards.
11       But they do get into the relationship
12  between the program and the resident, yes.
13  Q.  So, obviously, the central player in all
14  of this is the resident, right?
15  A.  Yes.
16  Q.  Okay.  And the institutional requirements
17  and the program requirements are primarily directed
18  to the GME program, itself, as opposed to, say,
19  imposing requirements on the teaching hospital, for
20  example?
21  A.  The institutional requirements are
22  focused on the administrative support for all
23  educational programs.
24       And that does include putting a large

58 (Pages 229 to 232)

Page 233

1  number of requirements on whoever the sponsor is.
2  If the sponsor is a teaching hospital, it puts those
3  requirements on the hospital.
4      Q.  And those requirements are related to
5  making sure that it complies with the program
6  requirements that are required of the residency
7  program; is that correct?
8      A.  That's one element of it.  And then there
9  are other elements -- like the duties of the
10  Graduate Medical Education Committee -- that are not
11  directly related to the program requirements.
12      Q.  The sponsoring organizations also must
13  have these contracts with certain things in them,
14  right?
15      A.  The residency program has a -- the
16  institution creates the agreement.  And we hold the
17  details of that agreement.  We hold them accountable
18  for the details of the agreement as specified in our
19  institutional requirements.  And then it varies.
20      In some places the agreement is between
21  the resident and the institution; and in other
22  places it's between the program and the resident.
23      Q.  But just so that I'm clear on what the
24  ACGME believes the main focus here is, is it that

Page 234

1  the main focus here is on the training of the
2  resident; is that correct?
3      A.  Correct.
4      Q.  And in conjunction with that focus, it,
5  for example, requires these teaching hospitals to
6  make certain physical facilities available.
7      It requires them to have contracts with
8  the particular residents?
9      A.  Correct.
10      Q.  Okay.  The ACGME does not focus, in any
11  way, for example, on how the hospital should
12  operate?
13      A.  Correct.  Other than we do require that
14  the hospital demonstrate quality patient care as
15  measured by JACO or other entities that accredit the
16  quality of patient care.
17      Q.  But other than that, the requirements of
18  the ACGME don't deal with the operation, itself, of
19  the hospital?
20      A.  Correct.
21      Q.  Its focus is on the residency program and
22  the residents?
23      A.  Correct.
24      Q.  Okay.  Excuse my voice.

Page 235

1      It seemed to me, in listening to your
2  conversation with Mr. Martin this morning, that one
3  thing was for certain.
4      And that is that accreditation of a
5  particular program depends solely on meeting minimum
6  standards of the ACGME; is that correct?
7      A.  That's correct.
8      Q.  So that's what it means to be accredited?
9  It is that you have met the certain minimum
10  standards?
11      A.  Correct.
12      (WHEREUPON, a certain document was
13      marked Leach Deposition Exhibit
14      No. 12, for identification, as of
15      04-20-2007.)
16  BY MR. LYONS:
17      Q.  Okay.  Have you seen this before?
18      A.  I have.
19      Q.  Okay.  Did you review it?
20      A.  I saw it once.  It was posted on the
21  Website, I think.
22      Q.  You didn't have anything to do with
23  drafting it?
24      A.  Not directly, no.

Page 236

1      Q.  Did you ever review it before it was
2  published?
3      A.  I don't know that I did.  Susan Swing is
4  the Director of Research and Education for the
5  ACGME.  Christine Taylor was a summer student who
6  worked with her to develop this.  And they did it
7  and posted it on the Website.
8      And I saw it then.  But I can't remember
9  whether -- it wasn't presented to me for approval or
10  anything.  But Susan Swing works for me, so...
11      Q.  Okay.  At the time that you read it, was
12  there anything in there that you thought was
13  incorrect, inaccurate?
14      A.  I don't think so.
15      Q.  Okay.  By the way, "Outcome Project," is
16  this a project in connection with the six
17  competencies?
18      A.  Yes.  In September of 1997, the ACGME
19  committed to using Educational Outcomes as an
20  accreditation tool.
21      That commitment is expressed in this
22  long-term outcome project of which the competencies
23  are derivative.
24      Q.  Okay.  And this was published, I

59 (Pages 233 to 236)

Page 237

1 believe -- let me see if there is a date on this.
2       Do you have a date? Maybe you could help
3 me out as to about when it would have been
4 published.
5    A.  I think Christine Taylor worked with
6 Susan, maybe, around 2004, in that range.  And this
7 work would have been --
8    Q.  Right around that time?
9    A.  Right.
10    Q.  So probably towards the end of the period
11 we're talking about in this case?
12    A.  Correct.
13    Q.  Okay.  Turn over to -- well, the only
14 marking on it is 033-1495.
15    A.  Okay.
16    Q.  It's got a paragraph 3 there.
17    A.  Yes.
18    Q.  And then it's got two bullet points.
19    A.  Yes.
20    Q.  The first bullet point says -- and I
21 quote -- "Much of residency education occurs as
22 residents are performing patient care activities in
23 the same setting where professional practice will
24 occur."

Page 238

1       Do you see that?
2    A.  Yes.
3    Q.  Is that an accurate statement?
4    A.  Yes.
5    Q.  Okay.  Then in the very next bullet point
6 there, they point out -- I'll quote -- "Learning
7 opportunities provided through lectures,
8 conferences, and independent reading are not as
9 close to, quote, 'real life,' close quote, as the
10 experiential learning that takes place in the
11 clinical setting."
12       Do you see that?
13    A.  I do.
14    Q.  Okay.  Do you agree with that statement?
15    A.  I do.
16    Q.  Okay.  Putting it into plain English,
17 would it be fair to say that, while didactic
18 training is necessary, that, in order to get the
19 real experience of a GME, you need to get into the
20 clinical setting.
21       Would that be fair?
22    A.  I agree.
23    Q.  Okay.  And since this was written at the
24 end of our period, would these statements that we

Page 239

1 just talked about here -- these two bullet points --
2 would they be applicable as well for the years 1997
3 through 2003?
4    A.  Yes.
5    Q.  Okay.
6       (WHEREUPON, a certain document was
7       marked Leach Deposition Exhibit
8       No. 13, for identification, as of
9       04-20-2007.)
10 BY MR. LYONS:
11    Q.  Have you seen that before, Exhibit 13?
12    A.  It's a Power-Point slide on an ACGME
13 template.  It may be part of a Power-Point
14 presentation under the "Outcomes Project" section of
15 the ACGME Website.  But I'm not certain.
16    Q.  I think that you're absolutely correct.
17 That's, at least, the way it was given to us by
18 Mr. Martin.  That appeared to be the case.  This
19 came out of some documents that he produced to us.
20       At any rate, what I'm most interested in
21 is what it says here.  And this is a summary of what
22 the ACGME feels is the best way to implement the six
23 competencies?
24    A.  It's part of a -- slide is entitled,

Page 240

1 "Summary."  I think that implementing the six
2 competencies is much more complex than this, but
3 this is part of a summary.
4    Q.  Okay.  And it says here that they list
5 two major goals.  One, "Develop competence as a
6 physician," and, two, "Improve patient care."  Is
7 that true?
8    A.  Correct.  It says, "The major goals of
9 the Outcome Project are: One, develop competence as
10 a physician, and, two, improve patient care."
11    Q.  And the, "Outcome Project," is how do we
12 implement the six competencies?
13    A.  How do we use educational outcomes as an
14 accreditation tool and, as part of that,
15 deconstructing physician competence into six
16 competencies and measuring and improving those
17 competencies.
18       So this goal would be served by assessing
19 and advancing the quality of resident education
20 through accreditation and through these
21 competencies.  The goal is to improve the
22 preparation of physicians and, thereby, improve
23 patient care.
24    Q.  You use the word, "preparation."  She

Page 241

1  used -- or somebody used the word, "competence." I
2  guess they're interchangeable.
3      A.    We do not think of a physician as
4  competent until they've completed residency. And I
5  think these are compatible statements.
6          "Develop competence as a physician; i.e.,
7  residents upon graduation are competent. And,
8  thereby, because their training has been improved,
9  patient care will be improved when they go into
10 practice."
11     Q.    And I think your last statement there to
12 me really reflects the interrelationship between the
13 patient care and what the program requirements are;
14 is that correct?
15     A.    Yes. I think that's correct.
16     Q.    Okay.
17     A.    Through our activities, we improve
18 patient care by assessing and advancing the quality
19 of resident education through accreditation.
20     Q.    And that improvement process along the
21 way, if you will, takes place -- at least, in
22 part -- through the patient care that we talked
23 about; is that correct?
24     A.    Correct. Correct.

Page 242

1          (WHEREUPON, a certain document was
2           marked Leach Deposition Exhibit
3           No. 14, for identification, as of
4           04-20-2007.)
5  BY MR. LYONS:
6      Q.    Before you read that article, let me just
7  ask you a couple of preliminary questions.
8          Is the New England Journal of Medicine a
9  peer-reviewed journal?
10     A.    It is.
11     Q.    So the articles that would appear in
12 there would be peer reviewed?
13     A.    Correct.
14     Q.    It's a well-respected medical journal?
15     A.    Opinion varies; but, in general, that's
16 true.
17     Q.    Okay. Have you ever seen what's been
18 marked as Exhibit 14?
19     A.    I saw it in the journal, itself. It has
20 a little different form now. I assume the words are
21 the same.
22     Q.    This is the way it was given to us.
23     A.    Right.
24     Q.    Have you read this article before?

Page 243

1      A.    I have some time ago; but I have read it
2  before, yes.
3      Q.    Okay. Let me just direct you to a couple
4  of the passages I want to talk about. On the first
5  one, it would be page 34-0003.
6      A.    Okay.
7      Q.    Okay. By the way, are you familiar with
8  any of the physicians who wrote -- well, they're not
9  all physicians -- but the physicians who wrote this
10 article? I guess, all but two of them are.
11     A.    I know Molly Cooke. I know Dave Irby. I
12 know Ken Ludmerer. I know of -- but don't know --
13 William Sullivan.
14     Q.    Well-respected in their fields?
15     A.    Yes.
16     Q.    Okay. Over there on page 3, under the
17 third paragraph, in that, "Learning Medicine as
18 Professional Education," do you see that?
19     A.    I do.
20     Q.    It starts off with, "Responsibility." Do
21 you see that?
22     A.    I do.
23     Q.    It says -- and I quote -- "Responsibility
24 for the care of patients is a powerful stimulus for

Page 244

1  learning." Do you see that?
2      A.    I do.
3      Q.    Okay. Do you agree with that statement?
4      A.    Yes. I interpret it as anticipating the
5  day when I will be independently responsible for
6  care of patients.
7          And knowing what a heavy burden that is,
8  I really would like to learn how to take care of
9  patients.
10     Q.    And as we've said so many times, one way
11 that you learn how to do that is through patient
12 care?
13     A.    Right.
14     Q.    As a matter of fact, that statement has
15 probably been true through the inception of
16 residency programs; isn't it?
17     A.    And before.
18     Q.    And before. Okay. Later on, in that
19 same paragraph, the authors state -- and I quote --
20 "Given that every patient deserves the best possible
21 care, we are challenged to provide appropriate
22 opportunities for experiential learning and practice
23 while meeting the service demands of teaching
24 hospitals."

61 (Pages 241 to 244)

Page 245

1    Do you see that?
2    A.  I do.
3    Q.  Okay.  Do you believe that statement to
4 be true?
5    A.  Yes.  Just to be clear, this is
6 experience — "experiential learning," not
7 experimental learning.
8    Q.  Did I mispronounce it?
9    A.  I think you said, "experiential," but
10 there was a little stumble.  And I just want to make
11 sure it's recorded.
12    Q.  Okay.  All right.  But with that little
13 change?
14    A.  Right.
15    Q.  Okay.  So if I understand all of this,
16 it's that the service demands with a teaching
17 hospital have to be taken into consideration in
18 developing any GME program; is that what they're
19 saying?
20    MR. MARTIN:  Object to form.
21 BY THE WITNESS:
22    A.  I do not interpret it that way.  Given
23 that every patient deserves the best possible care,
24 we are challenged to provide appropriate

Page 246

1 opportunities for experiential learning and practice
2 while meeting the service demands of teaching
3 hospitals.  And the sentence is unclear, because I
4 haven't pulled it out of context, whether it refers
5 to the faculty.  I assume it does.
6    So I assume this is a sentence about the
7 needs of the faculty to see patients and the needs
8 of the faculty to be present and teach residents.
9 And parsing out their time may be challenging.
10 That's one possible interpretation of this.
11 BY MR. LYONS:
12    Q.  There is a balancing act between the
13 service needs of the hospital and the
14 experiential --
15    A.  Right.  Correct.
16    Q.  -- learning and practice --
17    A.  Correct.
18    Q.  -- of the residents?
19    A.  Right.
20    Q.  Okay.  Well, that's how I read it, too.
21    Over on -- let me see.  Okay.  Let's see.
22 On page 04 — the second paragraph in, "Preparing
23 Physicians for the 21st Century" — the second
24 paragraph there, would you mind just reading that to

Page 247

1 yourself.
2    A.  Just to be clear, "The acquisition of
3 skills"?
4    Q.  Yeah.  Yeah.  I'm sorry.
5    A.  Okay.  Okay.
6    Q.  Okay.  Is what they are stating here --
7 and, perhaps, it's stated much more succinctly by
8 yourself and the testimony here today.
9    But is really what they're saying here is
10 that the essence of a successful residency program,
11 and the challenges of a successful residency
12 program, is to provide residents an environment
13 where they can learn how to provide good patient
14 care without putting patients at risk in service to
15 education?  Would that be fair?
16    MR. MARTIN:  Objection to form.
17 BY THE WITNESS:
18    A.  Yes.
19 BY MR. LYONS:
20    Q.  Okay.
21    A.  I think.  And toward the end of the
22 paragraph, it references simulation and other
23 opportunities to practice skills remote from direct
24 patient care.

Page 248

1    Q.  But my summary of that is accurate in
2 your view?
3    A.  Yes.
4    MR. MARTIN:  Of what the authors are saying?
5    MR. LYONS:  No.  No.  My summary of what the
6 author is saying.
7 BY MR. LYONS:
8    Q.  And I think your -- I think, Doctor, if I
9 heard you correctly, that you agreed with what I
10 said.  Did I hear that correctly?
11    MR. CARLSON:  We're sufficiently removed in
12 time.  Perhaps, the reporter might repeat it.
13    (WHEREUPON, the record was read by
14    the reporter.)
15 BY THE WITNESS:
16    A.  So there was a little -- I heard you say,
17 "without putting patients at risk in service of
18 education."
19 BY MR. LYONS:
20    Q.  Yes.
21    A.  And she read, "without putting patients
22 at risk and service of education."
23
24

62 (Pages 245 to 248)

Page 249

```
 1        So I would agree with your statement
 2  using, "in," in that paragraph.
 3     Q.  Okay.
 4     A.  Okay.
 5     Q.  And that's what I did say.
 6     A.  Right.
 7     Q.  Over on page 05, "Finding the Will to
 8  Change."
 9     A.  Yes.
10     Q.  Okay.  And the second paragraph there
11  starts, "Reform of the process"?
12     A.  Yes.
13     Q.  Okay.  Then, in the third sentence there,
14  they say, "Long-term preceptorships or
15  apprenticeships are being reestablished to ensure
16  adequate observation, supervision, and mentoring of
17  trainees."
18        Do you see that?
19     A.  I do.
20     Q.  He indicates that preceptorships or
21  apprenticeships are being reestablished.
22        Had, at some point in time, they gone out
23  and come back?  Is that what he's referring to?
24     A.  No.  I think the sentence refers to
```

Page 250

```
 1  medical students rather than residents.
 2        So the previous sentence says, "Some
 3  schools are developing clerkships that no longer
 4  focus solely on departmental inpatient services, but
 5  instead include interdisciplinary approaches to the
 6  teaching of inpatient and outpatient care.
 7  Long-term preceptorships or apprenticeships are
 8  being established."
 9        So, in other words, typically, a
10  medical-student rotation is a sequence of
11  experiences that are disconnected.  And they claim
12  that some medical schools are establishing long-term
13  preceptor or apprentice relationships with a mentor
14  that cut through the various rotations through
15  medical school.
16     Q.  The reason I thought, perhaps, he
17  referred to residencies is, he used the word,
18  "trainees."  And I've never heard that word used in
19  reference to medical students.
20     A.  Given the previous sentence, I would
21  interpret it as referring to medical students.
22     Q.  Okay.  Okay.  You had mentioned earlier,
23  I believe, the Commonwealth Fund?
24     A.  Yes.
```

Page 251

```
 1     Q.  A 1982 report, I believe?
 2     A.  Yes.
 3     Q.  Okay.  What is the Commonwealth Fund?
 4     A.  I don't really know.  I think it's a
 5  foundation.  And it commissions studies done on
 6  various phenomena in society that go beyond
 7  medicine, but also include medicine.
 8     Q.  Okay.  Are you familiar with the report
 9  of the Commonwealth Fund Task Force on Academic
10  Health Centers in April of 2002?
11     A.  I know of it.  I don't know it.  So I
12  can't say I'm familiar with it.  But I know of it.
13     Q.  Well, let's see if we can explore that a
14  little bit.
15        (WHEREUPON, a certain document was
16          marked Leach Deposition Exhibit
17          No. 15, for identification, as of
18          04-20-2007.)
19  BY MR. LYONS:
20     Q.  Have you seen this report before?
21     A.  Not really.  I've seen the title and the
22  document, but I haven't really read it in detail.
23     Q.  Okay.  Let me see if we can go through
24  this and make some sense out of it.
```

Page 252

```
 1        It's a document that was produced to us
 2  by Mr. Martin.
 3     MR. MARTIN:  Excuse me.  But didn't I produce
 4  the whole document, and you've only produced part of
 5  it?
 6     MR. LYONS:  It was about 400 pages, as I
 7  recall.
 8     MR. MARTIN:  Okay.
 9     MR. LYONS:  That's why we didn't copy the
10  whole thing.  I'm not going to ask him about the
11  other --
12     MR. MARTIN:  I would object to questions,
13  unless you give him the whole document.
14     MR. LYONS:  That's fine.
15  BY MR. LYONS:
16     Q.  Anyhow, on page what's Bates Stamped
17  15 --
18     A.  Yes.
19     Q.  -- down there at the bottom, under,
20  "Findings" --
21     A.  Yes.
22     Q.  -- would you mind just reading that
23  paragraph, the introduction, and then the first
24  four.
```

63 (Pages 249 to 252)

Page 253

1     MR. CARLSON: To himself?
2     MR. LYONS: Yeah. Just to himself.
3     MR. CARLSON: Okay.
4  BY THE WITNESS:
5     A.   Okay.
6  BY MR. LYONS:
7     Q.   Okay. First of all, "AHC," is Academic
8  Health Center?
9     A.   Yes.
10    Q.   Okay. The fourth finding there says --
11 and I quote -- "The clinical environment within AHCs
12 is widely perceived as unresponsive to medical
13 education."
14         Do you see that?
15    A.   It's, "unreceptive," I think.
16    Q.   What did I say?
17    A.   "Unresponsive."
18    Q.   You're right, "unreceptive." I stand
19 corrected. Thank you.
20         Now, an academic health center is what?
21    A.   They define it, I think, as medical
22 schools and their closely affiliated hospitals and
23 physician groups in Paragraph 1.
24    Q.   Yes. Okay. And that would include

Page 254

1  things like teaching hospitals?
2     A.   Yes.
3     Q.   Okay. Now, they're finding there that
4  the clinical environment -- within these academic
5  health centers -- is widely perceived as unreceptive
6  to medical education.
7         Do you hold that same perception?
8     A.   There have been challenges as the
9  clinical delivery patterns have changed.
10         So, for example, as mentioned earlier,
11 the hospital length of stays have shortened and the
12 patients in the hospital tend to be very sick and of
13 a particular type.
14         A lot of patient care has shifted to
15 various ambulatory sites.
16    Q.   By that, you mean, like, clinics?
17    A.   Like clinics.
18    Q.   Okay.
19    A.   And there the time is even more
20 constrained. So patients, if they're in the
21 hospital for two weeks, may be willing to have
22 medical students and residents sit and talk with
23 them.
24         They're less willing if the parking meter

Page 255

1  is ticking and they've got to be somewhere else in a
2  half an hour. So the interface between the clinical
3  delivery system and the educational mission is more
4  challenged now than it used to be.
5     Q.   Perhaps, even disconnected somewhat?
6     A.   No. I don't think it's disconnected.
7  And I would disagree with the word, "unreceptive."
8  I think it's more of a challenge that academic
9  health centers are trying to wrestle with.
10    Q.   But there is this problem out there?
11    A.   Correct.
12    Q.   Here is another part of the report.
13         (WHEREUPON, a certain document was
14         marked Leach Deposition Exhibit
15         No. 16, for identification, as of
16         04-20-2007.)
17 BY MR. LYONS:
18    Q.   This is just some more pages that fall
19 right behind the previous page.
20    MR. CARLSON: It's from the same document?
21    MR. LYONS: The same document, yeah. I just
22 split them up.
23 BY THE WITNESS:
24    A.   Okay.

Page 256

1  BY MR. LYONS:
2     Q.   Okay. Turn to that last page, which is
3  page 24. By the way, this report was in April of
4  2002, I believe, right?
5     A.   The title page is dated April of 2002.
6     Q.   Okay.
7     MR. MARTIN: I'd have the same objection,
8  unless you give him the rest of the report.
9     MR. LYONS: Okay.
10    MR. CARLSON: I'm sorry. Are you asking him
11 to focus on a particular element?
12 BY MR. LYONS:
13    Q.   Yeah. The last paragraph on page 24.
14 Just read it to yourself, if you don't mind.
15    A.   Okay.
16    Q.   Okay. In that paragraph, the authors
17 state that there's been a dramatic increase in the
18 number of residents over the last four years, and
19 that there have been any reasons for that increase.
20 One of which was the reliance of hospitals on
21 residents as a source of labor.
22         Do you see that?
23    MR. MARTIN: Object to form.
24 BY THE WITNESS:

64 (Pages 253 to 256)

Page 257

1    Q.   First, I think you said, "four years,"
2  and the article says, "forty years."
3  BY MR. LYONS:
4    Q.   I meant to say, "forty."
5    A.   Right. And then there is, in the second
6  sentence, "Among the many reasons for this growth
7  are the growth in the UME enterprise, the increasing
8  complexity of medical care requiring longer periods
9  of medical training, the increased reliance of
10  hospitals on residents as a source of labor,
11  Medicare program incentives that encourage hospitals
12  to increase the size of GME programs, the lack of a
13  single national organization with the power to
14  control the overall size of the GME enterprise, and
15  an influx of graduates from foreign medical schools
16  to U.S. residency programs."
17    Q.   The question I had for you was that, out
18  of the many reasons why -- over the last forty
19  years -- the GME programs have expanded -- maybe
20  expediently -- one of the reasons was the
21  increased reliance of hospitals on residents as a
22  source of labor?
23    MR. MARTIN:  Are you asking if that's true or
24  if that's what the article said?

Page 258

1  BY MR. LYONS:
2    Q.   The first question I have for you is,
3  that's what the article says, correct?
4    A.   That is what the article says.
5    Q.   Okay. Do you agree with that statement?
6    A.   No, I don't.
7    Q.   Why is that?
8    A.   Because it's not true.
9    Q.   Well, tell me why it's not true.
10    A.   Residents are not a source of labor.
11  They're students, and they're in an organized
12  educational program.
13         Even if you considered them a source of
14  labor, they're an inefficient source of labor. They
15  are not fully trained. It would be very dangerous
16  to have them function in that capacity. So I don't
17  agree with that at all.
18    Q.   Of course, if the labor that they're
19  talking about is something other than performing
20  services as a doctor -- for example, at some lower
21  level, less skilled -- that they might be competent
22  to do, right?
23    A.   Not really. For example, we have
24  standards that hospitals have to have phlebotomists,

Page 259

1  and IV teams -- and other things that involve
2  labor -- taking care of patients.
3         And once you've seen a resident sort of
4  muck around trying to get an IV started and compared
5  that to an IV tech who can do it blindfolded, you
6  would never go back and use that resident as a
7  source of labor.
8    Q.   How about pushing a patient down a
9  hallway on a stretcher?
10    A.   We also have standards that require the
11  sponsoring institution to have transportation
12  services and messenger services for the same
13  reason -- that residents are not a good source of
14  labor even for these tasks. That's not their
15  function.
16    Q.   You've never heard anecdotal stories that
17  it happens?
18    A.   I've been training and pushed all kinds
19  of carts around all kinds of places. But the ACGME
20  has now required standards that prohibit that. And
21  they've done it to preserve the primary educational
22  mission of residents.
23    Q.   Saying not to do it and not doing it are
24  two different things, now, right?

Page 260

1    A.   Well, we monitor for it. And if we
2  detect it, we cite programs for that.
3    Q.   Okay. Fair enough.
4         Are you familiar with a group called The
5  Blue Ridge Academic Health Group?
6    A.   Not directly. I've heard of them. But I
7  don't know who they are or what they actually do.
8    Q.   Have you ever read anything they've
9  written?
10    A.   No. I've heard they've produced a
11  report, but I have not read it.
12    Q.   Okay. We'll give you the opportunity.
13    A.   Thank you.
14    MR. LYONS:  17?
15    THE REPORTER:  Yes.
16         (WHEREUPON, a certain document was
17          marked Leach Deposition Exhibit
18          No. 17, for identification, as of
19          04-20-2007.)
20    MR. MARTIN:  Is this the entire report, do you
21  know, Steve?
22    MR. LYONS:  I don't know.
23  BY THE WITNESS:
24    A.   The index goes through to page 28, and

65 (Pages 257 to 260)

Page 261

1  the document goes through page 13.
2      MR. LYONS: No, it's not.
3      MR. MARTIN: I would object to the use of the
4  document, unless you give him the full document --
5  particularly, since he hasn't seen it before.
6  BY MR. LYONS:
7      Q.  You said you had not seen this document
8  before?
9      A.  Correct.
10     Q.  Okay. I want to direct your attention to
11 page 95, which is page 8 of the report.
12     A.  Yes.
13     Q.  Over on the left hand column, the second
14 paragraph starting with the UME.
15     A.  Yes.
16     Q.  "UME," is Undergraduate Medical
17 Education?
18     A.  Correct.
19     Q.  Just read that.
20     A.  To myself?
21     Q.  Yeah, please.
22     A.  Okay.
23     Q.  They state in there that -- and I
24 quote -- "The many years of clinical exposure and

Page 262

1  training, from internship through residency and
2  fellowship, are taught and supervised largely by
3  faculty and residents who have little or no formal
4  training or skill development as educators."
5      Do you see that?
6      A.  I do.
7      Q.  Do you agree with that statement?
8      A.  Underline, "formal training," yes. They
9  don't -- they're not graduates. They don't have
10 degrees of education.
11     They are physicians, and they do teach by
12 habit. But they have not had formal training as a
13 rule in education.
14     Q.  Okay. So with that caveat or that
15 qualification, then, you would agree with that
16 statement?
17     A.  Right.
18     Q.  Okay. On that same page -- and, by the
19 way, this article was written in May of 2003; is
20 that correct?
21     A.  That's the date on the title page.
22     Q.  Okay. Just read to yourself that last
23 sentence right before the topic, "The New Medical
24 Marketplace."

Page 263

1      A.  Okay.
2      Q.  Do you agree with that statement?
3      A.  Yes. It's a metaphor using a magnetic
4  pole as an attractor. And board certification is a
5  major milestone that concludes the Graduate Medical
6  Education Phase of physician training. And so it is
7  a goal.
8      Q.  If I could be so bold, what it means to
9  me, I think, is that board certification is one of
10 the major reasons why you would go through
11 undergraduate and postgraduate medicine?
12     MR. MARTIN: Object to form.
13 BY THE WITNESS:
14     A.  Board certification is one of the
15 elements needed to practice independently in most
16 hospitals. Most hospital credentialing committees
17 look for that.
18     And so, again, that's one of the
19 elements — along with licensure and
20 credentialing -- that enables you to practice
21 independently, all three of which require graduation
22 from an ACGME-accredited program.
23 BY MR. LYONS:
24     Q.  We kind of left out the osteopaths in

Page 264

1  this equation; haven't we?
2      A.  Right. There is a council on
3  postgraduate -- they call it postgraduate education
4  just to be confusing. That's a Council on
5  Postgraduate Medical Education developed by the
6  American Osteopathic Association that is analogous
7  to the ACGME.
8      Q.  Their physicians as well are also
9  eligible to do the same thing as the allopathic
10 physicians, correct?
11     A.  In general, yes. They do have their own
12 boards. So an osteopath who graduates from an
13 osteopathic school and completes an osteopathic
14 residency may not sit for an ABMS board. But they
15 can sit for the osteopathic boards.
16     Q.  And vice versa, I suppose?
17     A.  Correct. The allopaths cannot take the
18 osteopath boards unless they've had one year of
19 training in an osteopathic hospital.
20     Q.  Sounds like the two sides don't like each
21 other.
22     MR. MARTIN: Object to form.
23     MR. CARLSON: Is that a question?
24     MR. LYONS: No. It's a comment only.

66 (Pages 261 to 264)

Page 265

1     Exhibit 18.
2          (WHEREUPON, a certain document was
3          marked Leach Deposition Exhibit
4          No. 18, for identification, as of
5          04-20-2007.)
6  BY MR. LYONS:
7     Q.   This is an AMA article. Have you ever
8  seen it?
9     A.   I don't believe I have. I know one of
10  the authors, Carlos Pellegrini.
11    Q.   Would this be a peer-reviewed article?
12    A.   This looks like it comes from the
13  archives of surgery, which is a peer-reviewed
14  journal.
15    Q.   Okay. This is the only document. This
16  will be a short one.
17         Just take a quick look to yourself at
18  that first paragraph.
19    A.   Okay.
20    Q.   He refers to junior residents as
21  apprentice surgeons.
22         Do you see that in the second sentence?
23    A.   I do.
24    Q.   Is that an accurate description of a

Page 266

1  junior resident?
2     MR. MARTIN: Objection. Form.
3  BY MR. LYONS:
4     Q.   You can answer.
5     A.   It's not clear what he means by a junior
6  resident. He's referring to an earlier time.
7  Halsted was the Chair of Surgery at Hopkins and
8  developed a system for surgical education.
9         And in those times this may have been
10  true. I think, now, surgical training is five
11  years. I don't know what the reference to,
12  "junior," means. I think it's much broader than
13  being an apprentice.
14         So, no, I guess I don't agree with this
15  statement as applying it currently. I agree with it
16  as a historical reference.
17    Q.   "Halstedian," is, what? Early 1900s?
18    A.   Yes.
19    Q.   Okay. Now, your view is that,
20  "apprentice," is too narrow of a term for --
21    A.   Yes.
22    Q.   -- residents?
23    A.   Correct.
24    Q.   It would include the concept of

Page 267

1  apprenticeship, but it's broader?
2     MR. MARTIN: Well, objection to form.
3  BY MR. LYONS:
4     Q.   You can answer.
5     A.   Correct.
6     Q.   Turn over to page 126, which is, I think,
7  234 on this thing.
8     A.   Okay.
9     Q.   Right there it says -- right there --
10  right before the, "Conclusions" -- it says, "What
11  About Education?"
12    A.   Yes.
13    Q.   Just read the first three or four
14  sentences of that, please.
15    A.   Okay.
16    Q.   Okay. That quote there is from a 2003
17  article, I believe, The American Journal of Surgery?
18    A.   I think the -- quote one -- yes, the
19  "American Journal of Surgery, 2003," correct.
20    Q.   And the quote says -- and I quote -- "The
21  hallmark of this experience" -- which is a graduate
22  surgical education in the United States -- "is a
23  commitment to patient care without regard to time,
24  day of the week, hours worked, or on-call schedule.

Page 268

1  It is the patient's welfare that comes first," close
2  quote.
3         Do you agree with that statement?
4     A.   Yes. And, now, I think it takes some
5  clarification on patient care.
6         I care for my wife 24 hours a day. I'm
7  not with her right now, but I'm still caring for
8  her. And I think that that spirit is the same in
9  this quote -- that thinking about, caring about, the
10  patient has no boundaries. It does not mean that
11  you're sitting next to the patient for 24 hours.
12    Q.   But it would include the concept of
13  delivering some form of patient care as well as
14  caring for the patient?
15    MR. MARTIN: Objection. Form.
16  BY THE WITNESS:
17    A.   It would include some direct patient
18  contact, as well as caring for the patient.
19  BY MR. LYONS:
20    Q.   Okay.
21    A.   You may or may not be interested in
22  knowing that Halsted, who was a brilliant surgeon at
23  Hopkins, was, also, a cocaine addict. And some
24  people feel his work ethic was helped by some

67 (Pages 265 to 268)

Page 269

1 stimulants that others did not take.
2       So we've all been living in a
3 cocaine-free world ever since trying to live up to
4 his standards. Osler treated him. That's not part
5 of this deposition.
6    Q.   Okay. At any rate that statement that we
7 just looked at would be equally applicable to the
8 years '97 through 2002?
9    A.   Yes. In the spirit in which I've
10 interpreted it?
11   Q.   Yes.
12   A.   Yes.
13   Q.   Now, in a document that has been filed by
14 Mr. Martin with the Court, he has listed -- among
15 other people -- yourself as a person who will be
16 giving opinion testimony in this case.
17       First of all, are you aware of that?
18   A.   Yes. I've received a subpoena. And I
19 think I'm listed as an expert.
20   MR. CARLSON: May I make a statement?
21   MR. LYONS: Sure.
22   MR. CARLSON: I received, from one of your
23 colleagues, a copy of a document which he referred.
24       And after it was filed, I have drawn

Page 270

1 Dr. Leach's attention to it. And that's how his
2 attention was brought to it.
3 BY MR. LYONS:
4    Q.   At any rate, the document states that you
5 will be called. It doesn't say, "expert."
6       It just says, "You will be called to give
7 testimony under certain sections of the rules of
8 evidence."
9       And my sense is, from what your counsel
10 is telling me here today, that you would have seen
11 that document?
12   A.   I have not seen it.
13   Q.   Oh, you have not seen it?
14   A.   I have not seen it. Mr. Carlson informed
15 me --
16   MR. CARLSON: I drew his attention to it.
17 BY MR. LYONS:
18   Q.   Okay. But you haven't had a chance to
19 read it?
20   A.   It wasn't given to me to read.
21   Q.   Okay.
22   A.   So I haven't seen the document.
23   Q.   Oh, I see. Your counsel just told you --
24   A.   Right.

Page 271

1    Q.   -- that there is this document, which
2 you've never seen?
3    A.   Right.
4    MR. MARTIN: And I think I've said, in that
5 document, that University Hospital has not retained
6 Dr. Leach as an expert in this case.
7    MR. LYONS: That's not my question.
8 BY MR. LYONS:
9    Q.   So you're aware that you have been listed
10 as a witness who will give opinion testimony, but
11 you've just never seen that document?
12   A.   I have not seen the document.
13   MR. MARTIN: First of all, I don't think I say
14 that in that disclosure, Steve.
15       I'm looking at it right here. Maybe I'm
16 missing it.
17   MR. LYONS: Let's go back to the very
18 beginning.
19   MR. MARTIN: I'll read it to you.
20   MR. LYONS: Let's just keep all of this off
21 the record for the time being.
22       (WHEREUPON, a recess was had.)
23 BY MR. LYONS:
24   Q.   While we were off the record, we have

Page 272

1 established that Mr. Martin has listed you as a
2 person who will give testimony under Sections 702,
3 4, and 5 of the Rules of Evidence.
4       And he's listed you as someone who may
5 testify -- not, "will" -- may testify, under those
6 provisions, and -- I'm sorry -- you may give opinion
7 testimony under those provisions.
8       And my understanding, Dr. Leach, is that,
9 at this point in time, you've never read that
10 document?
11   A.   That's correct.
12   Q.   You've been informed of its existence?
13   A.   Correct.
14   Q.   Okay. As we sit here today, have you
15 formed any opinions that you might be giving in
16 regard to that disclosure to us?
17   MR. MARTIN: Other than the ones he's already
18 given today?
19 BY THE WITNESS:
20   A.   Help me understand --
21   MR. CARLSON: Let me see if I can. Let me
22 make another statement.
23       He's formed no opinions in preparation
24 for this case or this testimony.

68 (Pages 269 to 272)

Page 273

1      MR. LYONS:  Okay.
2      MR. CARLSON:  Any opinions he may have
3  articulated today, he held before he received any
4  subpoena.
5      And he may or may not have testified to
6  them today -- or about them, or in an opinion-like
7  manner, depending on what the court says, today.  I
8  hope that's helpful.
9      MR. LYONS:  Okay.
10  BY MR. LYONS:
11      Q.  Maybe this would be a way to clear it up.
12      I'm sensing that, from what you're saying
13  here, you've had no discussions with any lawyers in
14  this case about what opinions you might give at a
15  trial in this case; is that fair?
16      A.  I've had discussions with both counsels,
17  and my own, about just the basic phenomenon that I
18  would be deposed.
19      And I don't know what words you used,
20  because, "opinion," means something special for you.
21  And from my point of view, as a nonlawyer physician,
22  I have been deeply interested in and committed to
23  Graduate Medical Education.
24      I have thought, as my organization has,

Page 274

1  of residents as students.  And I wanted to bring
2  clarity to the case.
3      And by design I was not interested in
4  receiving compensation for that or in framing my
5  remarks to serve either side of the case.  I just
6  wanted to get the truth out as I saw it based on my
7  experience.
8      Q.  Okay.  But to go back to my question for
9  a moment, you've had -- and let me just limit this
10  to things that you might say at trial as opposed to
11  depositions.
12      You've had no discussions with any
13  lawyers in this case about what your opinions might
14  be at trial?
15      A.  No.
16      Q.  Okay.  And the view that you hold that
17  residents are students -- you would agree, would you
18  not -- that there is some disagreement with that
19  view?
20      MR. MARTIN:  Object to form.
21  BY MR. LYONS:
22      Q.  NLRV, for example.
23      A.  There's disagreement with NLRV in,
24  itself.  In 1979 it ruled they were students.  And

Page 275

1  in 1999 it ruled they were both students and
2  employees.
3      Q.  The most recent one, in the legal system,
4  counts the most, though; doesn't it?
5      MR. MARTIN:  Objection.  You're asking him to
6  make a call, now, on precedential value.
7      MR. LYONS:  But, anyhow --
8      MR. MARTIN:  Please, let's move forward on
9  this depo.  Let's not ask him legal questions.
10  BY MR. LYONS:
11      Q.  My only point to you, Doctor, is this.
12  You have a view -- and you say the ACGME has a
13  view -- that medical residents are students?
14      A.  Correct.
15      Q.  That view is not shared by everyone; is
16  that correct?
17      A.  I assume that to be true.
18      Q.  Okay.  Earlier this morning -- it seems
19  like a long time ago -- you talked about the Dreyfus
20  Model?
21      A.  Dreyfus, yes.
22      Q.  "Dreyfus"?
23      A.  Yes, D-r-e-y-f-u-s.
24      Q.  Okay.  And this is a model that the ACGME

Page 276

1  has adopted?
2      A.  Not in a formal way.  It's a very useful
3  model that we use and program directors use in
4  thinking about the continuum of education.
5      Q.  Okay.  There are other models out there
6  that deal with the same subject, correct?
7      A.  Correct.
8      Q.  Were those other models considered?
9      A.  They all are, and they continue to be
10  considered.  They're useful constructs to understand
11  the phenomena of acquisition of skills.
12      Q.  What are some of the other models that --
13  is it you've used them, or you've considered using
14  them and you've disposed of them?
15      A.  No.  No.  We use them, and we use them in
16  our thinking.  We just haven't had -- the Board of
17  Directors has not had a formal vote to accept the
18  Dreyfus Model or not.
19      Q.  Okay.
20      A.  But we use them all of the time.
21      Q.  Okay.
22      A.  Another model might be Millers where you
23  know, and know how, and you show, which is a
24  continuum of experience.

69 (Pages 273 to 276)

DAVID C. LEACH, M.D., APRIL 20, 200

Page 277

1       But we have actually found the Dreyfus
2  Model more gets at the nubbin of physician education
3  in a way that the others don't. We don't reject the
4  others. We just find this particularly useful.
5       Q.   Okay. Now, when a resident finishes his
6  training, he receives a certificate of completion,
7  assuming that he successfully completes it?
8       A.   Not necessarily. Most programs do that.
9  It's done at the program level.
10      What is required is a letter to the
11  certifying board in which the program director
12  attests that the resident is competent, and meets
13  professional standards, and should be eligible for
14  the exam.
15      Q.   So some of them don't even receive a
16  certificate of completion?
17      A.   Correct.
18      Q.   They don't receive any kind of formal
19  medical degree like -- I mean, a degree like you
20  would from medical school?
21      MR. MARTIN: Objection. Form. Are you
22  talking University Hospital or someplace else?
23      MR. LYONS: I'm talking about generally first.
24  BY THE WITNESS:

Page 278

1       A.   As I said, many programs give a
2  certificate.
3  BY MR. LYONS:
4       Q.   Yes.
5       A.   And residents have this on their wall
6  subsequently. What is required by ACGME is this
7  letter to the boards.
8       MR. LYONS: Okay. Let me just take a quick
9  moment, and talk with my colleagues, and see if
10  we're done.
11      (WHEREUPON, a recess was had.)
12  BY MR. LYONS:
13      Q.   Just a couple of follow-up questions.
14      Right there at the very end, before we
15  broke, you had mentioned that it was both yours and
16  the ACGME's view that medical residents were
17  students. Do you recall that?
18      A.   Yes.
19      Q.   Okay. And that view is expressed based
20  solely from the perspective of the ACGME; is that
21  correct?
22      A.   Yes.
23      Q.   You don't mean to make any judgment from
24  a tax perspective; is that correct?

Page 279

1       A.   No, none.
2       Q.   Okay. You also mentioned Mr. -- is it --
3  Dreyfus?
4       A.   Dreyfus, yes.
5       Q.   Who is Mr. Dreyfus?
6       A.   Hubert Dreyfus is a professor of
7  philosophy at the University of California,
8  Berkeley.
9       Q.   He is or was?
10      A.   "Is." He is in his 80s. He spoke at one
11  of our conferences last September. He's this tall,
12  (indicating), wears cardigan sweaters. He couldn't
13  be anything but a philosopher. And he's a wonderful
14  teacher.
15      He has a brother, Stuart, also, at U.C.
16  Berkeley in the mathematics department. And the two
17  of them have written a book called, "On the
18  Internet," in which this continuum of education is
19  outlined in Chapter 3.
20      Q.   Okay. Now, is the model that you spoke
21  of -- is this what you might call an economic model,
22  or is it just a, quote, "model"?
23      A.   No. It's not an economic model. It's a
24  theoretical construct about how skills are acquired.

Page 280

1       Q.   Okay.
2       A.   And he's used the model for how you learn
3  how to drive a car, fly an airplane, play chess,
4  learn a foreign language.
5       And we have stolen that model from him
6  and applied it to medicine with his consent and
7  blessing; hence, he came to speak to our group.
8       Q.   And Mr. Miller -- he is in the same
9  situation?
10      A.   Yes.
11      Q.   I assume it's Mr. Miller.
12      A.   Yes. I don't know if he's alive, and I
13  don't know where he is. But that's correct.
14      Q.   He --
15      A.   It's called, "Millers Pyramid." If
16  you're doing a search on it, look up, "Millers
17  Pyramid." And it will reference you to the work.
18      Q.   This, once again, is the acquired skills
19  theory?
20      A.   Correct. Correct.
21      Q.   We had talked earlier about conversations
22  that you and I had and conversations that you and
23  Mr. Martin had, I suppose, in the presence of
24  Mr. Carlson.

Page 281

1    How many conversations did you have with
2 Mr. Martin; do you recall?
3    A.    I had lunch with Mr. Martin once; and
4 then I had a subsequent conversation about a month
5 ago. I've had one conversation with you over the
6 phone.
7    Q.    That lasted about 20 minutes, right?
8    A.    Right.
9    MR. CARLSON: Well, actually, it was about 45.
10 I had my watch on.
11    MR. LYONS: That's what you billed him, right?
12 We're going to get him in trouble.
13 BY THE WITNESS:
14    A.    He cares for me 24 hours a day.
15 BY MR. LYONS:
16    Q.    I assume that your luncheon engagement
17 with Mr. Martin was here in town?
18    A.    It was.
19    Q.    Do you recall about how long that
20 discussion lasted?
21    A.    An hour to an hour-and-a-half, I would
22 say.
23    Q.    And then the second conversation was on
24 the phone?

Page 282

1    A.    No. He was here. And it lasted, maybe,
2 two to three hours, something like that.
3    Q.    And that was when?
4    A.    About a month ago.
5    Q.    And then the luncheon was before that?
6    A.    Correct.
7    Q.    Okay. During the course of all of those
8 discussions, did you ever talk about the possibility
9 that you might be giving these opinions in court?
10    A.    See. I don't know what you mean by,
11 "opinions."
12    Q.    Okay.
13    A.    When I talked with you, the first words
14 out of your mouth were, "Tell me why you think
15 residents are students," or something like that.
16    And I told you because they are, and
17 because they're national standards, and because of
18 our requirements, and so on, and so on. If that
19 meant that we were having a conversation about me
20 giving an opinion, then the answer would be, yes.
21    Nobody has asked me to come to trial. I
22 was subpoenaed to give this deposition. And I
23 assume the testimony will appear before the Court.
24    Q.    Okay.

Page 283

1    A.    So I'm a little confused about opinion
2 versus sort of expressing my lay of -- not, "lay
3 opinion" -- but my opinion as the head of the ACGME
4 on the topic versus expressing a formal opinion as
5 an expert in court. I don't understand the
6 distinction between those two.
7    Q.    I'll leave it at that.
8    During this, what, four-and-a-half or
9 five hours of conversation with Mr. Martin, over
10 these two meetings -- was that about five hours,
11 four-and-a-half?
12    A.    Probably, an hour-and-a-half and two to
13 three hours. So I would say three-and-a-half to
14 four-and-a-half hours, something like that.
15    Q.    Was there ever any discussion, during the
16 course of those two conversations, about Mr. Gentile
17 and his testimony?
18    A.    Never. I have not seen Mr. Gentile's
19 testimony.
20    The reference was made that he was one of
21 the witnesses in the case; and that he described me
22 as a giant in the field, which I thought was a
23 little hyperbole.
24    Q.    That was Mr. Martin's suggestion?

Page 284

1    A.    Is that right?
2    Q.    That's where the first idea came from.
3 But, anyhow, I digressed.
4    But you've never seen his testimony?
5    A.    No.
6    Q.    Did you talk about it with Mr. Martin in
7 your discussions?
8    A.    No, not other than what I said.
9    Q.    How about Mr. Nicholson? The same thing?
10    A.    I didn't know, until you've just now
11 mentioned it. And I assume this is Dan Nicholson?
12    Q.    No.
13    A.    So I don't even know.
14    Q.    You don't even know. Obviously, that was
15 not discussed.
16    A.    There is a Dan Nicholson you might want
17 to talk to.
18    Q.    Thanks for the hint.
19    All right. Now, I think in one of the
20 duties that you have as Executive Director is, you
21 go and you talk to residents, at least, from time to
22 time, if not a lot; is that right?
23    A.    Correct.
24    Q.    Okay. I take it that in these -- what

71 (Pages 281 to 284)

DAVID C. LEACH, M.D., APRIL 20, 200

## Page 285

1 are they -- speeches, discussion groups?
2    A.   Just to be clear, they are not site
3 visits. I'm not making accreditation site visits
4 when I go into a place.
5        I'm there to do two things -- to listen
6 deeply to what the residents, what the faculty, what
7 the DIO, what the people that are in the program
8 want to tell me; and then I usually will give a
9 speech of some sort updating them on the ACGME's
10 opinion about this or that -- where we are with
11 competencies, where we are with duty hours, and so
12 on.
13    Q.   Okay. So you do have discussions with
14 residents, from time to time, at these sites -- not
15 "sites" -- at the times in which you go to these
16 places?
17    A.   Correct. Correct.
18    Q.   Do you ever have any of these residents
19 tell you that they're students?
20    A.   Well, they know that they're students.
21 They're in there to become a completely trained
22 physician.
23    Q.   Do they ever tell you that, that they're
24 students?

## Page 286

1    A.   Yes.
2    Q.   Use that very word?
3    A.   Yes.
4    Q.   Okay. Now, when a medical student
5 graduates -- gets his M.D. -- he's called a doctor,
6 right?
7    A.   Correct.
8    Q.   Okay. When he steps into the hospital to
9 begin his residency, he's called a doctor, right?
10    A.   Correct.
11    Q.   Okay. The patients call him, "Dr."?
12    A.   Yes.
13    Q.   Okay. The attendings call him, "Dr."?
14    A.   Yes.
15    Q.   The little nametags on his lab coat says,
16 "Dr.," right?
17    A.   It does.
18    Q.   The name on the lab coat of the medical
19 student says, "Medical Student," right?
20    A.   Technically, the name on the resident's
21 says, "Dr. So and So, Resident."
22    Q.   Yeah.
23    A.   Whereas, the medical student has the name
24 and, "Medical Student."

## Page 287

1    Q.   Okay. Now, when does that doctor become
2 a physician?
3    A.   They become a competent physician able to
4 practice independently at the end of the ACGME
5 residency program and upon graduation from that.
6    Q.   Before then they're just a physician, not
7 a competent physician?
8    A.   Correct.
9    Q.   Okay. One follow-up question. Who is
10 Dan Nicholson?
11    A.   Dan Nicholson is the -- he's sort of a
12 lobbyist almost for the Cleveland Clinic. He lives
13 in Washington.
14        But if you call him, he picks up his
15 phone and says, "Cleveland Clinic." He is sort of a
16 national resource for, particularly, the financing
17 of Graduate Medical Education. But he pays
18 attention to all of the laws as they're being
19 developed.
20        And he doesn't really lobby to try and
21 persuade the law to be different. But he informs
22 the Cleveland Clinic of a variety of legislative
23 events -- some that deal with education and some
24 that don't -- that he feels would impact the

## Page 288

1 functioning of the Cleveland Clinic.
2        He speaks at many of the groups like OMNI
3 and the Association of Hospital Medical Educators.
4 So that's what he was. I've been out of that loop
5 for ten years. So I don't know what he's doing now.
6 He may well be retired. That's who Dan Nicholson
7 is.
8    MR. LYONS: I don't have anything further
9 right now.
10        FURTHER EXAMINATION
11 BY MR. MARTIN:
12    Q.   When do they become -- you were just
13 asked a series of questions about timing.
14        When do physicians become licensed
15 physicians?
16    A.   It varies from state to state. They can
17 apply for license as soon as -- in some states,
18 after one year -- after completing one year of
19 training in an ACGME residency and after having the
20 other things -- these national boarded medical
21 examiners' exams, and the graduating from medical
22 school, and so on.
23        Now, if they do that, then they're
24 licensed. Others require two years and, in some

72 (Pages 285 to 288)

Page 289

1 cases, three years. And for international
2 graduates, in most cases, three years. They needn't
3 apply -- it is, in fact, one of the things the
4 program director will do will be to sort of pay
5 attention to that, because it's not unheard of to
6 graduate from residency and not have a license. And
7 so then you have to scramble to get a license. And
8 it takes some time to do that.
9        So it's variable. But they have to have
10 a license to practice independently. So they must
11 have a license after they graduate from residency.
12 They frequently do. But they don't have to have a
13 license to practice during residency.
14    Q.   You were asked some questions about what
15 are people called in terms of about being called,
16 "Dr."
17        Do you recall what the word doctor means
18 from Latin?
19    A.   DocEre, which is to teach.
20    Q.   Switching subjects -- thank you.
21        Switching subject for a second, do you --
22 let's talk about -- there were a lot of questions
23 hours ago about the number of site visits. And
24 there were also some questions about how large of a

Page 290

1 staff that you have.
2    A.   Yes.
3    Q.   Do you have an adequate-sized staff to do
4 the site visits that are necessary for the
5 accreditation process?
6    A.   Yes.
7    Q.   How do you do that? Do you use
8 volunteers?
9    A.   No. These are paid employees. We train
10 them. We have 35 dedicated site visitors.
11 Probably, three-quarters of them are physicians and
12 one-quarter are Ph.D.s.
13        And we put them through an extensive
14 training program. And then they -- analogous to a
15 residency, they, then, go out on site visits with
16 experienced site visitors, and observe, and
17 eventually do a site visit on their own, and write
18 their own report -- which is critiqued by the
19 experienced site visitor.
20        And then we consider them able to go out
21 on their own.
22    Q.   Switching subjects -- this is just a
23 series of follow-up questions. So it's going to
24 skip around. I apologize for that.

Page 291

1        You were asked some questions by
2 Mr. Lyons about the evolution over time -- about the
3 robustness of GME programs?
4    A.   Right.
5    Q.   Over the last 40 years, has Graduate
6 Medical Education become more robust or less robust
7 in terms of the educational component?
8    A.   More robust. There are more
9 requirements. They are more detailed. They focus
10 on competencies and assessments.
11        The evaluation tools for residents, now,
12 typically include a 360-degree evaluation of where
13 nurses, and patients, and medical students, and peer
14 residents contribute to the evaluation -- as well as
15 the attending -- focus direct observation of
16 resident skills where somebody who knows what
17 they're doing directly observes the
18 resident -- while they examine the heart or do
19 whatever they're doing -- portfolios where the
20 experiences residents have are tracked, as well as
21 annual -- and sometimes more frequent -- cognitive
22 exams, including oral exams.
23        So all of those evaluation mechanisms
24 have evolved over the last forty years. Forty years

Page 292

1 ago it was whatever your attending thought of you.
2 They said, "Good to go," or, "not," and you would
3 get some cognitive test. But these other things you
4 would not have.
5        And then, while it's not universal,
6 increasingly simulation is being used to evaluate
7 residents in a more formal way. So I would say it's
8 more robust.
9    Q.   I'm going to switch topics, again,
10 because these are just follow-up questions. There
11 were some questions about the cost that teaching
12 hospitals incur in teaching residents.
13        As you're sitting here today, are you
14 prepared to testify about whether or not teaching
15 hospitals make money or lose money on the teaching
16 of residents or what the costs are today for those
17 programs?
18    A.   I think it's a wash. I mean, I'm not --
19 you'd have to ask the finance people. But when I
20 was a DIO and looking after 800 residents, the
21 direct reimbursements that our system got pretty
22 much covered the stipend and direct costs -- like
23 having a library and so on.
24        The indirect costs covered the added

73 (Pages 289 to 292)

Page 293

1  expense of being in an urban hospital with a lot of
2  technology, and so on, because this was a large
3  inner city teaching hospital.
4       So I think, if all of the residents went
5  away, and the library went away, and all of those
6  direct educational expenses, and the direct
7  reimbursements went away, you would still have
8  indigent patients, high technology, and so on.
9       So I think it is, no. I don't think
10 anybody makes money with the educational
11 reimbursement system.
12      And, in fact, our requirements every year
13 require that institutions do more and more to
14 protect the educational programs. And every year
15 reimbursement goes down and down. And they still do
16 it, because they're committed to the educational
17 mission. They don't do it to make money.
18      Q.   There were a lot of questions about one
19 of the missions or functions of Graduate Medical
20 Education as improving patient care.
21      And can you explain what the relationship
22 is between educating residents and improving patient
23 care and whether or not there is a time lag on there
24 or not?

Page 294

1      A.   All right. Well, it's a reciprocal
2  relationship. So, first, I think you need good
3  patient care to have good education.
4       But I also think good education does
5  improve patient care. And it does it in several
6  ways.
7       One -- with the longest sort of time
8  lag -- is that it prepares a mature workforce of
9  physicians completely trained who will be better
10 doctors for the next 30 or 40 years. That improves
11 patient care.
12      On a shorter time frame, I think that,
13 whenever you have bright learners around asking
14 questions about, "Why are we doing this, what does
15 this mean," and you have faculty who have to teach
16 them in a formal way, you end up having more
17 conversations about the particular patient and
18 patients in general.
19      And so, if I'm the only doctor in a
20 Community Hospital, and I see you, and I have an
21 opinion about you, and I do something, that's
22 patient care. If I now have go back and, under
23 critical review, defend my thoughts and my plan to
24 others who are experts in the field, it will

Page 295

1  enhance. It has the potential and frequently does
2  enhance the quality of care.
3       Because in preparing for that critical
4  review, I've made my thinking a little more crisp.
5  And in having my observations stand up -- under
6  scrutiny of others -- in an open educational
7  program, the product is better than it would be just
8  on my own.
9       MR. MARTIN:  That's all.
10      MR. LYONS:  I've just got a couple of really
11 quick follow-ups.
12          FURTHER EXAMINATION
13 BY MR. LYONS:
14      Q.   You indicated that a resident may go
15 through an entire residency without actually being
16 licensed, correct?
17      A.   Correct.
18      Q.   Okay. But he must get some kind of
19 provisional license, right?
20      A.   Yes. And it varies from state to state.
21 Sometimes there's an institutional license, and
22 other times there are provisional license
23 constraints -- or a restricted license as a trainee.
24      Q.   But every resident has to have some form

Page 296

1  of a licensure?
2      A.   Well, they may be covered under an
3  institutional license.
4      Q.   Okay. But they would be licensed under
5  that institution's license?
6      A.   Under the institutional, right. It
7  requires no action on their part. And the State
8  doesn't necessarily review the individual
9  credentials. It's an institutional license.
10      Q.   And in other instances, they actually get
11 a provisional license from the State?
12      A.   Correct. Right.
13      Q.   Okay. In talking about this idea that
14 maybe medical residency programs break even, you're
15 not suggesting to us here that you're an economist
16 or a finance guy, right?
17      A.   I'm not.
18      Q.   Okay. You don't have any expertise along
19 those lines?
20      A.   No.
21      Q.   Okay. Would it be fair to say that your
22 statement that they break even was a guess?
23      A.   I think it's more than a guess, because
24 for 13 years I was the designated institutional

74 (Pages 293 to 296)

DAVID C. LEACH, M.D.,  APRIL 20, 2007

Page 297

1   official at the Henry Ford Health System, which had
2   several residency programs and about 800 residents.
3        And so I've seen it in my conversations.
4   I would go to the Board of Trustees, and so on,
5   asking for resources. And we would talk about
6   economic things. And the Chief Financial Officer of
7   the system explained to me a little bit about the
8   reimbursement system.
9        So it's more than a guess; but I'm not
10  holding myself up as any kind of expert.
11      Q.   Okay. In your discussion here just a
12  moment ago with Mr. Martin, you mentioned a
13  reimbursement of direct expenses; do you recall
14  that?
15      A.   Yes.
16      Q.   Okay. There are other reimbursements for
17  Graduate Medical Education other than direct
18  expenses, correct?
19      A.   Again, my understanding is naive. But I
20  think there are indirect medical education
21  reimbursements designed to cover the added cost of
22  being a complex teaching hospital.
23      Q.   Medicaid?
24      A.   I think, in some states, Medicaid pays

Page 298

1   something. There are some states where I think it
2   doesn't. And there's some states where it doesn't
3   pay very much.
4        I think children's hospitals are
5   vulnerable. There are some HMOs that pay some token
6   amount. But, in general, they don't. And most
7   third-party insurance companies don't pay at all.
8        Again, the ACGME standards require that
9   there be adequate resources available. And we don't
10  care about the source of the revenue. That's up to
11  the hospital to work out. We just make sure it's
12  there.
13      Q.   The hospital has to make sure the
14  financial resources are there?
15      A.   Correct.
16      Q.   At the very last part of your discussion
17  here with Mr. Martin, you had mentioned that the
18  patient care and the learning experience go hand in
19  hand?
20      A.   Yes.
21      Q.   Okay. Would it be fair to say that the
22  patient care and the learning experience are not
23  incident to one another, but they're all just part
24  and parcel of the same package?

Page 299

1      A.   I think that, in my comments to
2   Mr. Martin, I reference the benefit of having
3   critical conversations about a patient. And I think
4   that's true. And I think it does enhance patient
5   care to do that.
6        I think there are many ways of learning.
7   And they're not just one thing, because you also
8   need didactic sessions.
9        You need, in my opinion, simulated
10  encounters. You need a lot of other things besides
11  direct contact with patients, although direct
12  contact with patients is essential.
13      Q.   And let me just follow up with that. I
14  guess, I thought that was my question; but maybe it
15  didn't turn out that way.
16      But, anyhow, because the interdependence
17  of the patient care, the learning experience,
18  neither one is incident to the other; would you
19  agree?
20      MR. MARTIN:  Object to form.
21  BY THE WITNESS:
22      A.   What is, "incident"?
23  BY MR. LYONS:
24      Q.   One of them would dominate over the other

Page 300

1   one? They're both linked together.
2      A.   They're linked together.
3      Q.   They're inseparable?
4      A.   Well, it's not uncommon, in teaching
5   hospitals, to have wards that are so-called
6   nonteaching wards where there's no connection with
7   the formal educational program. Patients are just
8   cared for there.
9      Q.   I'm just talking about the GME situation.
10     A.   Right.
11     MR. CARLSON:  He was about to go into the
12  other wards.
13  BY THE WITNESS:
14     A.   So, in the other wards, they are linked,
15  yes. Absolutely.
16  BY MR. LYONS:
17     Q.   Let me see if I -- in the GME experience
18  that we're talking about here in this case, the
19  patient care and the learning seem to be
20  inseparable.
21      For example, you can't have the learning
22  without the patient care; is that right?
23     A.   That's correct.
24     Q.   Okay. So in that sense, they're

75 (Pages 297 to 300)

DAVID C. LEACH, M.D., APRIL 20, 200

## Page 301

1  inseparable?
2      A.   Correct. I think learning is more than
3  patient care. But they're inseparable.
4      Q.   Okay. So, from that standpoint, because
5  they are inseparable, you couldn't say that one was
6  incident to the other?
7      MR. MARTIN: Object to form.
8  BY MR. LYONS:
9      Q.   You can answer.
10     A.   From our point of view, when we look at a
11  program, we look through the lens of educators. And
12  one is -- I mean, everything is contingent on high
13  quality patient care.
14         But you can have high quality patient
15  care and a crappy educational program. You cannot
16  have bad patient care and a good educational
17  program.
18     MR. LYONS: Okay. That's it. I'm done.
19  We're done. Thank you.
20     THE WITNESS: Thank you very much.
21     THE REPORTER: Signature?
22     MR. CARLSON: No waiver. We'll read it. But
23  we'll turn it around expeditiously.
24         FURTHER DEPONENT SAITH NOT.

## Page 302

1         IN THE UNITED STATES DISTRICT COURT
2            SOUTHERN DISTRICT OF OHIO
3                WESTERN DIVISION
4  UNITED STATES OF AMERICA,    )
5         Plaintiff,       )
6         vs.            ) No. 1:05-CV-445
7  UNIVERSITY HOSPITAL, INC.    )
8         Defendant.      )
9
10         I hereby certify that I have read the
11  foregoing transcript of my deposition given at the
12  time and place aforesaid, consisting of Pages 1 to
13  301, inclusive, and I do again subscribe and make
14  oath that the same is a true, correct and complete
15  transcript of my deposition so given as aforesaid,
16  and includes changes, if any, so made by me.
17
18              DAVID C. LEACH, M.D.
19  SUBSCRIBED AND SWORN TO before me
20  this     day of        , A.D. 2007.
21
22     Notary Public
23
24

## Page 303

1  STATE OF ILLINOIS )
2              ) SS:
3  COUNTY OF COOK   )
4         I, JENNIFER L. BERNIER, a Notary Public
5  within and for the County of Cook State of Illinois,
6  and a Certified Shorthand Reporter of said state, do
7  hereby certify:
8         That previous to the commencement of
9  the examination of the witness, the witness was
10  duly sworn to testify the whole truth concerning
11  the matters herein;
12         That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction and constitutes a true record
16  of the testimony given and the proceedings had;
17         That the said deposition was taken
18  before me at the time and place specified;
19         That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24         IN WITNESS WHEREOF, I do hereunto set

## Page 304

1  my hand and affix my seal of office at Chicago,
2  Illinois, this 24th day of April, 2007.
3
4
5         Notary Public, Cook County,
6         Illinois.
7         My commission expires June 17, 2008
8
9
10  C.S.R. Certificate No. 84-4190
11
12
13
14
15
16
17
18
19
20
21
22
23
24

76 (Pages 301 to 304)